**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**UNITED STATES OF AMERICA,**                       :
                                                    :
      **- v. –**                                    :          **11-CR-663 (AT)**
                                                    :
**JOMO WILLIAMS,**                                  :
                                                    :
                   *Defendant*.                     :
-------------------------------------------------------------X



## DEFENDANT JOMO WILLIAMS' MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO VACATE ALL CONVICTIONS DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL



John Meringolo, Esq**.**
Meringolo & Associates, P.C.
375 Greenwich Street, 7th Floor
New York, New York 10013
 (212) 941-2077
*Attorneys for Defendant Jomo Williams*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………….. ii

INTRODUCTION ........................................................................................................ 1

PERTINENT FACTUAL BACKGROUND ................................................................ 1

MR. WILLIAMS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHICH WARRANTS THAT HIS CONVICTIONS BE VACATED ........................................ 10

MR. WILLIAMS' TRIAL COUNSEL DENIED HIM THE OPPORTUNITY TO PARTICIPATE IN JURY SELECTION ..................................................................... 12

MR. WILLIAMS' TRIAL COUNSEL FAILED TO TIMELY RAISE THE ISSUE OF UNDUE INFLUENCE ON AND INTIMIDATION OF THE JURY ........................................... 14

MR. WILLIAMS' TRIAL COUNSEL FAILED TO ADEQUATELY CONFRONT JOSEPH ROSARIO AS A WITNESS AGAINST MR. WILLIAMS ......................................... 17

CONCLUSION ........................................................................................................... 19

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Faretta v. California*, 422 U.S. 806, 819–20 (1975) ................................................................. 11

*Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018) ...................................................................... 12

*Gonzalez v. United States,* 553 U.S. 242, 248 (2008)................................................................ 13

*Jackson v. Conway,* 763 F.3d 115, 153 (2d Cir. 2014)............................................................... 12

*McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018)............................................................ 13, 14

*McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970) .......................................................... 11

*Strickland v. Washington*, 466 U.S. 668, 686 (1984) .................................................... 11, 13, 18

*United States v. Collins*, 665 F.3d 454, 460 (2d Cir. 2012)....................................................... 16

*United States v. Cronic*, 466 U.S. 648, 656 (1984) ................................................................... 19

*United States v. Mejia*, 356 F.3d 470, 475 (2d Cir. 2004)......................................................... 16

*United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020)............................................................ 12

*United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1981).................................................. 16, 17

*United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020)................................................... 12

*United States v. Schwartz,* 283 F.3d 76 (2d Cir. 2002)................................................................ 9

*United States v. Strother,* 49 F.3d 869 (2d Cir. 1995) ................................................................. 7

*United States v. Teague,* 953 F.2d 1525, 1533 (11th Cir. 1992) ................................................ 11

*United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460 (1978)................................................... 18

**Statutes**

18 U.S.C. § 924(c)(1)(A)(iii) ..................................................................................................... 3

18 U.S.C. §§ 1951 ..................................................................................................................... 3

18 U.S.C. §§924(j)(1) ................................................................................................................ 3

28 U.S.C. § 2255 ................................................................................................................... 3, 22

**Rules**

Rule 43 (a)(2) of the Federal Rules of Criminal Procedure.................................................. 15, 16

Rule 606(b) of the Federal Rules of Evidence............................................................................. 8

**Constitutional Provisions**

U.S. CONST. amend. VI ........................................................................................................... 12

## INTRODUCTION

Defendant Jomo Williams submits this memorandum of law in support of his motion to vacate his trial convictions of Count One: conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951, Count Two: Hobbs Act robbery in violation of 18 U.S.C. §§ 1951 and 2, and Counts Three and Four: using a firearm during and in relation to a crime of violence, resulting in death, in violation of 18 U.S.C. §§924(j)(1) and 2. *United States v. Williams,* 11-CR-663 (AT). Mr. Williams was sentenced by this Court on April 15, 2015 to 20 years' imprisonment on Count One and 20 years' imprisonment on Count Two, with both sentences to run concurrently. Mr. Williams was sentenced to ten years' imprisonment for Count Four (Count Three was dismissed as a lesser included offense). A final judgment was entered on April 28, 2015. *United States v. Williams,* 11-CR-663 (AT), Dkt. #173. After unsuccessfully appealing his convictions to the higher courts, Mr. Williams moves this court pursuant to 28 U.S.C. § 2255, alleging various ineffective assistance of counsel claims related to defense counsel's actions during trial.

## PERTINENT FACTUAL BACKGROUND

The following is a recitation of the facts pertinent to the issues of the present motion.

### The Superseding Indictment and Pre-trial Motions

The Second Superseding Indictment charged Mr. Williams with four counts – Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(b)(1); Count Two: Hobbs Act robbery in violation of 18 U.S.C. §§ 1951; Count Three: using a firearm during and in relation to a crime of violence and drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and Count Four: using a firearm in relation to a crime of violence and drug trafficking crime that resulted in death, in violation of 18 U.S.C. §§924(j)(1) and 2. Count One refers to a conspiracy between Mr. Williams, his co-defendant Khalid Barbee, and other unnamed

co-conspirators to participate in the armed robberies of drug dealers, including the robbery of D'Angelo Jordan on October 11, 2006, which resulted in his death, and a October 16, 2006 robbery allegedly committed by Mr. Williams and another co-conspirator. Count Two refers to the robbery and killing of D'Angelo Jordan and Counts Three and Four involve the allegation that Mr. Williams used a firearm, in relation to the robbery and a conspiracy to distribute marijuana, which killed Jordan.

On October 16, 2006, Mr. Williams was arrested with, among others, government witness Joseph Rosario, a livery cab driver. Upon arrest, Rosario gave a videotaped statement to a Bronx County District Attorney. Rosario explained that he was supposed to pick up one customer that day, but three men got into his car. He only knew one person – referred to as "K" – who he had picked up on five other occasions. On October 16, 2006, Rosario stated that, after picking up K and the other individuals, they directed him to circle a block and then told him to stop near a man who was sitting on top of a postal box. According to Rosario, the customers got out of the car and he then heard gun shots. The three men got back into the car, with one of the unknown individuals sitting in the back seat. This individual had been shot in the leg. During his video statement, Rosario repeated, two additional times, that he did not know the person in the back seat and had never seen him before.

Prior to Mr. Williams' trial, defense counsel informed the Court that government witness Rosario intended to testify that he had driven Mr. Williams to the murder of Jordan and that Mr. Williams was in the cab with him during the October 16, 2006 arrest. Defense counsel argued that the video statement would blatantly contradict the expected trial testimony, and as such, sought to admit the video statement under Rule 613 of the Federal Rules of Evidence to challenge the trustworthiness of Rosario's testimony.

2

The Court ruled that if, when Rosario testified, he admitted the prior inconsistent statements, then the Court would not permit further impeachment. If Rosario did not admit making the inconsistent statements, then the Court would allow video evidence only to the extent of the specific questions and answers that were relevant to the inconsistent statements, not the entire video.

## Jury Selection

Jury selection commenced on May 5, 2014, a pivotal part of the trial process of which Mr. Williams did not take part. Despite his protestations, trial counsel prevented Mr. Williams from being present in the robing room where jury selection was occurring. As a result, Mr. Williams was convicted by a jury that was selected without his knowledge nor any input or suggestion from him. At sentencing, Mr. Williams made clear to the Court that his wishes to participate in jury selection were not respected:

> You know, I know I was found guilty by a jury of my so-called peers, but I asked them, can I go pick, can I be part of the jury selection. I asked you. You told me no. The judge, she told me that the judge is new, she don't do things like that. I read through the trial minutes. She specifically asked you, Mr. Cohn, if your client -- are you sure your client is allowing this? You said yes. You think I don't want to be part of every piece that is going to determine my life? You think not? That was a jury that I was found guilty in front of. Like I said, if they could have seen certain things, if my lawyer would have made certain arguments and certain people would have came and testified that I wanted to be cross-examined, police officer, probably, probably they would have seen something because I sat here, and I know somebody was  in there deliberating and wanted to know what goes on.

*See* **Exhibit A,** *United States v. Williams,* 11-CR-663 (AT) Sentencing Transcript at 36.

## Joseph Rosario's Testimony

 At trial, Joseph Rosario testified that he was working as a cab driver in October 2006 when he had gotten arrested with an individual he knew by the name of "K" and someone he described

as "the guy with the dreads," Tr. 106, who was later identified as Mr. Williams. Tr. 110-111. He testified that he had met "K" weeks before the arrest and got introduced to him and "the guy with the dreads…" the first time. Tr. 108. Rosario testified that he drove 'K' and "the guy with the dreads" two times to Washington Heights. Tr. 114. *See* **Exhibit B,** *United States v. Williams,* 11-CR-663 (AT) Trial Transcript Portions – Rosario Testimony.

On the night of October 11, 2006, he picked up "K," "dreads," and an individual he knew as "Smash." Tr. 117. Smash exited the car and entered into a Dodge Magnum, which Rosario was directed to follow. Tr. 119. Smash reentered Rosario's vehicle on the corner of Amsterdam Avenue and 158th Street and then pulled over at Broadway and 158th Street in Manhattan. Tr. 120-1. All the passengers left the car. Tr. 122. Rosario testified that while he was waiting, he heard gunshots he saw the individuals rush out of a building, enter his car, and all drove off. Tr. 123. One of the individuals, the identity of which Rosario did not remember, had a bag that he could smell contained marijuana. Tr. 123. The individuals were driven to another location and exited the vehicle.

According to Rosario's testimony, on October 16, 2006, Rosario picked up K, "the guy with the dreads," who was behind the front passenger seat, and "some new guy" he had never seen before, who sat behind Rosario. Tr. 125. After circling the area in the Bronx, Rosario was instructed to pull over in front of a mailbox on which an unknown individual was sitting. Tr. 128-9. They exited the car, K approached the individual on the mailbox, and "tried to raise his hand up." Rosario then heard gunshots. Tr. 130. K and "dreads" rushed back into the vehicle. Rosario testified that "dreads" was in the backseat, shot in his knee. Rosario's vehicle was pulled over by the police and they were subsequently arrested. Tr. 132.

Rosario subsequently made statements to the Bronx District Attorney concerning the incident that occurred which caused his arrest. When recalling these statements at trial, he stated that he lied about certain things which were in contradiction to his current testimony. Tr. 133-4. Specifically, he testified that:

Q. And then did you also talk to the detectives and the DA about when you had first met the guy with the dreads?
A. Yes.
Q. Did you tell them the truth about that?
A. No.
Q. What did you tell them about when you had first met the guy with the dreads?
A. That I had -- that I never seen him before.
Q. In particular were you asked the following question and did you give the following answer:
"Q And you never seen him before, the person who got shot in the back of the -- in the leg, had you ever seen him before?
"A No, never. No. I don't know him. Never seen him before." Did you get that question and did you give that answer?
A. Yes, I did.
Q. Was that true?
A. No, that wasn't true.
Q. Why did you give that answer?
A. I was confused.
MR. COHN: Objection.
THE COURT: Overruled.
Q. What were you confused about?
A. I thought they was referring to the guy that ran out the car.
Q. But you also discussed the guy with the dreads, right?
A. Yes, I did.
Q. Were you asked the following question and did you give the following questions and answers:
"Q Okay. And you said, so you've known -- you don't know K by any other name?
"A No, I don't. I don't know.
"Q Okay. And before a week ago you'd never seen him before?
"A No, just yesterday and today. They was forcing me to run, run, run, run, run, run. I was scared.
"Q Okay.
"A Telling me.
"Q And the passenger in the back, you'd never seen either of them before?
"A Okay."
Were you given those questions and did you give those answers?
A. Yes, I did.
Q. Were those accurate?

A. The -- the part that I said that I met him, that I never met him before, no, it wasn't.
Q. Had you, in fact, met the man with the dreads before?
A. Yes, I did.
Q. When had you met him before?
A. On weeks ago.

Tr. 135-8.

Rosario then testified that he was untruthful about knowing "K" and "the guy with dreads" because he "wasn't trying to look like I was hanging out with them," and wanted to "speed up the process" of the interview. Tr. 138. During a break in testimony, Mr. Williams' defense counsel raised the issue of Rosario's prior inconsistent statement, noting that "the witness says that he misunderstood the nature of the question and who they were asking about. I think that given the government has read that much in that the entire tape ought to come in." Tr. 141. It was further argued that "the problem is he said he misunderstood something that was critical and in fact he could not have misunderstood and, therefore, the nature of the examination and the questions and his demeanor are all important in determining whether or not he was stretching the truth when he said he misunderstood and tried to give an explanation for what was in the government's view, at least, clearly a lie." Tr. 142. Rosario admitted as much during cross examination ("I just said it so I wouldn't get looked at like I was hanging out with the leader." Tr. 182.). The Court did not change its ruling regarding the exclusion of the entire tape. Tr. 144.

On May 11, 2014, days after Rosario's testimony had concluded, the government withdrew its objection to the introduction of portions of Rosario's video statement that constituted prior inconsistent statements, citing the Second Circuit case, *United States v. Strother,* 49 F.3d 869 (2d Cir. 1995). In *Strother,* the Second Circuit held that the district court had erred in precluding the admission of business records for the purposes of proving a prior inconsistent statement, holding that "extrinsic evidence of a prior inconsistent statement is more persuasive to a jury than a

witness's acknowledgment of inconsistencies in a prior statement." *United States v. Strother,* 49

F.3d at 876.

During Mr. Williams' case-in-chief, only portions of Rosario's video statement were

admitted by stipulation, Tr. 639-41, and along with the following instruction:

> The statements made by Mr. Rosario in the video are not being offered for the truth of the matter asserted but, rather, for the limited purpose of impeachment. As I will explain in greater detail tomorrow, that means that you may not conclude that the witness told the truth in this video or in these video statements and acted accordingly. Rather, you can consider these video statements solely in evaluating the witness' credibility when he testified before you on the stand.

Tr. 641.

The admitted portions consisted of three short clips that were each shorter than one minute

in length. Tr. 639-45. *See* **Exhibit C,** Trial Transcript Portions – Rosario Stipulation.

**<u>Jury Deliberations</u>**

On May 14, 2014, the first day of deliberations, the jury sent a note reading: "We need to

be in a room where we can discuss our ideas freely. We are not arguing or yelling. We can't

whisper. We are uncomfortable that we can be heard." Tr. 863-4. *See* **Exhibit D,** Trial Transcript

Portions – Jury Deliberations.

The Court added that: "This suggests to me that they may feel that people who are in the

courtroom can hear them and that that is causing them to feel uncomfortable." Tr. 864. The

government informed the Court that one of the court security officers ("CSOs") had relayed that

he could hear the jury audibly in the courtroom and hallway, so "he stuck his head in" and told the

jury that they might want to "keep it down" so they wouldn't be heard. The Court identified the

court security officer who spoke to the jury and directed him to "have no contact with the jurors."

Tr. 864. As to how to ameliorate the problem, the government conceded that "at this point the

genie is out of the bottle and we have to address the note in some way…" Tr. 865.

Mr. Williams' defense counsel did not make any further inquiry into the note, but rather, suggested that the jury move locations to another courtroom, which the Court had ultimately chosen to do. Tr. 865. The Court did address the jury and advise them that they would be transferred to another courtroom "because I have the sense that you feel concerned about [being heard]." Tr. 873. As the Court assured: "No one in this room -- not any of the parties, none of the lawyers, and no one in the audience -- will be permitted to go into that courtroom. So you can rest assured you will not be heard by anyone." Tr. 873. Defense counsel did not weigh in on this instruction nor was a hearing requested to ascertain the amount of prejudice sustained by the court security officer's commentary.

On May 15, 2014, Mr. Williams was convicted on all counts. Nearly a month later, on June 5, 2014, defense counsel filed a letter with the Court seeking to interview the jurors to determine whether fear impacted their deliberations, citing the court security officer's improper communications as well as their constant stationing outside of the jury room. For the first time on record, counsel recounted that he was advised the jury had requested to be escorted from the courthouse out of fear, but "[i]t did not register and the jury was already gone." *See* Defense Counsel June 5, 2014, Letter, Dkt. #103. Citing Rule 606(b) of the Federal Rules of Evidence, as well as *United States v. Schwartz,* 283 F.3d 76 (2d Cir. 2002), counsel requested the Court to contact the jury to conduct an inquiry and if fear affected their deliberations, to set aside the verdict. On June 24, 2014, the Court denied Mr. Williams request. The Court conceded that members of the audience vocalized and made gestures during the testimony of one of the government witnesses, O'Neil Douglas, as well as during the reading of the verdict. However, the Court held that the defendants failed to make an adequate showing of extrinsic influence warranting further investigation into the matter.

**The Sentencing and Attorney-Client Relationship Breakdown**

The breakdown in communications between Jomo Williams and trial counsel was evident throughout the trial record, with its culmination during sentencing. As previously cited above, Mr. Williams' frustrations and objections to being excluded from the jury selection process were stated on record. In addition, Mr. Williams expressed a general disagreement in the preparation of his defense, explaining that:

> I regret not getting on that stand. The jury supposed to hear me. But my lawyer was not prepared. He is never prepared. Never prepared for me. Never prepared for me. Never help me. Never want to listen to my ideas. All I needed was your help. All I needed was your help. Listen to me. You told me one time, you said, you told me one time, you say, I advise people to joint team USA. You told me that. Look, team USA is one that want to give me life. That's what I want to join? No.

Sent. Tr. 35.

He further pleaded: "I just need a new lawyer. I just need the Court to grant me a new lawyer that could help me. We don't got no money. We don't have any money. Sent. Tr. 36 As Mr. Williams plainly stated: "I get a lawyer that we don't even get along. We never see eye-to-eye. He disrespect my mom. He disrespect me. He talk to me crazy, unprofessional." *See* Sent. Tr. at 33.

After these complaints were noted on record, Mr. Williams was sentenced to a total of 30 years' imprisonment – 20 years' on Counts One and Two to run concurrently, and 10 years' on Count Four to run consecutively.

**The Appeal**

On June 23, 2014, Mr. Williams filed post-trial motions for a judgment of acquittal and new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, both of which were denied. On October 14, 2015, Mr. Williams timely filed his appellate brief with the Second Circuit Court of Appeals to vacate his convictions. *See generally United States v. Williams,* 15-1432, Dkt. #35. On February 28, 2019, the Circuit affirmed Mr. Williams' convictions, Dkt. #149,

and he timely filed a petition for a panel rehearing *en banc* on April 8, 2019. Dkt. #159. The petition was denied by the Second Circuit on May 9, 2019. Dkt. #164. A petition for a *writ of certiorari* to the United States Supreme Court was filed on August 6, 2019, Dkt. #166. On October 7, 2019, Mr. Williams' petition was denied. Dkt. #169. He subsequently timely filed a *pro se* motion pursuant to 28 U.S.C. § 2255, seeking to vacate his convictions on the grounds of ineffective assistance of counsel. On October 9, 2020, this Court appointed undersigned counsel to assist Mr. Williams in his claims.

## MR. WILLIAMS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHICH WARRANTS THAT HIS CONVICTIONS BE VACATED

### Applicable Law

The Sixth Amendment of the United States Constitution guarantees all criminal defendants the right to the assistance of counsel for his defense. U.S. CONST. amend. VI. The United States Supreme Court determined that "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970). The defendant does not surrender control entirely to counsel, as the "client's right to be the master of his own defense is central to the protections provided by the Sixth Amendment of the United States Constitution." *United States v. Teague,* 953 F.2d 1525, 1533 (11th Cir. 1992). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails…[the Sixth Amendment] speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta v. California*, 422 U.S. 806, 819–20 (1975).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

*Strickland* enumerates a non-exhaustive list of duties of counsel, including a duty of loyalty, a duty to avoid conflicts of interest as well as the "overarching duty to advocate the defendant's cause" including a duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* at 688. "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* In *Strickland,* the Court created a two-prong test for determining whether counsel was ineffective. The defendant must prove that "counsel's representation fell below an objective standard of reasonableness," *Id.* at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"When analyzing whether an attorney's performance was objectively reasonable, courts must avoid "the distorting effects of hindsight" and consider the lawyer's perspective at the time the decision was made. *United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020) (quoting *Jackson v. Conway,* 763 F.3d 115, 153 (2d Cir. 2014)). If the attorney made a strategic choice after thoughtful consideration, that decision will be "virtually unchallengeable." *United States v. Rosemond*, 958 F.3d at 121. (quoting *Strickland*, 466 U.S. at 690).

As to the issue of whether any deficient performance by counsel caused prejudice, a court must consider whether " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020) (quoting *Strickland*, 466 U.S. at 690). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018) (quoting *Strickland*, 466 U.S. at 694).

## I.   MR. WILLIAMS' TRIAL COUNSEL DENIED HIM THE OPPORTUNITY TO PARTICIPATE IN JURY SELECTION

**Applicable Law**

Not all ineffective assistance of counsel claims, however, fall under the *Strickland* test and require the showing that counsel's error was prejudicial to the outcome. Certain aspects of trial management are within the "lawyer's province," such as making decisions concerning "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v. United States,* 553 U.S. 242, 248 (2008) (internal quotation marks and citations omitted). "Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018). Violations of a "defendant's Sixth Amendment-secured autonomy" is considered "structural" which does not require a showing of prejudice, but rather, a violation of "protected autonomy right was complete when the court allowed counsel to usurp control of an issue within [the defendant's] sole prerogative. *Id.* As such, when a client's autonomy, not counsel's competence, is in issue, the courts do not apply its ineffective-assistance-of-counsel jurisprudence as enumerated in *Strickland*. *Id.* at 1510-11. The right of self-representation is either respect or denied; its deprivation cannot be harmless. *Id.* (internal citations omitted).

Structural errors affect the framework within which the trial proceeds, opposed to simply an error in the trial process itself. Structural errors include the rights to one's choice of counsel and to a public trial. *Id.* (internal quotations and citations omitted). An error may be considered structural, "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* Structural errors include the rights to one's choice of counsel and to a public trial. *Id.* (internal

quotations and citations omitted). "An error might also count as structural when its effects are too hard to measure…or where the error will inevitably signal fundamental unfairness…" *Id.*

**<u>Discussion</u>**

In the instant matter, Mr. Williams elected to exercise his right to a trial by a jury of his peers. Rule 43 (a)(2) of the Federal Rules of Criminal Procedure provides that the defendant must be present at "every trial stage, including jury impanelment." That right, however, was infringed when he was excluded from the jury selection process, effectively preempting him from partaking in a critical stage of the proceedings.

We submit that defense counsel erred in denying Mr. Williams the opportunity to partake in jury selection, and that said error was structural in kind, eviscerating the need to apply the *Strickland* test to determine the error's effect. The impanelment of Mr. Williams' jury without his presence goes beyond attorney error – it infringed on Mr. Williams' autonomy secured by the Sixth Amendment concerning the right to a jury trial (and waiver of said right). *McCoy v. Louisiana*, 138 S. Ct. at 1508. In *McCoy,* the Court held that the defendant's objective of his defense to assert innocence, and his counsel's failure to do so, was a structural error. As the Court explains: "Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." *McCoy* at 1508.

We submit that *McCoy's* rationale also applies to Mr. Williams' right to a jury and be present throughout jury selection. Whether to partake in jury selection was not a "strategic" choice made by counsel on behalf of Mr. Williams to achieve his ultimate objective, but rather, his

13

participation was an objective in and of itself. Defense counsel's decisions negated Mr. Williams' own objectives in relation to his constitutional rights, creating "a structural defect in the proceedings as a whole." *Id.* at 1511. Under alternative rationales, the denial of participating in jury selection, a stage which is inarguably critical and in many ways, the foundational backbone of a trial, is an error that is fundamentally unfair with effects that are too hard to measure. To deny Mr. Williams his right to jury impanelment is a fundamental infringement of his constitutional rights as well as his rights under Rue 23(a)(2) to be present at every trial stage. Furthermore, the effects of this error are immeasurable and would be nearly impossible to predict an alternative outcome if Mr. Williams had selected his own jury. And while we respectfully submit that this denial was a structural error that does not require Mr. Williams to show prejudice, it is difficult to imagine a more prejudicial beginning to the trial process.

Therefore, we respectfully submit that Mr. Williams' convictions are vacated and that he be accorded a new trial.

## II.    MR. WILLIAMS' TRIAL COUNSEL FAILED TO TIMELY RAISE THE ISSUE OF UNDUE INFLUENCE ON AND INTIMIDATION OF THE JURY

**Applicable Law**

When a jury submits a note or inquiry to the court, there is an established procedure that must be followed:

> (1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it.

*United States v. Mejia*, 356 F.3d 470, 475 (2d Cir. 2004) (citing *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1981)).

"It is settled law that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds." *Ronder* at 934. "Allowing counsel to be heard reduces the risk that the trial court will respond in a way that prejudices one side." *United States v. Collins*, 665 F.3d 454, 460 (2d Cir. 2012).

**<u>Discussion</u>**

In Mr. Williams' case, the jury expressed concerns of intimidation in a note sent to the Court. Specifically, the jury stated they were "uncomfortable that we can heard," a feeling which they conceded may impede them to "discuss our ideas freely." Tr. 864. The Court concluded that the jury's note might be in relation to "people who are in the courtroom [that] can hear them and that is causing them to feel uncomfortable." Tr. 864. These people included audience members that were witnessed making gestures to the government witness while on the stand and required a warning from the Court to cease said conduct. Tr. 362-3.

At the same time, defense counsel and the Court were informed by the government that one of the court security officers made it known to the jury that they could be heard outside of the deliberation room, an interruption that was a clear violation of the sanctity of jury deliberations. Tr. 864. The Court unilaterally addressed this issue by admonishing the court security officer and moving the jury to another, more private room. Tr. 865. Mr. Williams' defense counsel did not interject at this time. He did not ask the Court to inquire with each individual juror concerning whether they were intimidated, unduly influenced, or in any way affected by others – whether it be a court security officer or member of the audience. Defense counsel did not move for a mistrial or otherwise object to the handling of the note. Although defense counsel sought an interview of the jurors eventually, his request was made well *after* the verdict was rendered, obliterating the obvious time-sensitive need to address jury contamination as quickly as possible.

Jury intimidation or undue influence is undoubtedly a grave issue that can have dire consequences at a criminal trial. Defense counsel's failure to, at a minimum, request an inquiry be conducted with each juror was a decision that was objectively unreasonable by any measure. As provided in *United States v. Ronder*, 639 F.2d 931, 934, the procedure through which a jury note must be evaluated, specifies the necessary step of allowing defense counsel to respond *before* the trial court answers the note. The exact nature of defense counsel's response – whether it be inquiring with each juror or moving for a mistrial – can be debated, the necessity of a response at all cannot. It was incumbent upon defense counsel to respond accordingly and meaningfully prior to the Court's response to the jury. In this case, the issue of intimidation was not investigated nor even touched upon, but rather, "swept under the rug" by moving the jury to another room. While the move may have solved the short-term issue of people hearing the jury deliberate, it did not address the long-term problem of a jury verdict that was made in the context of fear.

Under *Strickland,* it must also be shown that there exists a "reasonable probability" that the attorney's error affected the outcome of the case. *Strickland*, 466 U.S. at 694. One would be hard-pressed to devise a scenario where potential jury intimidation did not affect a verdict in a criminal trial. The sanctity and secrecy of jury deliberations is a long-held principle of the trial process, with courts recognizing that any *ex parte* communications with a deliberating jury, even with the judge itself, "is pregnant with possibilities for error." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460 (1978) (Counsel was denied the opportunity "to clear up the confusion regarding the judge's direction to the foreman," to render a verdict, "which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction." *Id.* at 461.). Communications with other individuals – such as court security officers or members of the audience – is obviously even more concerning.

The extent of the court security officer's communications with the jury was never addressed. Had it been, any potential issues of intimidation – and why the jury was uncomfortable speaking beyond a whisper in the first place – would have been uncovered at an appropriate time to redress. Defense counsel's failure to act, to suggest an inquiry, or to move for a mistrial evinces unreasonable conduct that negatively impacted the outcome of the case. Therefore, we respectfully submit that Mr. Williams' convictions be vacated on the grounds of this error.

### III.   COUNSEL FAILED TO ADEQUATELY CONFRONT JOSEPH ROSARIO AS A WITNESS AGAINST MR. WILLIAMS

**<u>Applicable Law</u>**

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "[T]he adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate," and "thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984) (internal quotations omitted). "But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Id.* at 656-7. Therefore, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. *United States v. Cronic*, 466 U.S. at 659.

**<u>Discussion</u>**

The testimony of Joseph Rosario – the only individual alleging to be present with the defendants immediately after the October 11, 2006 shooting – was undoubtedly persuasive to the jury. Not only was his testimony about events immediately prior to and after the shooting, but unlike other witnesses, he was not a government cooperator and had a less substantial criminal

17

record. The crux of Mr. Williams' argument, both at pre-trial, during trial, and post-trial, was that Rosario's testimony about knowing Mr. Williams prior to October 11, 2006 was inconsistent with the statements he had made to the Bronx District Attorney. Defense counsel had sought the admission of the entirety of Rosario's video statement, which was denied by the Court prior to Rosario's testimony. However, after Rosario had testified, and his confrontation with his prior inconsistent statements were limited without the context of a video, the government conceded an error. Upon the "discovery" of a Second Circuit case that extrinsic evidence of a prior inconsistent may be used against a witness, the government withdrew its objection to admitting portions of the video tape.

Portions of Rosario's video statement were eventually admitted by stipulation during Mr. Williams' case-in-chief. Tr. 639-41. However, against Mr. Williams' wishes, Rosario was not called back as a witness nor did defense counsel object to the admission of only brief portions of the video. Continually throughout trial, Mr. Williams expressed a desire to confront Rosario directly with the video – not to stipulate to piecemeal statements presented to the jury without context. While Mr. Williams concedes that his defense counsel initially sought to introduce the entirety of the video, he failed to do so at the most critical stage – when the government withdrew its objections. Although the government conceded only portions of the video could be admitted, their admission of an error which permitted extrinsic evidence to be used to establish a prior inconsistent statement created a new opportunity and avenue for defense counsel to pursue in the confrontation of Rosario.

Mr. Williams adamantly wanted to confront all witnesses against him. In light of the sequence of events concerning the government's objection withdrawal, it is unclear why defense counsel failed to call Rosario back to the stand, especially in light of Mr. Williams' direction. What

otherwise would have been a fruitful opportunity to confront a witness while also taking advantage of the government's admission to a mistake, defense counsel failed to act. His inaction, by any measure, cannot be said to be objectively reasonable, particularly when considering the relevance and weight of Rosario's testimony. It further follows that the mismanagement of such a critical witness must have affected the outcome of the case, to the extent that if he were proven to be unreliable, there would have been no witness to the events immediately prior to and following the shooting.

Aside from the standard set forth in *Strickland,* Mr. Williams respectfully submits that defense counsel's failure to call Rosario as a witness effectively functioned as a denial of his right to confront witnesses against him. The adversarial process as it pertained to this witness was infringed upon when Mr. Williams could not confront him with his prior inconsistent statements, an action that would have undoubtedly been more persuasive in the eyes of the jury than a stipulation. As Mr. Williams documented during his sentencing, there was a breakdown in communications with his attorney throughout the trial, and the Rosario testimony might be the most telling example of it.

Therefore, we respectfully submit the failure to confront Rosario as a witness against Mr. Williams warrants that his convictions be vacated.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully submit that Mr. Williams' convictions be vacated pursuant to 28 U.S.C. § 2255.

Dated: February 12, 2021
      New York, NY

                      \_\_\_\_/s/_____
                      John Meringolo, Esq.

F4f4WilS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                          11 CR 00663 (JFK)

JOMO WILLIAMS,

        Defendant.

------------------------------x

                              New York, N.Y.
                              April 15, 2015
                              4:10 p.m.

Before:

                HON. ANALISA TORRES,

                              District Judge

                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
MICHAEL MAIMIN
KAN M. NAWADAY
    Assistant United States Attorneys

FREDERICK HARVEY COHN
ANGELA LIPSMAN
    Attorneys for Defendant

F4f4WilS

1              (In open court)

2              THE DEPUTY CLERK:  United States v. Jomo Williams.

3              Please state your appearances for the record.

4              MR. MAIMIN:  Michael Maimin and Kan Nawaday for the

5      government.  Good afternoon, your Honor.

6              MR. COHN:  Fred Cohn and Angela Lipsman for

7      Mr. Williams.

8              THE COURT:  Good afternoon.

9              This matter is on for sentencing in United States

10     versus Jomo Williams.

11             Before we go any further, I have an initial matter to

12     address.  I have determined that Count Three is a lesser

13     included offense of Count Four and, therefore, should be

14     dismissed.

15             Do the parties agree?

16             MR. MAIMIN:  As we set forth in our brief, Counts

17     Three and Four should be merged.  The circuit has approved a

18     number of different ways of merging counts, and one is to

19     dismiss the lesser included.

20             MR. COHN:  Your honor, I was notified by your chambers

21     of this.  I checked with Mr. Williams.  He wants to be able to

22     preserve his right to appeal and has asked me to take no

23     position on that.

24             THE COURT:  I am dismissing Count Three.

25             In connection with today's proceeding, I have reviewed

         SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    the presentence investigation report dated January 6, 2015,

2    including the recommendation and addendum; the defendant's

3    sentencing letters dated February 6, February 9, March 13,

4    March 20, March 24, March 30, and April 9, 2015, including the

5    attached exhibits; and a letter submitted today from Evette

6    Williams dated April 8, 2015; the government sentencing

7    memorandum dated March 4, 2015; and the victim impact

8    statements from Juel Frederick, Julissa Vidal, Deandrea

9    Frederick, and Trieva Jordan.

10             Have the parties received each of these submissions?

11             MR. MAIMIN:  We have, your Honor.

12             MR. COHN:  Your Honor, we have, but Mr. Williams wants

13   to make sure that you actually got the letters that were

14   attached; and therefore, we would appreciate it if you would

15   read off the letters that you got as opposed to just saying

16   exhibits.

17             Thank you, ma'am.

18             THE COURT:  As I stated, I received a letter from

19   Evette Williams dated April 8, 2015.  I have also a letter from

20   Shadaysia, who states that she is the third oldest niece of

21   Jomo Williams.  The letter has a numeral 5 at the top but does

22   not contain a date.  I have a letter from another niece, who

23   spells her name A-S-I-A, Asia, and I believe the last name is

24   Harley, H-A-R-L-E-Y.  There is no date.  I also have an undated

25   letter from his nephew, Ronnie.  I have another letter from

F4f4WilS

1   Dominique.  That is also undated.  I have a letter from

2   Kashashi Buffong dated March 12, 2015.  She states that she is

3   Mr. Williams' sister.  I have an undated letter from

4   April Ryan, and that is addressed to Mr. Cohn, but I do have

5   the original letter.  I have a letter also addressed to

6   Mr. Cohn, undated, which is from Rayquan, who states that he is

7   Mr. Williams' oldest son.  In addition, I have a letter from

8   Joleena, who says that she is Mr. Williams' daughter.  That is

9   also undated.  I have a letter from what looks like Tylieh

10  Baffong, who states that he is Mr. Williams' son.  It is

11  undated and unsigned.  I have a letter from Lynell Williams,

12  the mother of Mr. Williams, that is undated.  I have a letter

13  dated March 25, 2015, from a member of the clergy,

14  V. Rev. Fr. Melake Hayl Kesis Amde Tsion-Durden.  I have a

15  letter from an individual who spells his name A-N-E-L-I-E-J-A-H

16  Williams, who states that he is Mr. Williams' brother, and that

17  is dated March 25, 2015.  I also have a letter from

18  Mr. Williams dated February 3, 2015.

19          I have read each of these letters, and I have

20  considered them.

21          MR. MAIMIN:  And the letter from today?

22          THE COURT:  That was Evette Williams, the letter from

23  today.

24          MR. MAIMIN:  Thank you.

25          THE COURT:  The parties have received each of these

F4f4WilS

 1 | submissions?

 2 |          MR. MAIMIN:  I haven't seen the letter from Rayquan,

 3 | but I'm willing to waive reading it.

 4 |          MR. COHN:  I'm sorry?  I didn't hear.

 5 |          THE COURT:  I asked whether the parties have received

 6 | each of these submissions?

 7 |          MR. COHN:  Well, I made the submissions.

 8 |          THE COURT:  Have the submissions been filed with the

 9 | clerk of the court, with the exception of Evette Williams',

10 | which was just handed to me?

11 |          MR. COHN:  We filed them by ECF, your Honor.

12 |          THE COURT:  Are there any other submissions?

13 |          MR. COHN:  Not at this time.

14 |          I will say, your Honor, that Mr. Williams' mother

15 | wishes to address the Court at an appropriate time.

16 |          THE COURT:  I would also like to note that I have also

17 | considered the victim impact statements from Juel Frederick,

18 | Julissa Vidal, Deandrea Frederick, and Trieva Jordan.  I think

19 | I mentioned them, but I am not certain.

20 |          There are no further submissions; correct?

21 |          MR. MAIMIN:  That's correct, your Honor.

22 |          THE COURT:  Mr. Cohn, have you read the presentence

23 | report?

24 |          MR. COHN:  I have, and I have shared it with

25 | Mr. Williams.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F4f4WilS

| | |
|---|---|
| 1 | THE COURT:  Mr. Williams, have you read the |
| 2 | presentence report? |
| 3 | THE DEFENDANT:  Yes, ma'am. |
| 4 | THE COURT:  Have you discussed it with Mr. Cohn? |
| 5 | THE DEFENDANT:  Yes, ma'am. |
| 6 | THE COURT:  Have you had the opportunity to go over |
| 7 | with him any errors in the report? |
| 8 | THE DEFENDANT:  Vaguely. |
| 9 | THE COURT:  Did you say "vaguely"? |
| 10 | THE DEFENDANT:  Yes, ma'am. |
| 11 | MR. COHN:  I didn't hear what report you're talking |
| 12 | about. |
| 13 | THE COURT:  I asked whether Mr. Williams had gone over |
| 14 | the presentence report with you, and his answer was "vaguely." |
| 15 | MR. COHN:  I mean, I went to the jail and went over it |
| 16 | with him. |
| 17 | THE COURT:  I am happy to afford Mr. Williams the |
| 18 | opportunity now.  We can take a recess so that he can answer |
| 19 | whether he has had a sufficient opportunity to read the report. |
| 20 | So we will take a recess. |
| 21 | (Recess) |
| 22 | THE COURT:  Mr. Williams, now that you have had a |
| 23 | lengthy discussion with your lawyer, have you read the |
| 24 | presentence report? |
| 25 | THE DEFENDANT:  Yes, ma'am. |

F4f4WilS

1          THE COURT:  Have you discussed it with Mr. Cohn?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  Have you had the opportunity to go over

4     with him any errors in the report or anything else that should

5     be taken up with me?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  AUSA Maimin, have you read the presentence

8     report?

9          MR. MAIMIN:  I have, your Honor.

10          THE COURT:  Mr. Cohn, do you have any objections to

11     the presentence report regarding factual accuracy?

12          MR. COHN:  Your Honor, Mr. Williams points out the

13     following:  That in paragraph 40, where it is reported that

14     somebody saw him with a loaded firearm, there was no charge,

15     and he doesn't believe that should be in there.  He was not

16     charged with a firearm.

17          THE COURT:  What paragraph 40 states is that

18     Mr. Williams was arrested, but it does not state that he was

19     convicted of this charge.

20          MR. COHN:  It doesn't even say he was arrested for the

21     firearm.  It says that somebody reported that they had seen

22     him, and I believe he was charged with harassment or something

23     like that, which he pleaded to.

24          MR. MAIMIN:  Menacing, your Honor.

25          MR. COHN:  Menacing -- excuse me -- for which he

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F4f4WilS

1   received a minor sentence, and the Court should not credit the

2   firearm reportage.

3          THE COURT:  I have not credited it, and I will not

4   consider those allegations at all.  I am only considering the

5   crime of conviction.

6          MR. COHN:  Fine.

7          In paragraph 45, it reports that he gave a false name

8   on his arrest, and it says false personation.  He said he never

9   did give such a false name.  It's not the crime of conviction,

10  in any event.

11         THE COURT:  The crime of conviction in paragraph 45 is

12  false personation.

13         MR. COHN:  He said he never did that.

14         THE COURT:  Is he saying that he was never convicted

15  of that crime?

16         MR. COHN:  I'm sorry.  He says that he was never

17  convicted of an assault or that he threatened to kill his

18  girlfriend.

19         THE COURT:  So with respect to paragraph 45, are you

20  withdrawing the objection?

21         MR. COHN:  Yes, except that the report hear says that

22  he broke the door of his girlfriend's apartment.  He was not

23  charged with that.  Therefore, you shouldn't consider that.

24         THE COURT:  I am only considering the fact of his

25  crime of conviction.  I am not considering these underlying

F4f4WilS

1    allegations at all, and I can have the report adjusted by the

2    Department of Probation to note that Mr. Williams disagrees

3    with this claim that he broke the door and attempted to assault

4    the girlfriend.

5              MR. COHN:  Thank you, your Honor.

6              The entirety of 50 should be withdrawn because there

7    is no court reported court action, and he claims that the

8    charges were dismissed.  Therefore, that entire allegation

9    about several threatening phone calls to his girlfriend and

10   threat to kill her should be out of the report.

11             MR. COHN:  Paragraph 50 is under "Other arrests."  I

12   am not considering this arrest at all.  I am only considering

13   crimes of conviction.

14             MR. COHN:  Fine, your Honor.

15             Finally, in paragraph 60, although he refused to talk

16   about drug use, the report says that the probation officer

17   found from another source that at one point he allegedly

18   admitted using marijuana while he was in Antugia, and he said

19   he was never in Antugia.  He has no idea where that came from,

20   and that should be excised.

21             THE COURT:  I will have the Department of Probation

22   amend the report to indicate in paragraph 60 that Mr. Williams

23   claims that he was never in Antugia.

24             MR. COHN:  Fine, your Honor.  That does it.

25             THE COURT:  AUSA Maimin, do you have any objections to

F4f4WilS

```
 1    the report with respect to factual accuracy?
 2              MR. MAIMIN:  The only thing that I would note -- and I
 3    don't know if it needs to be changed because I think your Honor
 4    is aware of all the facts -- is that paragraph 58 states that
 5    in 2006 Williams was shot in his right leg during a physical
 6    altercation at a nightclub.  As your Honor knows, we had
 7    testimony at trial, including of the policemen who arrested him
 8    after it happened.  He was shot in the leg during an armed drug
 9    robbery.
10              THE COURT:  Any objection?
11              MR. COHN:  I'm sorry, your Honor.  One second.
12              Your Honor, this is the report, and my recollection of
13    the proof was that there was never an armed robbery.  In any
14    event, we believe it should stay the way it is.
15              THE COURT:  I will have the report altered to state
16    that the prosecution claims that this incident was in
17    connection with an armed robbery but that the defense denies
18    that.
19              MR. COHN:  Fine.
20              Anything further, Mr. Maimin?
21              MR. MAIMIN:  Nothing further on that.  I will just
22    point out that we actually quoted extensive testimony about
23    that armed robbery in our memorandum, and we also had a
24    policeman who arrested Mr. Williams while he was trying to get
25    away with a bullet lodged in his leg.  So I don't think that it
```

SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300

F4f4WilS

1    is really a huge issue, but I also understand that Mr. Williams

2    has pled not guilty even though he was found guilty to, among

3    other things, the robbery conspiracy that included that armed

4    robbery, and so I wouldn't ask for him to admit it today.

5         THE COURT:  I am going to adopt the factual

6    recitations as modified.  The presentence report will be made a

7    part of the record in this matter and placed under seal.  If an

8    appeal is taken, counsel on appeal may have access to the

9    sealed report without further application to the Court.

10        Although courts are no longer required to follow the

11   sentencing guidelines, we are still required to consider the

12   applicable guidelines in imposing sentence.  And to do so, it

13   is necessary that we accurately calculate the sentencing range.

14   Based on my independent evaluation of the sentencing

15   guidelines, I reject the guidelines calculation in the

16   presentence report.  First, I disagree with a number of

17   criminal history points ascribed to Mr. Williams.  A total of

18   14 points rather than 12 points apply because Mr. Williams

19   committed the instant offense while under a criminal justice

20   sentence, which pursuant to Section 4A1.1(c) of the guidelines

21   requires the addition of two criminal history points.  Second,

22   the presentence report incorrectly concludes that Mr. Williams

23   is a career offender under Section 4B1.1(a).  Because

24   Mr. Williams did not have at least two prior felony convictions

25   of either a crime of violence or a controlled substance offense

F4f4WilS

1   when he committed the instant offense, he is not a career

2   offender.  Finally, for the reasons stated in the Second

3   Circuit's Summary Order in United States v. Young,

4   561 F.App'x 85 (2d Cir. 2014).  I find that the presentence

5   report improperly suggests that the term of imprisonment

6   imposed on Count Four may run concurrently to the terms of

7   imprisonment imposed on Counts One and Two.  The term of

8   imprisonment imposed on Count Four must run consecutively.

9   Accordingly, I find the offense level is 43, the criminal

10  history category is VI, and the guidelines range is life plus

11  40 years' imprisonment.

12          I have considered whether there is an appropriate

13  basis for departure from the advisory range within the

14  guidelines system.  While recognizing that I have authority to

15  depart, I do not find any grounds warranting a departure under

16  the guidelines.

17          Now I will hear from the parties.  Does the government

18  wish to be heard with respect to sentencing?

19          MR. MAIMIN:  We do, your Honor.  And obviously, I

20  submitted an extraordinarily detailed and lengthy submission in

21  this case, and I rely on that.  However, I think that it is

22  worth speaking here, especially because the victims' family

23  were unable to make it up today and somebody ought to speak for

24  them.  Unfortunately, because of the actions that Jomo Williams

25  took, the victim himself is unable to speak ever again.

F4f4WilS

```
1          Jomo Williams is a murderer, and this was simply the
2     capstone of a life of crime.  Jomo Williams has shown
3     absolutely no remorse during his life of crime.  Not only in
4     the presentence report, but also in the testimony at trial, it
5     became clear that Jomo Williams is a lifelong violent criminal,
6     who has spent his entire life committing armed robberies,
7     dealing drugs.  His currency of the trade were guns and
8     violence.  He was violent to his baby's mother.  He was violent
9     to those who would cross him.  He was violent towards those who
10    did not give him what he wanted when he wanted it.  The fact
11    that he killed somebody in 2006 only demonstrates luck that
12    somebody did not die during his life of violence beforehand.
13    The fact that nobody has died since at his hands is at least in
14    part due to the fact that he has been incarcerated for most of
15    his life since that time.
16          He has demonstrated that prison will not deter him.
17    Whenever he would get out, even if he was on parole or other
18    supervision, he would immediately pick up his profession, which
19    was dealing drugs and committing armed robberies.
20          This may not have been a planned murder; that is, they
21    did not go in planning to kill D'Angelo Jordan.  But that was
22    certainly a reasonably foreseeable consequence.  When you
23    commit armed robbery after armed robbery, at some point that
24    gun is going to go off.  And as any firearms instructor will
25    tell any students, you never point a gun at somebody who you
```

F4f4WilS

don't intend to kill.  Jomo Williams did not understand that

or, worse, understood it too well and simply did not care.

Jomo Williams went into this robbery for the simple

reason that he wanted marijuana.  He may have been surprised

when D'Angelo Jordan fought back.  And by the way, Mr. Cohn

suggests in one of his sentencing letters that it is likely

that D'Angelo Jordan attempted to defend his illicit property

and pulled a gun.  There is, actually, no evidence of a gun

being pulled during the robbery.  The gun was found on his

doorstep on the second floor.  The testimony was clear that he

was struggling with Jomo Williams with his hand, out of the

perfectly natural reaction of somebody who is being robbed.

One natural reaction is to give in; the other natural reaction,

which unfortunately in this case led to his death, is to

resist.  He resisted, and Jomo Williams killed him for it.

Jomo Williams felt no remorse about this.  Afterwards

he bragged to his good friend, the brother of one of his

babies' mothers that he challenged my gangsta, so I had to wig

him.  To him, this was not a problem.  This caused him no

remorse.  Rather, to Jomo Williams, this was simply what

happens when somebody challenges Jomo Williams; you hurt them,

you kill them, so be it.

He had so little remorse that just five days later he

was out on the street committing yet another armed robbery.

Your Honor may recall that in that robbery Kevin Prince was the

F4f4WilS

1   one with the gun but Jomo Williams and Kevin Prince operated
2   together almost as one all the time.  Jomo Williams came out of
3   one side of the car, Kevin Prince came out of the other.  Your
4   Honor may recall, Kevin Prince reaches out with the gun, but
5   gunfire fires out, and Jomo Williams was the one who was hit
6   first rather than their intended victim.  They fled, driving
7   recklessly through the streets, leading the police on a chase.
8   As you may recall, Kevin Prince was trying to get rid of the
9   gun and ended up pleading guilty to possession of that firearm
10  in state court, but Jomo Williams was found bleeding in the leg
11  because he was shot during that robbery.  Jomo Williams'
12  violence extended not just to drug dealers, it extended to
13  April Ryan, the mother of his children, who he decided to put
14  on the stand; and in an utter sense of disregard of this
15  Court's authority, put somebody on the stand, knowing that she
16  was going to lie for him.  The jury found that her testimony
17  was false.  I'm not necessarily saying that I blame her.  Your
18  Honor saw her with your own eyes, how scared she was up on that
19  stand.  It is my thought that she simply testified that way
20  because she was scared of what would happen if she did not, and
21  that was reasonable fear considering her history with Jomo
22  Williams.  Whereas your Honor heard, when they were together,
23  yes, they had children, but also they had fights.  And these
24  weren't shouting matches, these weren't arguments; these were
25  physical fights where Jomo Williams would repeatedly attack

F4f4WilS

1    April Ryan.  In fact, April Ryan on the stand said she refused

2    to talk about whether she would get back together with Jomo

3    Williams if he were ever released on this case or otherwise.

4         As you may recall from Jason Elder, this robbery crew

5    didn't just target drug dealers, although to be clear, drug

6    dealers don't deserve to get robbed or killed either, they also

7    targeted civilians going after trucks.  If I remember

8    correctly -- I apologize -- some of that testimony your Honor

9    decided to preclude, but your Honor heard about it in the

10   pretrial motions, that this robbery crew went after more than

11   simply drug dealers but also civilians as well.  No one was

12   safe from Jomo Williams.  Jomo Williams, through his history,

13   has demonstrated that unless he is in jail, no one is safe from

14   him.  Even while under federal correctional sentence, Jomo

15   Williams has had a least two incident reports, one which

16   involved simply walking somebody's cell and beating that man.

17   Why?  Because that is how Jomo Williams responds to everything

18   through his entire life, it is with violence.

19        When your Honor looks at the 3553(a) factors, there

20   are no factors that counsel for leniency for Mr. Williams.

21        The first factor is the nature and circumstances of

22   the offense and the history and characteristics of the

23   defendant.  The nature and the circumstances of this offense

24   are the highest level that there can be.  This is the one of

25   the few offenses for which the death penalty is available.  We

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F4f4WilS

1    did not seek it -- I'm not saying we regret that in any way --

2    but it gives an idea of Congress' recognition of just how

3    serious this kind of an offense is.  It is an offense that

4    automatically starts at level 43; that is, if there is no

5    acceptance of responsibility, the guidelines are straight life

6    without factoring in things such as consecutive sentences.  The

7    history and characteristics of the defendant, as we have just

8    discussed, Jomo Williams' history and characteristics are

9    terrible, to say the least.  Mr. Williams has been nothing but

10   a violent thug his entire life and has offered nothing

11   productive to society.

12          Then, you have the four legitimate purposes of

13   sentencing:  To reflect the seriousness of the offense; to

14   promote respect for the law; and to provide just punishment for

15   the offense.  Again, because of the level of seriousness of

16   this offense, murder -- murder -- your Honor, all of those

17   counsel for a severe sentence, for a life sentence.  To afford

18   adequate deterrence to criminal conduct.  That has both

19   individual deterrence and general deterrence factors.

20   Individual deterrence, your Honor knows from the defendant's

21   history that he is not deterred by prison.  Prison simply means

22   when do I get out to do it again.  In terms of general

23   deterrence, your Honor must send a message to the streets that

24   armed robberies will not be tolerated because sometimes people

25   die during them, and that is the most serious offense that one

F4f4WilS

can consider, and only the most serious punishment would afford
adequate deterrence for that kind of an offense.  To protect
the public from further crimes of the defendant.  Again, I have
already discussed this.  Mr. Williams has shown that the only
thing that protects the public is incapacitation.  Nothing
short will do.  To provide the defendant with needed
educational or vocational training, medical care, or other
correctional treatment in the most effective manner.  In this
case, because it is so clear that he belongs in prison for the
rest of his life, that doesn't even matter much because there
shouldn't be a chance for him to get out and worry about what
job he will get.  Notably, he has never really held real jobs
in his life.  His job has been simple:  Drug dealer and drug
robber.

        Then, you also have the guidelines range itself.  Here
that's obvious.  That is life plus 40 years.  That counsels for
a life-plus-40-year sentence.

        The kinds of sentences available.  Again, the statute
here and the guidelines push for sentences of imprisonment as
the kinds of sentences that are available.

        Any relevant policy statement by the sentencing
commission.  Here the guidelines really are the policy
statement.  The application note to 2A1.1, makes clear the
sentencing commission considers life to be an appropriate
sentence in this case.

F4f4WilS

```
 1              The need to avoid unwarranted sentence disparities
 2     among defendants.  While your Honor is required to consider
 3     nationwide disparities, which are largely reflective of the
 4     guidelines, with the idea being the guidelines will serve as a
 5     general proxy for nationwide disparities.  And here again,
 6     that's life.  Your honor has asked us about other sentences.
 7     We have provided your Honor with a large list of sentences
 8     where life or something close to it were imposed, including in
 9     cases where the defendants pled.  Mr. Cohn provided four cases
10     to this Court, and three of them, where there were much more
11     serious sentences I may add than Mr. Cohn has asked for, the
12     defendants pled guilty.  And the courts and the sentencing
13     guidelines have accepted that there should be some credit for
14     acceptance of responsibility.  Those defendants are not
15     similarly situated to Mr. Williams.  The fourth case, the
16     Damian Brown case, that defendant who got 32 and a half years
17     from Judge Rakoff, did go to trial.  However, it should be
18     noted, first of all, that the lead defendant in that case,
19     Shawn Peterkin got 45 years.  Also, Damian Brown didn't have a
20     similar criminal history or past as Mr. Williams, and that case
21     presented an unusual circumstance, still thoroughly
22     unacceptable, but in that case, Damian Brown and his crew,
23     three others, Shawn Peterkin and two others, they were involved
24     in a long-term gun war basically over I think it was about a
25     week or week and a half where they would go out and shoot at
```

1   theirs rivals, and then their rivals would drive back and shoot

2   at them.  It was thoroughly unacceptable in every way, shape,

3   or form, but at least there was something where there was a

4   them-or-us attitude that was going on.  That is not what was

5   happening during this murder.  During this murder, he came in

6   on a man who he hoped and planned to be unarmed with the intent

7   of taking what he had to, doing what he had to take it, and

8   determined, "he challenged my gangsta, so I had to wig him."

9          Then, the need to provide restitution to any victims.

10  As I mentioned at Mr. Barbee's sentencing, the victims have not

11  asked for restitution yet.  On that, which I don't think should

12  affect the imprisonment in this case, we would ask that the

13  Court leave restitution open for 90 days, as the statute

14  permits, in order to allow the family to seek restitution

15  should they so seek.

16         I think it is also interesting that Mr. Williams has

17  submitted a large number of letters both by himself and family

18  members.  It is no surprise that his letter and his family

19  members' letters seek leniency, and I think that one thing that

20  is worth noting here is that men like Mr. Williams, when they

21  commit this crime, they make victims not only out of D'Angelo

22  Jordan and their family but out of their own family because

23  they have no regard for their own family when they get into a

24  position where they would have to (a) set such a poor example

25  as to rob and kill people, and (b) when they subject themselves

F4f4WilS

```
 1   to something where they're going to go away and they're not
 2   going to be able to provide for their family.  Notably, a lot
 3   of these letters tell a story that is just fundamentally at
 4   odds with what your Honor knows from the evidence in this case.
 5   Mr. Williams' letter, on his own, starts with:  I am not the
 6   tough individual as I may appear.  That is not what your Honor
 7   heard.  Mr. Williams, on the other hand, is very much the tough
 8   individual.  His entire life was about robbing people,
 9   including other drug dealers where those drug dealers could be
10   armed or otherwise dangerous.  Your Honor your Honor the
11   numbers of guns that D'Angelo Jordan owned in his house.  That
12   is certainly the tough person as he would appear.  Your Honor
13   heard about the violence that he would commit on others in
14   seeking his own ends.
15           Your Honor read from Mr. Williams' niece that
16   Mr. Williams was, quote, a peacemaker.  Again, this lies at
17   odds with what your Honor knows.  Mr. Williams wasn't a
18   peacemaker.  He was ready for war at all times, war against
19   others and war against society.
20           Your Honor read from one of Mr. Williams' brothers
21   that one of his reasons for asking for leniency was because of
22   the good lessons that Mr. Williams' mother taught them.  I have
23   no doubt that Mr. Williams' mother taught him extraordinary
24   lessons.  The problem here is that they did not take because,
25   according to Mr. Williams' brother, his mother always taught us
```

F4f4WilS

1    never to rob or steal and to work hard for everything.  That is

2    precisely the opposite of what Mr. Williams decided to do.  He

3    ignored his mother's advice and, as a result, a man is dead.

4           April Ryan, who your Honor saw testify here, said, I

5    really need him here to help me out with these kids.  Again,

6    your Honor heard that how he helped her out in the past was by

7    beating her, by assaulting her repeatedly.  That is not helping

8    somebody out with their kids.

9           Mr. Williams' mother said that Mr. Williams told her

10   about the time that he hit a superintendent in the head with a

11   hammer, which to look at the PSR it doesn't say he had it on

12   him.  He saw that the superintendent was in an argument with

13   his girlfriend.  He got into the argument and then says, he

14   went, retrieved a hammer, came back and hit the super in the

15   head.  That is, he thought this one out and thought how can I

16   hurt this man as much as I can that Mr. Williams told her,

17   quote, that he could not watch as she was being beaten up on by

18   the super of the building and his family.  That is,

19   Mr. Williams is telling his own family that this horrible

20   violence is justified; that what he does is the right thing.

21   This is not a man who has any remorse for what he does.

22   Bashing people in the head with a hammer is perfectly normal

23   and appropriate, as far as he is concerned.

24          The pastor says, he has a real love for people and

25   desires that the best of himself be given to those who depend

1     upon him.  Again, the best of himself to those who depend upon

2     him include his history of domestic abuse of April Ryan and the

3     horrible abuse of those who lived in his community.

4          Finally, another brother, Airman Eliejah Williams --

5     who, by the way, I will note that Jomo Williams, in looking out

6     for his friends, your Honor may recall that in this false

7     personation charge, he used the name Eliejah Williams, which

8     belongs to his brother and his son.  So he even uses his own

9     family to try to get out of trouble.  Airman Eliejah Williams,

10    who apparently is quite different from Mr. Williams here, he

11    has made something of himself, writes the following:  I believe

12    that the loss of his crentials, his loss of accreditation for

13    his vocation, and the loss of respect in the community, as well

14    as those freedoms that he was afforded prior to his felony

15    conviction, may have taken a bigger effect than keeping him out

16    of the work force.  He certainly will not be in a position to

17    be able to repeat his offense; and quite frankly, I cannot

18    imagine that he will ever repeat any illegal activity.  This is

19    so far removed from the facts of this case that it is difficult

20    to understand.  Of course, he has never had accreditation for

21    any vocation other than two jobs that he reported that

22    probation could not verify and the claim that he ran a music

23    business or entertainment business with his brother.  His only

24    vocation has been to rob people.  He needs no accreditation for

25    the business of robbing people.  The only accreditation he had

F4f4WilS

```
 1    was before he received his first felony back in 2002, so 13
 2    years ago, after that at least in theory he can no longer carry
 3    a firearm because, of course, it is illegal for a felon to
 4    carry a firearm.  Of course, the lack of that accreditation did
 5    not prevent him from following his dream and continuing his
 6    vocation of robbing other people, using guns, beating them, and
 7    eventually killing one of them.  That is not the thing that has
 8    kept him out of the work force.  What has kept him out of the
 9    work force has been his decision over and over to resort to
10    violence.
11            Simply put, there is no reason for leniency for
12    Mr. Williams.  Mr. Williams presents the absolute ideal
13    prospect for why it is that some people deserve to be in prison
14    for the rest of their life.  Mr. Williams did not accept
15    responsibility.  His co-defendant, Kevin Prince, who Judge
16    Keenan sentenced to a guideline sentence of 27 years, fully
17    accepted responsibility and did it early on.  The courts and
18    the guidelines have recognized that accepting responsibility
19    can be credited at the time of sentencing.  He was also given a
20    structured plea deal from the government that limited his
21    guidelines exposure.  He made decisions to at least accept
22    responsibility, knowing that he was going to go to jail for
23    likely 27 years, which in fact he did get.  Mr. Williams, on
24    the other hand, has continued to show no remorse.  He showed no
25    remorse at the time when he bragged about the murder and when
```

F4f4Wil5

1    he went out and tried to commit another armed robbery just days

2    later, and he shows no remorse now when he continues to deny

3    his involvement in spite of a unanimous jury verdict beyond a

4    reasonable doubt of his guilt.

5            Your Honor, the defendant deserves a guideline

6    sentence of life plus 40 years' imprisonment, and we strongly

7    urge the Court to so impose.

8            THE COURT:  Does defense counsel wish to be heard?

9            MR. COHN:  I do, but if the Court would indulge me, I

10   know that Mr. Williams has a lengthy statement that he would

11   like to make and that his mother would like to speak despite

12   the castigation or the misrepresentation about the family

13   indulged in by the government for no appreciable reason other

14   than just to do it.  If the Court would allow Mr. Williams'

15   mother to speak and then him, I would have a few final words.

16           Is that satisfactory, ma'am?

17           THE COURT:  I will permit his mother to speak, yes,

18   but at the rail.

19           Please state your name.

20           MS. WILLIAMS:  Lynell Williams.

21           THE COURT:  Go ahead.

22           MS. WILLIAMS:  I'm the mother of Jomo Williams.  He is

23   one of my 15 children, one of my 8 sons.

24           I know the prosecutor have to make an argument to make

25   his case creditable, but the things that he have said and what

F4f4WilS

1    I have heard does not even justify the child that I raised and

2    the child that I know that has now become a man.  First of all,

3    this family and Jomo has been very close-knit.  Second of all,

4    Jomo never lied to me.  Even in his worst days, he will let me

5    know his worst days.  And murder has never been one of his

6    worst days.  He has never admitted to me to have been no crime

7    of passion or whatever you might try to say about him.  No one

8    in this family here, or not even here today, have ever heard a

9    conversation of a murder.  No one have ever had to question him

10   about a murder.  Yes, we had to question about him being a

11   young man and making wrong choices in life, yes.  That has been

12   an issue with us, yes.  He has never disrespected me as a

13   child, as a grown man also.

14        I can understand him being impatient.  Who wouldn't

15   be, locked behind bars and accused of something you know you

16   didn't do?  Anybody would be anxious.  I would be anxious.

17        When I made that statement about him defending April,

18   I wanted the courts to know exactly the person that he is on

19   that level, wherein the prosecutor is saying that April was a

20   person that is afraid of him.  April is constantly asking about

21   him.  I think she even sends money to jail for him.  They're

22   always talking on the phone.  It is not just him and the kids

23   alone talking; it is him and April.  A person who is supposed

24   to be afraid of him -- I know if I was afraid of someone, I

25   wouldn't even have them even talk to my children, and my

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F4f4WilS

1    children know that's the type of person I am.  Much less to

2    still be involved with him.  So I really don't know where you

3    got all of your information from, but I know a lot of it is a

4    lot of lies.

5         But at this point, we just have to stick with our son,

6    which we are prepared to do, and stand by him to have his name

7    cleared.  You know, there's a lot of things that I saw happen

8    in his proceeding when I was here that I was not pleased.  His

9    lawyer, for one, the two times I spoke to that man, he

10   blatantly disrespect me, treated me like I was a common

11   criminal myself.  If that was my treatment, I can only imagine

12   what my son had to endure.  All I can say is my son was a good

13   son, is a good son.

14        My heart do go out, also, like I stated in my letter

15   to you, for the parent that lost her child.  You know, it is

16   nothing good when you lose a child.  It is nothing good at all.

17   So I do have sympathy for that mother.  I do feel for that

18   mother, no matter the circumstances, no matter whatever it is

19   that took place that caused that child not to be here for that

20   mother today.

21        But I am here for my son, you know, because, like I

22   said, I knew he made some bad choices.  Every time he was out

23   of jail he worked with me, with my cleaning company.  Every

24   time he was out of jail, he stayed with me.  Every time he went

25   back to jail, it was all probably not showing up for his

F4f4WilS

probation, most of the time that was the case, not that he had
gone back to a life of crime, anything like that.  You know, it
always would be some miscellaneous something that would cause
him to be back in there again.  But murder was never one of
them.  Guns was never one of them.  Drug dealing I don't know
what he was doing, but I know all I can tell you about the
child I raised and the character that you just described,
that's not the character that I have known for 30-odd years.
That is not the character that this family has known for 30-odd
years.

You know, so there is a lot more I can say, but at
this point I don't know what difference it would make.  Just
know that my son is not a murderer, and I will stick to that,
and I will always defend him on that, you know.

And I just thank you, your Honor, for hearing me out.

THE COURT:  Mr. Williams, do you want to make a
statement?

THE DEFENDANT:  Yes, ma'am.

I know today I got one shot at trying to paint a
picture to show that even though I have committed crimes in the
past, I did not commit this crime.  So last night I stood up
all night, and I took some notes so that I could try to get my
point across the best I can because the worst thing I regret
right now does is not getting up on that stand during trial.
That's the worst thing I regret.  I should have let myself be

F4f4WilS

1    heard.

2          I would like to thank the Court for allowing me to

3    speak.  I would like to thank my family, my friends, my loved

4    ones for believing in me no matter what.  You know if I did

5    something wrong, somebody would have known.  I love you all.

6          There was never a time in my life where I didn't take

7    full responsibilities for my actions.  If I did something wrong

8    or unlawful, I made sure that I took full responsibility for

9    it.

10          I never, never, had no part in that senseless killing

11    of D'Angelo Jordan.  I don't even know Khalid Barbee.  So the

12    people that did that need to come forward and tell the truth.

13    But what is the truth?  The truth cannot change.  No matter

14    what a person does, the truth can never change.  If you

15    question about the truth, on your truth, on any situation, then

16    that truth must stay the same.  Because that's the only way we

17    will know that you're telling the truth.  If the person should

18    change -- if it should be found out that a person changed that

19    truth, then that person becomes a liar and should be treated

20    like a liar.  But not in this case.  Not in solving the murder

21    of D'Angelo Jordan.  No, no, no.  Not in this case.  No matter

22    what statements I find, what video confessions I find to prove

23    that the witnesses are lying to the prosecution, they always

24    find a way to bend the truth and change it.

25          So I ask who determine the truth.  I wish I knew the

F4f4WilS

 1    person that determined the truth.  Or what determined the

 2    truth.  Every day I look at the TV, and I see crimes that have

 3    been done on camera.  Law enforcement, kids fighting, people

 4    getting hurt, people killing each other.  And the only proof

 5    that they have is that videotape because that's not

 6    premeditated.  That cannot change.  No matter what a person,

 7    that cannot change.

 8              And all I have, all I had with April Ryan, the person

 9    that's scared, or allegedly been scared, but if you would know,

10    she is sick with multiple sclerosis.

11              And the videotape of the prosecution where I would

12    think only credible witness.  That in no way, what I heard,

13    would get no proceeds for this senseless robbery, killing.

14              And all I ask for, it to play.  You could say days

15    later it was a -- days later, Jomo Williams went and committed

16    a robbery and got shot.  I got shot at a nightclub, ma'am, your

17    Honor.

18              But if you see the tape, he never said that -- he

19    never said nothing that he has testified about.  That's why I

20    wanted the jury to see the whole tape.  To say, hold on, you

21    say one thing change, but everything can't change, because like

22    I said before, the truth never change.

23              This is not a game where we could start over.  This is

24    not a game where we start over and say, all right, we get

25    another shot at life.  No, we only have one life.  I only have

F4f4WilS

1    one life.

2              A man was killed.  Like any other family, like my

3    family, like D'Angelo Jordan's family, like me, we want

4    justice.  We want proper justice.  What is happening today,

5    making me a sentence here, is not justice.  We want justice.  I

6    want justice.

7              Don't use my characteristics as saying that I am a

8    murderer.  Use evidence to prove that Jomo Williams murdered

9    D'Angelo Jordan.  Use evidence.  Because all me and my legal

10   team can do is try to use evidence.  That's all we could do,

11   concrete evidence.

12             Oneil Douglas, he's a murderer.  He murdered people.

13   But the prosecutor said one day, it snapped in his head and he

14   said, all right, today I'm just going to tell anything I was

15   ever part of, everything I ever did, I'm just going to tell the

16   truth, and hopefully I get a letter from the prosecutor and

17   they are going to let me go in jail for I can murder more

18   people.  They treat him as he's a saint.  And the mother of my

19   kids -- yes, we had situations growing up -- you treat her like

20   she's a murderer.  I read the transcripts.  You're damn right

21   she'll be scared.  Oneil Douglas, we see him with our own eyes

22   drinking water and taking time.

23             Justice is not served sentencing me today.  Justice

24   will not be served.  If I got to write my president, if I got

25   to write everybody, if I got to send this tape all over the

F4f4WilS

1    world until somebody say, look, Joseph Rosario say he know

2    Kevin Prince, he met him five days ago.  Five days ago was the

3    murder of D'Angelo Jordan.  But I never met the guy that he

4    described, the guy that was shot in his leg, yes, me, Jomo

5    Williams, I never met him.  He didn't say it one time.  He

6    didn't say it two times.  He said it three times.  He testified

7    to the grand jury two days later.

8            When do the truth change?  I know when.  When it works

9    for the prosecution.

10           I can recall where I was October 2011.  Pardon me if I

11   get a little aggressive.  I recall where I was October 2011 --

12   2006, October 11, 2006.  You might think, yeah, we don't

13   celebrate things.  Yes, we do.  We might fight.  We might

14   argue.  Things might happen in the relationship.  We might

15   cheat.  We might get caught cheating.  It might get blown out

16   of proportion.  It is known that people do things that hurt

17   other people when they are hurt, but we remember the times when

18   it was good.  I never -- I never -- I didn't see April Ryan

19   face-to-face until she got on that stand in 2010.  You can

20   check all my recordings on the family.  My family would never

21   back me up -- my brother is in the Navy -- they would never

22   back me up and say, look, we're going to make this girl get up

23   there and lie.  Just like Oneil Douglas, just like Jason Elder,

24   just like Joseph Rosario, the guy that made the statement was

25   prepared.

1          My lawyer never put me as my witness.

2          All we remember was that day.  That was the best thing

3     in the world that God did for me.  That was the best thing in

4     the world.  That was the best thing in the world.

5          I felt like, no matter what happened, I felt like no

6     matter what happened, I was trapped.  I felt like no matter

7     what happened, I couldn't -- I can't think -- yes, Kevin Prince

8     is a friend of mine.  Also, he pleaded guilty for murdering

9     D'Angelo Jordan.  He is a murderer.  So that means he is no

10    friend of mine no more because Jomo Williams is not a murderer.

11         But Kevin Prince was given a chance to plead out.

12    Khalid Barbee was given a chance.  They was given the chance to

13    tell a story.  They went to ATF, NYPD.  They were given a

14    chance to sit down and say, where were you on October 11, 2006,

15    where were you.  Numerous witnesses, numerous potential

16    witnesses, numerous suspects, everybody had a chance.  Where

17    did my chance come when somebody can sit down and say, Jomo, we

18    may have to arrest you for murder.  You said I'm in jail.  The

19    prosecutor said I'm always in prison.  So you could come to me.

20    Jomo, where were you?  Never.  Never one time.  I just get

21    handcuffed, arrested, sent to trial.

22         I get a lawyer that we don't even get along.  We never

23    see eye-to-eye.  He disrespect my mom.  He disrespect me.  He

24    talk to me crazy, unprofessional.

25         Look at my sentencing memorandum.  Jomo Williams, the

F4f4WilS

1    criminal they say I am, and I'm being tried for murder.  Look

2    at my sentencing memorandum.  Look at the prosecution's.  Is

3    this fair?  Is this fair?  This is my whole life.  This could

4    tell you that I volunteered to work with the police department.

5    This could tell you things like that.  This could tell you what

6    I did in my life.  But this could tell you everything that I am

7    not.

8           Where is my justice?  Where is my justice?  D'Angelo

9    Jordan is not my friend.  D'Angelo Jordan is not my friend.

10   Yes, I have friends that was murdered.  Yes, I have friends

11   that killed themselves.  Yes, I have friends.  Yes, I show

12   remorse to those friends.

13          When you ask to show remorse to D'Angelo Jordan, it is

14   not remorse that I could show.  I could only feel his parents'

15   and family's pain because I have sons.  I do feel their pain.

16   Why would a person show remorse if you're an innocent man?  If

17   you're innocent why show remorse?  Remorse is when you show

18   guilt.  Guilty men show remorse.  Kevin Prince showed remorse.

19          Jomo Williams, I feel their family pain.  I see my

20   son.  Oh my God, I don't know what I would do.  I don't know

21   what I would do.  All the guns you show the jury, all the guns,

22   all the drugs that were found in D'Angelo Jordan house, man, I

23   don't know him.  That has nothing to do with the murder.  Let's

24   stick on the case.  He was murdered.  Yes, D'Angelo Jordan was

25   murdered by a coward.  By a sucker.

F4f4WilS

1          If you want to meet my character, you want to read my

2     character, I'm so violent, I'm so this, I'm so that, I'm so

3     this.

4          D'Angelo Jordan, he is not a big guy.  If violence was

5     to come, I don't see myself having to shoot a big guy.  I don't

6     see myself having to shoot no one.  But they parade me like I

7     just sit here, I look like -- my look is as a black man from an

8     urban neighborhood that, you know, that been through life, been

9     through rough life, been through rough times.  That's how I

10    look, ma'am.  This is me.  This is how I look.  I can't change

11    the way I look.  But who I am?  Who I am is not what they paint

12    me out to be.  Who I am is not a murderer.  I did not kill this

13    man.  I was not part of them.  I was not part.  I was not part

14    of this.  I was never.

15         I regret not getting on that stand.  The jury supposed

16    to hear me.  But my lawyer was not prepared.  He is never

17    prepared.  Never prepared for me.  Never prepared for me.

18    Never help me.  Never want to listen to my ideas.

19         All I needed was your help.  All I needed was your

20    help.  Listen to me.

21         You told me one time, you said, you told me one time,

22    you say, I advise people to joint team USA.  You told me that.

23    Look, team USA is one that want to give me life.  That's what I

24    want to join?  No.

25         I know I have appeal issues.  I know that I will

F4f4WilS

1    fight.  I just need a new lawyer.  I just need the Court to

2    grant me a new lawyer that could help me.  We don't got no

3    money.  We don't have any money.

4         You know, I know I was found guilty by a jury of my

5    so-called peers, but I asked them, can I go pick, can I be part

6    of the jury selection.  I asked you.  You told me no.  The

7    judge, she told me that the judge is new, she don't do things

8    like that.

9         I read through the trial minutes.  She specifically

10   asked you, Mr. Cohn, if your client -- are you sure your client

11   is allowing this?  You said yes.  You think I don't want to be

12   part of every piece that is going to determine my life?  You

13   think not?

14        That was a jury that I was found guilty in front of.

15   Like I said, if they could have seen certain things, if my

16   lawyer would have made certain arguments and certain people

17   would have came and testified that I wanted to be

18   cross-examined, police officer, probably, probably they would

19   have seen something because I sat here, and I know somebody was

20   in there deliberating and wanted to know what goes on.

21        Everybody got a ticket.  After today, everyone gets a

22   ticket home off of Jomo Williams.  Oneil Douglas walks home.

23   He killed three people.  His friend, like he said.  They would

24   write a pretty letter and say, yeah, he helped us.  Jason

25   Elder, it just shock me.  Guy plead guilty in prison and then

1   all of a sudden he is with Khalid Barbee, bunking.  They sleep

2   in the same cell together.  They know each other.  Now you know

3   about a murder of D'Angelo Jordan.  Got to be kidding me.  He

4   go home.  I pay the price.

5           Judge Torres, I will fight to prove my innocence every

6   day.  I know that you got to sentence me today, and I know that

7   it is your job.  I know.  I know.

8           I wrote you a letter when I said that I might look

9   callous.  And strong as I am, I'm a weak individual.  Yes, I

10  grew up in prison, some of my life in prison, and sometimes

11  this is the look that makes you survive in prison.  Anything

12  that happened in prison, the prosecution could talk about.

13  Some things just happen because you are in a situation you

14  don't want to be in, and I'm not supposed to be in prison right

15  now.  I'm supposed to be home with my family.  Anything happen

16  on this day, from the day I was caught, that's not my destiny.

17          I ask you to take into consideration that I put on a

18  case.  I didn't just come here.  I didn't force April Ryan to

19  go up there.  If I was so much of a bad guy to her, she would

20  never have come there.  She's sick.  Yeah, the prosecutor said

21  in the closing argument that she was shaking, which I had a

22  doctor letter.  She's got multiple sclerosis.  Sometimes she

23  can't even get out of bed.  She is not here right now, you all,

24  because she can't get out of bed, can't bring my kids.  I

25  wanted to see my kids today.

F4f4WilS

 1          I object to all of this.  The whole indictment I

 2    object to.  Because I did not kill D'Angelo Jordan.  And after

 3    today, this will not be the last time you hear from me.  I will

 4    prove, I will make sure I prove to you one day that Jomo

 5    Williams did not kill that man.  I just hope that, I just hope

 6    that he is up there and just looking down and just shaking his

 7    head like, damn, that's not him, that's not him.

 8          Thank you, Judge, for letting me speak.  I'm ready for

 9    my judgment.  Thank you.

10          THE COURT:  Mr. Cohn, would you like to make a

11    statement?

12          MR. COHN:  I don't think, given the things that

13    Mr. Williams has to say about me, that there is much I can say

14    after that.  I will say that he has never admitted to me that

15    he did this crime; that he has protested his innocence from the

16    very beginning.  And I suspect that you will be hearing more

17    about my representation at some future date when he has a new

18    lawyer.

19          I don't believe you can appoint a new lawyer now.  I

20    think that what has to happen is that I have to file a notice

21    of appeal for him and make a motion to be relieved and have new

22    counsel appointed.  If you can make a notation that he should

23    not be sent to another jail until a new lawyer has been

24    appointed and he has an opportunity to consult with him, that

25    would be helpful, and I will certainly ask the circuit to do

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F4f4WilS

1    the same thing.

2           For what it is worth -- forget what it is worth.

3           I know that there were attempts made to get people who

4    knew better to testify, and because they were represented by

5    counsel, I couldn't speak to them, although I tried.  And

6    Mr. Williams knows that.  That some day they won't be, and if

7    what is reported to me is true, they will come forward and

8    testify that he wasn't there.  But there was nothing I could do

9    about it.  I issued a subpoena to the lawyer, one of them, and

10   his lawyer moved to quash it, and that disappeared.

11          I don't know what to do about this.  The jury found

12   him guilty, and you are bound by that.  On the other hand, I

13   reject what the government has to say about this man being

14   unredeemable.  You heard from a human being today.  You've

15   heard -- I mean, he didn't testify for a bunch of reasons, and

16   you may remember he raised it, and we had a colloquy about it,

17   and we advised him -- I advised him not to testify, and that

18   was all put on the record.  If he testified, all the things

19   that you had suppressed pretrial would come out in

20   cross-examination of him, and that was the reason for the

21   argument, and he seemed to accept that.

22          Hindsight is wonderful.  It is a decision that was

23   made.  It was a tactical decision that was made.  He may regret

24   it now, and I can understand that.

25          I don't recognize the relationship he described.  It

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F4f4WilS

 1    doesn't matter.

 2            He shouldn't do life in jail.  We have made some

 3    suggestions that would limit it so that he has an opportunity

 4    to get out at some time in his life, and I suggest, your Honor,

 5    that you do that.

 6            THE COURT:  Is there any reason why a sentence should

 7    not be imposed at this time?

 8            MR. MAIMIN:  No, your Honor.

 9            MR. COHN:  No legal reason.

10            THE COURT:  As I have stated, the guidelines recommend

11    a term of imprisonment of life plus 40 years.  Under the

12    Supreme Court's decision in Booker and its progeny, the

13    guidelines range is only one factor that I must consider in

14    deciding the appropriate sentence.  I'm also required to

15    consider the other factors set forth in 18 U.S.C. 3553(a).

16    These include, first, the nature and circumstances of the

17    offense and the history and characteristics of the defendant;

18    second, the need for the sentence imposed to (a) reflect the

19    seriousness of the offense, to promote respect for the law, and

20    to provide just punishment for the offense; (b) to afford

21    adequate deterrence to criminal conduct; (c) to protect the

22    public from further crimes of the defendant; and (d) to provide

23    the defendant with needed educational or vocational training,

24    medical care, or other correctional treatment in the most

25    effective manner.  Third, the kinds of sentences available.

F4f4WilS

1    Fourth, the guidelines range.  Fifth, any pertinent policy

2    statements.  Six, the need to avoid unwarranted sentence

3    disparities among defendants with similar records who have been

4    found guilty of similar conduct; and seven, the need to provide

5    restitution to any victims of the offense.  Ultimately, I am

6    required to impose a sentence sufficient but no greater than

7    necessary to comply with the purposes of sentencing that I

8    mentioned a moment ago.

9          I have given substantial thought and attention to the

10   appropriate sentence in this case in light of the Section

11   3553(a) factors and the purposes of sentencing as reflected in

12   the statute.

13         On the other hand, there is sufficient support for the

14   reasonableness of a guideline sentence.  This was a very

15   serious offense.  Mr. Williams participated in an armed robbery

16   during which he senselessly shot and killed D'Angelo Jordan.

17         One of the things that I find so disturbing about the

18   murder of D'Angelo Jordan, Mr. Williams, is the reason that you

19   gave to Jason Elder.  Mr. Elder testified at trial.  He came

20   across as a credible witness.  Mr. Elder is a friend of

21   Mr. Williams and the uncle of one of Mr. Williams' children.

22   Mr. Elder testified that Mr. Williams said that he shot

23   Mr. Jordan because, quote, the guy tested my gangsta, end of

24   quote, which according do Mr. Elder means to basically

25   challenge.

F4f4WilS

1          So when Mr. Williams brandished his gun and Mr. Jordan

2     resisted, Mr. Williams interpreted this resisting as testing

3     his gangsta.  Apparently, in the mind of Mr. Williams,

4     Mr. Jordan was essentially saying that Mr. Williams was not man

5     enough to shoot, which I believe wounded Mr. Williams'

6     feelings.  I believe that Mr. Williams felt deeply insulted and

7     disrespected; that even when he was holding a gun, he was not

8     being taken seriously.  To prove himself, Mr. Williams pulled

9     the trigger.  In that moment, the only thing Mr. Williams

10    proved is that he is willing to kill somebody without

11    justification.

12         Mr. Williams has a lengthy criminal record that

13    includes numerous acts of violence and threatened violence,

14    among them a gunpoint robbery and an attempted assault.  This

15    is his tenth criminal conviction.

16         On the other hand, there is no indication that the

17    killing of Mr. Jordan was premeditated.  Under the Section

18    3553(a) factors, I'm also to take into account the history and

19    characteristics of the offender.  Mr. Williams and his

20    14 siblings were raised by a single mother.  According to

21    Mr. Williams' sister, Kashashi Buffong, it wasn't easy growing

22    up under these family circumstances.  Mr. Williams dropped out

23    of high school in 1995 but ultimately earned his GED in 2006.

24         Mr. Williams is now the father of four children, ages

25    11, 12, 14, and 15.  Johnia Elder, with whom Mr. Williams is

F4f4WilS

1    out of contact, is raising one of Mr. Williams' daughters.

2    April Ryan, who suffers from multiple sclerosis, is raising

3    Mr. Williams' three other children.  Unfortunately, she is

4    unable to work due to her illness; and with Mr. Williams in

5    custody, Ms. Ryan has had to rely on public assistance to

6    support herself and all of the children.

7           Ms. Ryan, Ms. Baffong, and Mr. Williams' mother, in

8    addition to his aunt, his brother, nieces, children, and a

9    member of the clergy have written letters of support indicating

10   that Mr. Williams is a loving father, son, brother, nephew, and

11   uncle, who is missed by his family.

12          If there is ever a day in a person's life when he is

13   entitled to be judged on the basis of the entirety of his

14   contribution, it is at sentencing.  Section 3553(a), directing

15   the Court to consider the history and characteristics of the

16   offender, is consistent with that.

17          In sum, my judgment, for the reasons stated, is that a

18   sentence below the guidelines range of life plus 40 years is

19   merited here.  Accordingly, I do believe that a variance,

20   pursuant to 18 U.S.C. 3553(a), is appropriate.

21          Mr. Williams, please rise for the imposition of

22   sentence.

23          It is the judgment of this Court that with respect to

24   Count One, you are sentenced to 20 years' imprisonment.  With

25   respect to Count Two, you are sentenced to 20 years'

F4f4WilS

1    imprisonment.  With respect to Count Four, you are sentenced to

2    ten years' imprisonment.  The sentences in Counts One and Two

3    shall run concurrently; whereas, the sentence on Count Four

4    shall run consecutively, meaning that the total amounts to

5    30 years' incarceration.  You shall receive credit for time

6    served.  Your incarceration is to be followed by three years of

7    supervised release on Counts One, Two, and Four to run

8    concurrently.

9          The mandatory and standard conditions of supervised

10    release shall apply.  They are the defendant shall not commit

11    another federal, state, or local crime.  The defendant shall

12    not illegally possess a controlled substance.  The defendant

13    shall not possess a firearm or destructive device.  The

14    defendant shall refrain from any unlawful use of a controlled

15    substance.  The defendant shall submit to one drug testing

16    within 15 days of placement on supervised release and at least

17    two unscheduled drug tests thereafter, as directed by the

18    probation officer.  The defendant shall cooperate in the

19    collection of DNA, as directed by the probation officer.

20          In addition, the following special conditions set

21    forth in the presentence report will apply:  Upon the

22    defendant's release, the defendant shall submit his person,

23    residence, place of business, vehicle, or any other premises

24    under his control to a search on the basis that the probation

25    officer has reasonable belief that contraband or evidence of a

1    violation of the conditions of release may be found.  The

2    search must be conducted at a reasonable time and in a

3    reasonable manner.  Failure to submit to a search may be

4    grounds for revocation.  The defendant shall inform any other

5    residents that the premises may be subject to search pursuant

6    to this condition.  The defendant shall remain at his reported

7    place of residence from the hours of 9 p.m. to 6 a.m. or during

8    curfew hours otherwise set by the supervising probation

9    officer.  The defendant must receive approval from his

10   probation officer to leave his place of residence during curfew

11   hours except for instances involving medical emergencies.  The

12   defendant shall be supervised in the district of residence.

13   The defendant is to report to the nearest Probation Office

14   within 72 hours of release from custody.

15            There will be no fine because it appears that you are

16   unable to pay one, although you must pay the mandatory $400

17   special assessment.

18            MR. MAIMIN:  Your Honor, I think it is 300 because you

19   dismissed Count Three.

20            THE COURT:  That is correct.  $300 special assessment,

21   which shall be due immediately.

22            Mr. Williams, you may also be required to make

23   restitution in an amount to be determined.  The government

24   shall file a written submission with respect to restitution by

25   July 14, 2015.

F4f4WilS

1          Finally, I'm required to remind you, Mr. Williams,

2     that you must forfeit all property, real and personal, that

3     constitutes or is derived from proceeds traceable to the

4     commission of the offenses for which the defendant is jointly

5     and severally liable, including, but not limited to, a sum in

6     United States currency representing the amount of proceeds

7     obtained as a result of the offenses.

8          Does either counsel know of any legal reason why this

9     sentence should not be imposed as stated?

10          MR. MAIMIN:  No, your Honor.

11          MR. COHN:  No.

12          THE COURT:  The sentence is imposed as stated.  That

13     is the sentence of the Court.

14          You have a right to appeal your conviction and

15     sentence.  The notice of appeal must be filed within 14 days of

16     the judgment and conviction.  If you are unable to pay the cost

17     of an appeal, you may apply for leave to appeal in forma

18     pauperis.  If you request, the clerk of court will prepare and

19     file a notice of appeal on your behalf.

20          Are there any other applications?

21          MR. MAIMIN:  The government moves to dismiss all open

22     counts and underlying indictments as to Mr. Williams.

23          MR. COHN:  Your Honor, will you recommend that

24     Mr. Williams be incarcerated in an institution as close to New

25     York as possible because of his family circumstances and

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F4f4WilS

1    particularly the illness of the mother of his children.

2                 THE COURT:  First, the prosecution's motion is

3    granted.

4                 Yes, I will recommend that he be incarcerated as close

5    as possible to his family.

6                 MR. COHN:  Thank you, your Honor.

7                 THE COURT:  I would like to thank the family of

8    Mr. Williams and the friends who are present today.  It makes a

9    big difference to me to see how many people are here to support

10   him.  I know it made a difference to Mr. Williams.

11                Mr. Williams is going to be incarcerated for a very

12   lengthy period, and I ask that you continue to support his

13   children because they are going to suffer as a result of this.

14                Mr. Williams, I have a request for you.

15                THE DEFENDANT:  Yes, ma'am.

16                THE COURT:  Over the course of your incarceration, you

17   are going to come into contact with much younger men, and what

18   I ask is that you strongly discourage them from criminal

19   conduct because you certainly know what the result is, and this

20   is a way that you can make a positive impact on those young men

21   and the rest of society.

22                THE DEFENDANT:  Yes, ma'am.

23                THE COURT:  The matter is adjourned.

24                MR. MAIMIN:  Thank you, your Honor.

25                (Adjourned)

E56ebar3

```
 1              (In open court; jury present)

 2              THE COURT:  Welcome back.

 3              You may call your next witness.

 4              MR. MAIMIN:  The government calls Joseph Rosario.

 5   JOSEPH ROSARIO,

 6        called as a witness by the Government,

 7        having been duly sworn, testified as follows:

 8   DIRECT EXAMINATION

 9   BY MR. MAIMIN:

10   Q.  Good morning, sir.

11   A.  Good morning.

12   Q.  What is your occupation right now?

13   A.  Currently I'm unemployed.

14   Q.  And what did you do before you were unemployed?

15   A.  I used to work for a cab service.

16   Q.  What kind of cab service did you work for?

17   A.  Not TLC -- non-TLC licensed cab service, private.

18   Q.  What does that mean?

19   A.  Means I pick up fare, base.

20   Q.  What do you mean with a base?

21   A.  Excuse me?  Say again?

22   Q.  What do you mean, when you would pick up fares with a base?

23   A.  Well, us drivers would have some sort of system set up in

24   our vehicles in which we'll receive phone calls -- calls from

25   the base, dispatch, through a radio.
```

Case 1:21-cv-01334-AT   Document 2   Filed 02/16/21   Page 71 of 181

E56ebar3                      Rosario - direct

1   Q.  And did you have an understanding of how dispatch would get

2   the idea that there was a fare somewhere?

3   A.  Yes.

4   Q.  How?

5   A.  We were trained to understand the way they speak and sort

6   of -- like first shout was five minutes; second time shout, the

7   same call to me, ten minutes; third time she shouts the call to

8   me, open time, "open time" meaning anytime, you know, we give

9   them.

10          MR. COHN:  Move to strike as unresponsive.

11          THE COURT:  Sustained.  The answer is stricken.

12  Q.  Did you have an understanding of how the base would first

13  learn that there was a fare waiting?

14  A.  Yes.

15  Q.  How?

16  A.  Customers would call them.

17  Q.  And after a customer would call the base, what would the

18  base do?

19  A.  They'll log it in their system and dispatch it out to the

20  radio.

21  Q.  And what was the name of the company for which you worked?

22  A.  Diamond Luxury.

23  Q.  Did you have a car number?

24  A.  Yes, I did.

25  Q.  What was it?

E56ebar3                      Rosario - direct

```
 1    A.  Car number 88.
 2    Q.  What kind of cars did you drive for Diamond Luxury?
 3    A.  Cadillac Escalades, Dodge Chargers, Chrysler 300s.
 4    Q.  Is it fair to say these were luxury cars?
 5    A.  Yes.
 6    Q.  And what area of the city did you drive?
 7    A.  Bronx, Manhattan.
 8    Q.  What was your primary area of operation?
 9    A.  Bronx.
10    Q.  I'm going to go back a little bit in time.  Where did you
11    grow up, sir?
12    A.  I grew up in New York City.
13    Q.  Where in New York City?
14    A.  New York, New York, Harlem.
15    Q.  How far did you go in school?
16    A.  High school.
17    Q.  How far in high school?
18    A.  Eleventh grade.
19    Q.  And what happened at eleventh grade?
20    A.  I dropped out.
21    Q.  Did you do any schooling after that?
22    A.  Yes, I did.
23    Q.  What?
24    A.  College plus.  I did my college and high school at the same
25    time.
```

Case 1:21-cv-00533-AT   Document 2   Filed 02/16/21   Page 73 of 181

E56ebar3                          Rosario – direct

1    Q.  And where was that?

2    A.  Monroe College.

3    Q.  How did you get in?

4    A.  It was like a GED acceptance program they had.  I just

5    walked in and applied for it, retesting.

6    Q.  What do you mean, "retesting"?

7    A.  Because I test -- the first time I tested, I failed.  So I

8    had to retest again for the placement test.

9    Q.  Did you end up getting in?

10   A.  Yes, I did.

11   Q.  Did you end up completing that degree?

12   A.  No, I didn't.

13   Q.  And when is it that you started driving cabs?

14   A.  Started driving cabs back in 2006.

15   Q.  How old were you at the time?

16   A.  Seventeen years old.

17   Q.  So is this around the same time you dropped out of school?

18   A.  Yes.

19   Q.  Were you driving a cab in October of 2006?

20   A.  Yes, I was.

21   Q.  What kind of car were you driving at that time?

22   A.  A 2005 Dodge Magnum.

23   Q.  What color was it?

24   A.  Silver.

25   Q.  I'm going to show you what's been marked for identification

E56ebar3                    Rosario – direct

1   as Government Exhibit 603.  Do you recognize that, sir?

2   A.  Yes, I do.

3   Q.  What is it?

4   A.  It's my vehicle.

5   Q.  And who took that photo?

6   A.  I took a picture.

7   Q.  And is that the Dodge Magnum you just mentioned?

8   A.  Yes.

9            MR. MAIMIN:  The government offers 603.

10           MR. COHN:  No objection.

11           MR. BURKE:  Fine.

12           THE COURT:  It is admitted.

13           (Government's Exhibit 603 received in evidence)

14   BY MR. MAIMIN:

15   Q.  And is that approximately how your car looked in October of

16   2006?

17   A.  Yes.

18   Q.  Were there any decorations on the outside of the car?

19   A.  Yes.

20   Q.  What?

21   A.  Besides the wheels, it had a sticker.

22   Q.  What was the sticker?

23   A.  Car club, Rough Riders.

24   Q.  And what is Rough Riders?

25   A.  It's a car club.

E56ebar3                    Rosario - direct

1   Q.  Why did you have that sticker on your car?

2   A.  My car was -- my car was selected for a car show at the

3   time.

4   Q.  Now, you mentioned that you would get fares through the

5   base?

6   A.  Yes.

7   Q.  Would you always get your fares through the base?

8   A.  Yes.  I would get my fares through the base at first.

9   Q.  What do you mean, "at first"?

10  A.  "At first" meaning after I meet the clients, the clients,

11  sometimes they don't want to call the base.  Then they just ask

12  for your personal number.

13  Q.  And did you give out your personal number?

14  A.  Yes.

15  Q.  Would you pick up fares using your personal number?

16  A.  Yes.

17  Q.  What did you charge?

18  A.  Thirty-five dollars an hour.

19  Q.  Would you also charge by the stop?

20  A.  Yes, I do.

21  Q.  And what would you charge for that?

22  A.  Minimal at that time was six dollars local.

23  Q.  Typically when customers hired you to drive by the hour,

24  what would they do?

25  A.  Typically when they drive -- they pay by the hour, they

E56ebar3                        Rosario - direct

1    either smoke or we just make stops, try to -- multiple

2    different stops.

3    Q.  When you say "smoke," what do you mean?

4    A.  Smoke marijuana.  That's about it.

5    Q.  Would you charge them extra to smoke marijuana?

6    A.  Yes, I would.

7    Q.  How much?

8    A.  Five dollars extra.

9    Q.  While you were a cab driver were you stopped for any

10   driving related crimes or violations?

11   A.  Yes.

12   Q.  What kinds of crimes are we talking about?

13   A.  Suspended license.

14   Q.  And what happened with those?

15   A.  They got -- I fixed the issue.  It got thrown out.

16   Q.  Were you convicted of any crimes relating to frauds?

17   A.  Yes.

18   Q.  What?

19   A.  Possession of forged instrument.

20   Q.  And can you explain that, what happened, to the jury.

21   A.  Yes.  I was driving, and I had multiple credit cards in my

22   glove compartment with my name on it, forged with real

23   information, credit card information on the card.  And I got

24   arrested for it.

25   Q.  Where had you gotten those credit cards?

1   A.  I was working for somebody.

2   Q.  Who?

3   A.  A friend.

4   Q.  What was his name?

5   A.  Dorneo (phonetic).

6   Q.  And where was he located?

7   A.  In the Bronx.

8   Q.  What, if anything, did you do with these fraudulent credit

9   cards?

10  A.  I used to go buy iPhones, iPads and sell them, resell them.

11  Q.  How much would you make doing this?

12  A.  Throughout the day, about 700 to 1,000 bucks.

13  Q.  For how long did you do this?

14  A.  I did this for approximately like four, four months.

15  Q.  And around when was this?

16  A.  That was around last year, actually.

17  Q.  Can you estimate around how much you made in total doing

18  this?

19  A.  About 15 grand.

20  Q.  And did you end up getting arrested for that?

21  A.  Yes, I did.

22  Q.  What happened with those charges?

23  A.  Pending charge -- pending sentencing, I pled guilty to it.

24  Q.  And have you ever been arrested for false impersonation?

25  A.  Yes.

E56ebar3                         Rosario - direct

1   Q.  Can you explain what happened there.

2   A.  I was -- I have a vehicle that I had purchased from an

3   excop, and the cop -- the car had the sirens and the lights and

4   the whole device inside the car was an undercover detective

5   car.  And I got arrested when I was just messing with the

6   buttons, and I -- on the highway, I was fooling around and I

7   pulled someone to the side.  And it ended up being an off-duty

8   cop.

9   Q.  Why did you pull him to the side?

10  A.  I was just fooling around.

11  Q.  Did you say anything to him after pulling him to the side?

12  A.  Yes, I did.

13  Q.  What?

14  A.  I stated I was an officer by my last name.

15  Q.  And how did that work out for you?

16  A.  I got arrested for that.

17  Q.  And did you end up pleading guilty?

18  A.  Yes, I did.

19  Q.  Have you ever purchased a fake ID from somebody?

20  A.  No.  I got a fake ID I didn't purchase.  But I got it,

21  yeah.

22  Q.  Where did you get it?

23  A.  Same person I was working for.

24  Q.  And did you ever get caught with that fake ID?

25  A.  Yes, I did.

Case 1:21-cv-05534-AT   Document 2   Filed 02/16/21   Page 79 of 181

E56ebar3                         Rosario - direct

```
 1   Q.  I'm going to ask you to turn to October 2006, okay?

 2   A.  Okay.

 3   Q.  Were you ever arrested with anybody in October of 2006?

 4   A.  Yes, I was.

 5   Q.  How many people were you arrested with?

 6   A.  Two people.  Two people and me.

 7   Q.  Where were they when you were arrested?

 8   A.  They were in my vehicle.

 9   Q.  Can you describe those people.

10   A.  Guy, a guy in dreads.  There was tall, tall -- tall guy

11   to -- my clients.

12   Q.  Did you know either of their names or nicknames?

13   A.  Yeah.

14   Q.  Which one?

15   A.  One was K, and the other one was -- I described him as the

16   guy with the dreads.

17   Q.  So you didn't know the name of the guy with the dreads?

18   A.  No, I didn't.

19   Q.  Had you met those two men before?

20   A.  Yes.

21   Q.  How did you first meet K?

22   A.  I met K through the base, called up the base.

23   Q.  Around how long before you were arrested had you met K,

24   approximately?

25   A.  Sorry, I don't remember approximately.
```

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 80 of 181

E56ebar3                    Rosario - direct

1  Q.  Are we talking days, weeks, months, years, decades?

2  A.  Weeks.

3  Q.  And what happened after you first --

4           THE COURT:  I didn't hear the answer.

5           MR. MAIMIN:  I'm sorry.

6  A.  Sorry.  Weeks.  Weeks.

7  Q.  And after you first picked up K -- well, where did you

8  first pick up K?

9  A.  I first picked up K in the Watson area of the Bronx.

10  Q.  And what happened when you picked up K in the Watson area

11  of the Bronx?

12  A.  I dropped him off on 169th Street and Boston Road.

13  Q.  And did you do anything when you dropped him off?

14  A.  He asked me my number, so I gave him my number.

15  Q.  Did he call you again that day?

16  A.  Yes, he did.

17  Q.  How many times?

18  A.  Approximately -- one more time after that on that same day.

19  Q.  And did you, in fact, pick him up later that same day?

20  A.  Yes, I did.

21  Q.  Do you recall where you took him?

22  A.  I took him to 241st and White Plains.

23  Q.  And did you drive K after that day?

24  A.  After that day, no.

25  Q.  You never drove K after that day, either alone or with

1   others?

2   A.   Okay, yes.  Well, that same day I was done, then I drove

3   him again, yeah.

4   Q.   So on days after the day that you first met him, did you

5   drive K again?

6   A.   Yes, I did.

7   Q.   Did you always drive K alone or was he sometimes with

8   others?

9   A.   He sometimes would be with others.

10  Q.   Who were some of the people who he was with?

11  A.   Got introduced to the guy with the dreads and him.  At that

12  time, first time.

13  Q.   And after the first time did you meet anybody else with

14  him?

15  A.   Yes, I did.

16  Q.   Who?

17  A.   Smash.

18  Q.   And where would you typically pick K up?

19  A.   I would typically pick him up on 169th and Boston Road.

20  Q.   And would he pay you by the stop or by the hour?

21  A.   He would pay me by the hour.

22  Q.   What typically would he be doing when you picked him up?

23  A.   Typically -- get in the car -- he's paying me by the hour,

24  so now I just be on the road with him as I get on the highway

25  and smoke marijuana and listen to music, make different stops.

E56ebar3                    Rosario - direct

1  Q.  Did you know what he was doing at those stops?

2  A.  No.  Just stop and he'll leave the car.

3  Q.  Would he also be smoking marijuana and listening to music

4  and making stops when Smash or the guy with the dreads was in

5  the car?

6  A.  When the guy with the dreads was in the car.

7  Q.  Did you ever pick K or the guy with the dreads or Smash out

8  of a photographic array?

9  A.  Yes, I did.

10 Q.  I'm going to show you what's been marked for identification

11 as Government Exhibit 3503D.  I'm going to ask you to look at

12 those three pages and tell us whether you recognize them.

13 A.  Yes.

14 Q.  What are they?

15 A.  Photographic lineup.

16 Q.  And did you review these previously?

17 A.  Yes, I did.

18 Q.  Approximately when is it that you reviewed them first?

19 A.  April 18th, 2007.

20 Q.  And did you select anybody from those?

21 A.  Yes.  Yes, I did.

22         MR. MAIMIN:  The government offers 3503D.

23         THE COURT:  Any objection?

24         MR. COHN:  Bear with me one second, your Honor.

25 (Pause)  Is the government going to offer which of those

1   photographs there were identifications of?

2              MR. MAIMIN:  We'll go through them soon.

3              MR. COHN:  No objection.

4              THE COURT:  Mr. Burke?

5              MR. BURKE:  No objection.

6              THE COURT:  It's admitted.

7              (Government's Exhibit 3503D received in evidence)

8   BY MR. MAIMIN:

9   Q.  Can you please look at -- and, Ms. Germain, if you can put

10  up the first page of 3503D, and perhaps zoom in.  Perfect.

11             Did you identify anybody in the first page of the

12  photographic array labeled 3503D?

13  A.  Yes.

14  Q.  Which photograph did you identify?

15  A.  Number six.

16  Q.  And which place is that on the photographic array?

17  A.  Bottom right, last.

18  Q.  And who did you identify that as?

19  A.  The dreads.

20  Q.  I'm going to ask you to take a look at what's been marked

21  for identification as Government Exhibit 200.  Do you recognize

22  that, sir?

23  A.  Yes.

24  Q.  What is that?

25  A.  Photographic.

E56ebar3                          Rosario - direct

1    Q.  Who is that a photograph of?

2    A.  Dreads.

3    Q.  Is that the same photograph as in the bottom right-hand

4    corner of 3503D?

5    A.  Yes, it is.

6              MR. MAIMIN:  The government offers Government

7    Exhibit 200.

8              MR. COHN:  No objection.

9              MR. BURKE:  None.

10             THE COURT:  It is admitted.

11             (Government's Exhibit 200 received in evidence)

12             MR. MAIMIN:  Can we please put up 200.

13   BY MR. MAIMIN:

14   Q.  And so, again, who was that?

15   A.  Dreads.

16   Q.  And now let's look at the second page of 3503D, if you

17   will.  Did you identify anybody on the second page of 3503D?

18   A.  Yes.

19   Q.  Who?

20   A.  Smash.

21   Q.  And which one was Smash?

22   A.  Number four.

23   Q.  And that's the bottom left-hand corner?

24   A.  Yes.

25   Q.  And let's just zoom out for a moment, Ms. Germain.  No,

E56ebar3                        Rosario - direct

1   zoom out.  Sorry.

2           And at the bottom, were you the one who initialed it

3   at the bottom right-hand corner?

4   A.  Yes.

5   Q.  Did you do that for each of these?

6   A.  Yes, sir.  Yes, I did.

7   Q.  And you see how it's written, photo selected number four?

8   A.  Yes.

9   Q.  Is that accurate?

10  A.  Yes.

11  Q.  And then let's go to the third page of 3503D.  Did you

12  select somebody from this?

13  A.  Yes, I did.

14  Q.  Who?

15  A.  K.

16  Q.  Which one was K?

17  A.  Number three.

18  Q.  And which one is number three?

19  A.  Third one on the first row.

20  Q.  And I'm going to show you what's been marked for

21  identification as Government Exhibit 202.  Do you recognize

22  that, sir?

23  A.  Yes, sir, I do.

24  Q.  What is that?

25  A.  Picture of K.

E56ebar3                          Rosario - direct

 1   Q.  Is that the same picture as the 3503D?

 2   A.  Yes.

 3           MR. MAIMIN:  The government offers Government

 4   Exhibit 202.

 5           MR. COHN:  No objection.

 6           MR. BURKE:  None.

 7           THE COURT:  It is admitted.

 8           (Government's Exhibit 202 received in evidence)

 9   BY MR. MAIMIN:

10   Q.  When you identified those three photographs, had anybody

11   indicated which photograph you should identify?

12   A.  No.

13   Q.  What were you asked to identify?

14   A.  The person I recognized.

15   Q.  Now let's go back to talking about K and his friends, okay?

16   Did you only drive K and Smash and the guy with the dreads

17   around the Bronx?

18   A.  The Bronx, yes.

19   Q.  Did you ever drive to any other boroughs?

20           MR. COHN:  Objection to the form.  With or without.

21           MR. MAIMIN:  I'm sorry.  Withdrawn.  I'll rephrase.

22   Q.  Did you ever drive K and/or -- let's do it one at a time.

23           Did you ever drive K to any other boroughs?

24   A.  Yes.

25   Q.  Which boroughs?

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 87 of 181

E56ebar3                    Rosario - direct

 1   A.   Manhattan.

 2   Q.   Was K alone or with others when you did that?

 3   A.   With others.

 4   Q.   Who?

 5   A.   Dreads.

 6   Q.   And where in Manhattan would you drive?

 7   A.   Washington Heights.

 8   Q.   Approximately how many times did you drive to Washington

 9   Heights with K and the guy with the dreads?

10   A.   Two, two times.

11   Q.   Did you have an understanding of what they were doing in

12   Washington Heights?

13   A.   Yes.

14   Q.   What?

15   A.   Buying marijuana.

16            MR. COHN:  Objection.

17            THE COURT:  If you'll step up, please.

18            (Continued on next page)

19

20

21

22

23

24

25

E56ebar3                      Rosario - direct

1              (At side bar)

2              MR. COHN:  Seems to call for hearsay, your Honor, did

3    he have an understanding of what we're going to do.  Unless it

4    was a message from God, he must have heard it from him.

5              THE COURT:  Or he observed it.

6              MR. COHN:  No.  The question was:  Did you have an

7    understanding of what they were going to do?

8              THE COURT:  Right.  And if he had observed it, then he

9    would have an understanding.  But if he --

10             MR. COHN:  No.  It's a perspective question; not a

11   retrospective question.

12             MR. MAIMIN:  I'll withdraw it and lay the foundation

13   for it.

14             THE COURT:  Okay.

15             MR. COHN:  Thank you.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

E56ebar3                          Rosario - direct

1          (In open court; jury present)

2          THE COURT:  Sustained.

3   BY MR. MAIMIN:

4   Q.  What, if anything --

5          MR. COHN:  Your Honor, I take it the question on the

6   table is withdrawn?

7          MR. MAIMIN:  Sure.

8          MR. COHN:  Thank you.

9   Q.  What, if anything, did you see happen when you went to

10  Washington Heights?

11  A.  They would come out the car, come back inside with

12  marijuana.

13  Q.  And what would they do with the marijuana when they came

14  back into the car?

15  A.  Smoke.

16  Q.  Did they have the marijuana when they left the car?

17  A.  No.

18  Q.  Was there ever any incident of note that occurred in

19  Manhattan?

20  A.  Yes.

21  Q.  Around where did that occur?

22  A.  158th Street.

23  Q.  Around how long after you met K did that occur?

24  A.  I don't remember.

25  Q.  Do you recall around how long before your arrest that

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 90 of 181

E56ebar3                    Rosario - direct

1  occurred?

2  A.  I don't remember.

3  Q.  Again, I'll just ask, days, weeks, months, years or

4  decades?

5  A.  Weeks.

6  Q.  How did that incident begin?

7  A.  Excuse me?

8  Q.  What was the first thing that happened on the day of that

9  incident?

10  A.  I got a call from -- I got a call from K on 169th and

11  Boston Road, picked him up.

12  Q.  Was K alone or with others when you picked him up?

13  A.  Others.

14  Q.  Who?

15  A.  Smash and dreads.

16  Q.  And did you, in fact, pick all three of them up?

17  A.  Yes.

18  Q.  What happened after you picked all three of them up?

19  A.  At first we was just riding around, smoking weed -- I mean,

20  marijuana.  And we was just in -- on the road like, on the

21  highway.  Came back around, got off the exit, ended up right

22  back in the same location.

23  Q.  By the way, when you say you were riding around, smoking

24  weed or marijuana, were you smoking it?

25  A.  No.

Case 1:21-cv-01334-AT   Document 2   Filed 02/16/21   Page 95 of 181

E56ebar3                    Rosario – direct

1    Q.  So who was smoking it?

2    A.  K, Smash and dreads.

3    Q.  And what happened after you arrived back in the same area

4    from which you started?

5    A.  After I got back, another vehicle pulled up on the side of

6    the road.

7    Q.  What kind of vehicle was it?

8    A.  A black Dodge Magnum.

9    Q.  I'm going to ask you to take a look at what has been

10   previously marked for identification as Government Exhibit 600.

11   Do you recognize this, sir?

12   A.  Yes.

13   Q.  What is that?

14   A.  It's a Dodge Magnum.

15   Q.  What color is it?

16   A.  Black.

17   Q.  Is that the actual Dodge Magnum, black Dodge Magnum that

18   you saw in October of 2006?

19   A.  That's the car, yeah.

20   Q.  And is that the actual car or is that the type of car?

21   A.  Type of car.

22   Q.  But does that accurately depict generally what that car

23   looked like?

24   A.  Yes.

25          MR. MAIMIN:  The government offers Government

E56ebar3                    Rosario - direct

1   Exhibit 600.

2              MR. COHN:  No objection.

3              MR. BURKE:  None.

4              THE COURT:  It is admitted.

5              (Government's Exhibit 600 received in evidence)

6              MR. MAIMIN:  Ms. Germain, could we please put it up.

7   BY MR. MAIMIN:

8   Q.  So what happened when you saw the black Dodge Magnum?

9   A.  I was -- oh.  After the black Magnum came on the side of

10  us, Smash went to that car.

11  Q.  Were you able to see the driver of that Magnum?

12  A.  I saw the driver, yes.

13  Q.  For how long?

14  A.  Seven seconds.

15  Q.  Would you recognize him today?

16  A.  No.

17  Q.  So what happened after Smash switched to the black Dodge

18  Magnum?

19  A.  He directed us to follow it.

20  Q.  And did you, in fact, follow it?

21  A.  Yes.

22  Q.  Where did you follow it?

23  A.  Back to the highway, which led us back to the West Side

24  Highway, then we got off on 158th Street.

25  Q.  I'm going to ask you to take a look at what has been

1   previously marked for identification as Government Exhibit 401.

2   Apparently we don't even have to do that.  Can we please bring

3   up 401.

4         And there should be a laser pointer up there by you.

5   If you press the red button, it will work.  Here, I'll show you

6   one to have in front of you as well, since it's not that clear.

7         Using Government Exhibit 401, can you show the jury

8   where you drove.

9   A.  Can you zoom it in a little?

10  Q.  Pardon me?

11  A.  Can you zoom it in a little bit?  158th Street right there.

12  Q.  And were you still following the black Magnum at that time?

13  A.  Yes, I was.

14  Q.  What happened next?

15  A.  Followed the black Magnum to Amsterdam, the corner of

16  Amsterdam and 158th Street.

17  Q.  And what happened on the corner of Amsterdam and 158th?

18  A.  Smash left the vehicle and got in my car.

19  Q.  And what happened next?

20  A.  Magnum -- pulled up side of the Magnum and we circled the

21  block.

22  Q.  Who, if anybody, told you to circle the block?

23  A.  Smash.

24  Q.  Where did you circle the block to?

25  A.  Back around to 158th Street.

E56ebar3                          Rosario - direct

1    Q.  And what happened after you circled back around to 158th

2    Street?

3    A.  I approached Broadway and 158th Street.

4    Q.  And what happened next?

5    A.  I was told to pull over, to pull over.  And I saw a fire

6    hydrant opening, and I pulled over there.

7    Q.  Ms. Germain, could we please bring up Government

8    Exhibit 251.

9            Do you recognize this, sir?

10   A.  Yes, I do.

11   Q.  What is this?

12   A.  158th Street.

13   Q.  And can you see on this where it is that you pulled over?

14   A.  Yes.

15   Q.  Where?

16   A.  The fire hydrant right there.

17   Q.  And what, if anything, happened after you pulled over by

18   the fire hydrant?

19   A.  I pulled over and they left the car.

20   Q.  Did anything happen before they left the car?

21   A.  Yes.

22   Q.  What?

23   A.  They were on the phone.

24   Q.  Do you recall who was on the phone?

25   A.  I don't recall.

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 95 of 181

E56ebar3                         Rosario - direct

1    Q.  What were you doing generally at this time?

2    A.  I was on my phone.

3    Q.  So what happened after they were on the phone?

4    A.  About ten seconds after that, they hung up the phone.  They

5    just opened the doors and crossed the street.

6    Q.  And when you say "they," who were you talking about?

7    A.  K, Smash and dreads.

8    Q.  And did you see where they went?

9    A.  Yes.

10   Q.  Where?

11   A.  Across the street.

12   Q.  Did you see the building that they went to?

13   A.  Yes.  Yes, sir.

14   Q.  Is that the one that you're pointing out with the laser

15   pointer?

16   A.  Yes, it was.

17   Q.  Just left of center on the photo?

18   A.  Yes.

19   Q.  Did you see whether they went into the building or stayed

20   outside?

21   A.  Saw that they went inside the building.

22   Q.  Could you see them after they went into the building?

23   A.  I lost sight of them after that.

24   Q.  And what were you doing at this time?

25   A.  Just waiting outside.

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 96 of 181
Case 1:21-cv-00633-AT Document 2 Filed 03/30/21 Page 96 of 181      123
E56ebar3                          Rosario - direct

1   Q.  What happened next?

2   A.  Next I heard gunshots.

3   Q.  And what happened after you heard gunshots?

4   A.  After I heard gunshots, I see they rushing out the

5   building.

6   Q.  Do you recall around how long it was before you heard

7   gunshots?

8   A.  I don't recall.

9   Q.  Was it a short period of time or long period of time?

10  A.  Short period of time.

11  Q.  So what happened after they ran out?

12  A.  They ran into my car and I drove off.

13  Q.  Did you see if anybody had anything with them when they ran

14  in?

15  A.  Yes.

16  Q.  Who had what?

17  A.  I don't recall who had it, but I seen the bag.

18  Q.  Can you describe the bag?

19  A.  It's a big bag, brown bag.

20  Q.  Could you tell what was in the brown bag?

21  A.  I could tell by the smell.

22  Q.  What was the smell?

23  A.  Marijuana.

24  Q.  So what happened after you drove off?

25  A.  After I drove off, we approached the corner of 158th Street

E56ebar3                    Rosario - direct

1   and Amsterdam, in which there was a red light.  And Smash had

2   dropped out my vehicle and got back into the other car.

3   Q.  What other car?

4   A.  Black Magnum I was following.

5   Q.  So does that mean you saw it again?

6   A.  Yes.

7   Q.  When did you first see that black Magnum?

8   A.  When I approached the corner of 158 and Amsterdam.

9   Q.  And where was that Magnum?

10  A.  On my left-hand side, parked.

11  Q.  What happened after Smash went to the other black Magnum?

12  A.  He took the bag and we followed the black car again back to

13  the Bronx.

14  Q.  And where did you go in the Bronx?

15  A.  Back to 169th Street.

16  Q.  And what, if anything, happened at 169th Street?

17  A.  Then they all left my vehicle and the other car.

18  Q.  Did you end up getting paid?

19  A.  I didn't get paid.

20  Q.  Did you end up getting anything for your time?

21  A.  Yes.  I got -- I got a little bag of marijuana.

22  Q.  Who gave it to you?

23  A.  K.

24  Q.  Do you smoke marijuana?

25  A.  No.

E56ebar3                         Rosario - direct

1   Q.  What did you do with that bag of marijuana?

2   A.  I gave it to my friend.

3   Q.  After that incident did either K or Smash try to call you

4   again?

5   A.  Yes.

6   Q.  How often?

7   A.  Every day.

8   Q.  And did you, in fact, take those fares?

9   A.  No.

10  Q.  Was there any time at which you took a fare from either K

11  or Smash?

12  A.  Yes.

13  Q.  When was that?

14  A.  My last -- the other incident when I got arrested in the

15  Bronx.

16  Q.  Who called you for that?

17  A.  K.

18  Q.  And what happened when K called you?

19  A.  I picked them up at 169th Street and Boston Road, him -- it

20  was some new guy I never seen and the guy with the dreads

21  again.

22  Q.  And who sat where in your car when you picked them up?

23  A.  K was in the front passenger seat, dreads was behind the

24  front passenger seat in the back and the dude was behind me.

25  Q.  What happened after you picked those three up?

E56ebar3                          Rosario – direct

```
1    A.  We started back on the road, smoking weed.  And I was going

2    directed to an area, which was 180th Street in the Bronx.

3    Q.  180th and what?

4    A.  Mohegan.

5    Q.  I'm going to show you what has been previously marked for

6    identification as Government Exhibit 403.  Do you recognize

7    this, sir?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  It's a map of 180th Street.

11   Q.  180th and what?

12   A.  And Mohegan.

13   Q.  Are you familiar with that area?

14   A.  Yes, I am.

15   Q.  Does that fairly and accurately depict the layout of the

16   streets in that area?

17   A.  Yes, it is.

18           MR. MAIMIN:  The government offers Government

19   Exhibit 403.

20           THE COURT:  And in what borough are you referring to?

21           THE WITNESS:  I'm referring to the Bronx.

22           THE COURT:  Any objection?

23           MR. COHN:  I said, no, ma'am.  I'm sorry you didn't

24   hear.

25           MR. BURKE:  No.
```

E56ebar3                              Rosario - direct

1              THE COURT:  It is admitted.

2              (Government's Exhibit 403 received in evidence)

3              MR. MAIMIN:  Can we please see Government Exhibit 403.

4              MR. COHN:  Barely.

5    BY MR. MAIMIN:

6    Q.  Kind of using that, can you show the jury approximately

7    where 180th and Mohegan is?

8    A.  180th Street and Mohegan is this block right here.

9    Q.  So right about in the center of the map?

10   A.  Yes.

11   Q.  And what happened when you got to the area of 180th and

12   Mohegan Avenue?

13   A.  I was directed to go around the block, circle the block.

14   Q.  And how many times did you circle the block?

15   A.  I circled the block three times before I kind of started

16   noticing it was kind of weird.  I kept going around in circles.

17   Q.  So what happened after the third time?

18   A.  Third time they told me to pull over to my right-hand side

19   of the block.

20   Q.  And what, if anything, did you see where you pulled over?

21   A.  It was a mailbox in front of the building.

22   Q.  I'm going to show you what's been marked for identification

23   as Government Exhibit 280.  Do you recognize this, sir?

24   A.  Yes.

25   Q.  What is that?

E56ebar3                    Rosario - direct

1   A.  It's 180th Street and Mohegan.

2            MR. MAIMIN:  The government offers Government

3   Exhibit 280.

4            MR. COHN:  No objection.

5            MR. BURKE:  Fine, Judge.

6            THE COURT:  It is admitted.

7            (Government's Exhibit 280 received in evidence)

8            MR. MAIMIN:  Ms. Germain, if we can zoom in on the

9   center area, please.

10  BY MR. MAIMIN:

11  Q.  Is this the area you're talking about where you pulled

12  over?

13  A.  Yes.

14  Q.  Can you see the box you're talking about on this

15  photograph?

16  A.  Yes, you can.

17  Q.  Where is it?

18  A.  Right there.

19  Q.  So what, if anything, was going on with this box?

20  A.  There was a guy sitting on top of that box.

21  Q.  And where did you park?

22  A.  I parked right here.

23  Q.  So right next to the box?

24  A.  Yes.

25  Q.  Was the box on the right side or left side of your car?

E56ebar3                    Rosario - direct

1    A.  On the right side -- on the right side of my car.

2    Q.  And what, if anything, happened after you parked the car?

3    A.  K was in the front seat, put the window halfway down and

4    asked the guy that was sitting on top of the box if he had

5    marijuana.

6    Q.  And what, if anything, did the guy say?

7    A.  The guy didn't say nothing.  He just shook his head left to

8    right, as in no.

9    Q.  And what happened next?

10   A.  After that, about approximately 15 seconds later, they

11   rushed out the car again.

12   Q.  Who's "they"?

13   A.  "They," I mean the new dude, K and dreads.

14   Q.  And how did they get out of the car?

15   A.  The dude -- the guy that was behind me closed the door,

16   shut the door went around my car.  K was just opening the door,

17   and dreads opened the door halfway but left the door still

18   open.

19   Q.  So the doors on the passenger side of your car were still

20   open?

21   A.  Yes.

22   Q.  And what, if anything, did you see after they got out of

23   the car?

24   A.  I saw they approached the guy that was sitting on top of

25   the box, and I saw that K just tried to raise his hand up like

E56ebar3                      Rosario - direct

1    half -- like all the way up.

2    Q.  So just to be clear, so that's kind of extending the arm

3    out from the body?

4    A.  Yes.

5    Q.  What direction was he extending the arm?

6    A.  Towards the guy.

7    Q.  Could you see what, if anything, he had in his hand?

8    A.  At that time, no.

9    Q.  And what happened after K extended his arm out in the

10   direction of the guy?

11   A.  Gunshots.  I heard gunshots after that.

12   Q.  Did you see what, if anything, the guy did, the guy on the

13   box?

14   A.  The guy -- yeah.  He put his hands up like that.

15   Q.  Okay.  And, again, just for the record, that's putting your

16   hands up above your shoulders?

17   A.  Yes.

18   Q.  So what do you mean, you heard gunshots?

19   A.  I heard gunshots from outside of the car.

20   Q.  And what happened next?

21   A.  Put the car in drive as soon as I heard gunshots, and they

22   rush into my car.

23   Q.  Who rushed into your car?

24   A.  K and the guy with the dreads.

25   Q.  How did they rush into your car?

E56ebar3                         Rosario – direct

1    A.  The door was already halfway open, so all they did was just

2    jump in the car.

3    Q.  And how about the third guy?

4    A.  Third guy there was nowhere to be found after that.

5    Q.  And so what happened after they rushed into your car?

6    A.  We rushed down the block.  We drove Mohegan to -- it was a

7    dead end, so we made a right.  There was a red light there.

8    Q.  Was K saying anything during this?

9    A.  Yeah.  He was just like go, go, go, go.

10   Q.  And was he giving you any specific instructions?

11   A.  He was like, go straight, go -- and I ate the light.  The

12   light was red.  I ate the light.  And from that point on I just

13   started driving fast towards Crotona.

14   Q.  Was the guy with the dreads saying anything?

15   A.  Yes.  He was in the back seat.  I guess he got shot in his

16   knee.

17   Q.  And what was he saying?

18   A.  He was just shouting, he got shot.

19   Q.  Were you able to see anything in that?

20   A.  Blood.

21   Q.  Where did you see the blood?

22   A.  From his kneecap.

23   Q.  So what happened after that?

24   A.  After that we approached Crotona.  I made a right on

25   Crotona and took Crotona all the way down and started getting

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 105 of 181

E56ebar3                          Rosario - direct

1   chased by the police.

2   Q.  Did you pull over immediately?

3   A.  No.

4   Q.  Where did you go?

5   A.  I just kept running, trying to go fast.

6   Q.  And did you end up getting caught?

7   A.  Yes, I did.

8   Q.  Where did that happen?

9   A.  On Crotona Avenue and Garden Street.

10  Q.  And how did that happen?

11  A.  I made a right and I blocked the -- they, the cops, blocked

12  the corner of the block on the other end of the block.

13  Q.  So what happened once you got, finally got pulled over?

14  A.  Guns were drawn and we were pulled out the car and thrown

15  to the ground.

16  Q.  And where were you taken after that?

17  A.  To the precinct.

18  Q.  Where were you placed in the precinct?

19  A.  In the jail cell.

20  Q.  With whom?

21  A.  With dreads and K.

22  Q.  And were they saying anything to you?

23  A.  They were just telling me -- they were just telling me that

24  when they come downstairs to pick me up, not to say nothing.

25  Q.  Did they mention anything about the third guy?

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 106 of 181

E56ebar3                        Rosario - direct

```
 1   A.  I asked them about the third guy, and they was --
 2           MR. COHN:  Objection.
 3           THE COURT:  Sustained.
 4   Q.  What happened after you were put in the cell?
 5   A.  I was picked up by detectives.
 6   Q.  What happened next?
 7   A.  I was brought upstairs and they asked me questions about
 8   what had happened.
 9   Q.  Did you answer those questions?
10   A.  Yeah.
11   Q.  What happened after that?
12   A.  After that I was put right back downstairs to the cell.
13   Q.  And what, if anything, did you say to K and the guy with
14   the dreads?
15   A.  I was just like -- they were asking me questions.  I was
16   just talking to the detectives.
17   Q.  And what happened next?
18   A.  After that we was transported to central bookings.
19   Q.  What happened at central booking?
20   A.  Central bookings, like I got reprinted and got repicked up
21   by the detectives in central booking.
22   Q.  Did you speak with anybody there?
23   A.  A detective.
24   Q.  Was there anybody else in the room?
25   A.  ADA.
```

1   Q.  And did you talk with them about the incident that had just

2   happened?

3   A.  Yes.

4   Q.  That is, the incident in the Bronx?

5   A.  Yes.

6   Q.  Did you talk to them about the incident in Manhattan?

7   A.  No.

8   Q.  Did anybody ask you about the incident in Manhattan?

9   A.  No.

10  Q.  Did you tell them lies about certain things that had

11  happened?

12  A.  Yes.

13  Q.  Did you tell them -- did you talk to them about when you

14  had first met K?

15  A.  Yes.

16  Q.  Did you tell them the truth about when you had first met K?

17  A.  No.

18  Q.  What did you tell them about when you had first met K?

19  A.  That I had just met him.

20  Q.  And specific, were you asked the following questions and

21  did you give the following answers:

22  "Q   And you stayed, so when -- how long ago did you first

23  picking up K?

24  "A   Five, five days ago.  Five days ago.

25  "Q   Five days.  So you've known him?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   "A   Something like that.

2   "Q   So you've known him within just this past week?

3   "A   Yeah.

4   "Q   That's the first time you gave him a ride?

5   "A   Yeah.

6   "Q   And on what date did you give him your phone number?

7   "A   The same day I picked him up.

8   "Q   Okay.

9   "A   Sunday.

10  "Q   And on Sunday -- so it was a week ago that you met him,

11  last Sunday?

12  "A   On a Sunday, yeah.  Yeah."

13          Did you, in fact, get those questions and give those

14  answers?

15  A.  Yes, I did.

16  Q.  Was it true that you had met K only within the last five

17  days to about a week?

18  A.  No, it wasn't true.

19  Q.  How long ago had you actually met K?

20  A.  Weeks ago.

21  Q.  Why did you give those answers?

22          MR. COHN:  Objection.

23          THE COURT:  Overruled.  You may answer.  You may

24  answer.

25  Q.  Why did you give those answers?

Case 1:21-cv-00683-AT Document 2 Filed 06/30/14 Page 109 of 181

E56ebar3                    Rosario - direct

1    A.  The reason I gave those answers, I wasn't trying to look

2    like I was hanging out with them.

3    Q.  And why was that?

4    A.  Because of things that they were doing.

5    Q.  And then did you also talk to the detectives and the DA

6    about when you had first met the guy with the dreads?

7    A.  Yes.

8    Q.  Did you tell them the truth about that?

9    A.  No.

10   Q.  What did you tell them about when you had first met the guy

11   with the dreads?

12   A.  That I had -- that I never seen him before.

13   Q.  In particular were you asked the following question and did

14   you give the following answer:

15   "Q   And you never seen him before, the person who got shot in

16   the back of the -- in the leg, had you ever seen him before?

17   "A   No, never.  No.  I don't know him.  Never seen him

18   before."

19            Did you get that question and did you give that

20   answer?

21   A.  Yes, I did.

22   Q.  Was that true?

23   A.  No, that wasn't true.

24   Q.  Why did you give that answer?

25   A.  I was confused.

1          MR. COHN:  Objection.

2          THE COURT:  Overruled.

3    A.  I was confused.

4    Q.  What were you confused about?

5    A.  I thought they was referring to the guy that ran out the

6    car.

7    Q.  But you also discussed the guy with the dreads, right?

8    A.  Yes, I did.

9    Q.  Were you asked the following question and did you give the

10   following questions and answers:

11   "Q   Okay.  And you said, so you've known -- you don't know K

12   by any other name?

13   "A   No, I don't.  I don't know.

14   "Q   Okay.  And before a week ago you'd never seen him before?

15   "A   No, just yesterday and today.  They was forcing me to run,

16   run, run, run, run, run.  I was scared.

17   "Q   Okay.

18   "A   Telling me.

19   "Q   And the passenger in the back, you'd never seen either of

20   them before?

21   "A   Okay."

22          Were you given those questions and did you give those

23   answers?

24   A.  Yes, I did.

25   Q.  Were those accurate?

E56ebar3                              Rosario - direct

```
 1   A.  The -- the part that I said that I met him, that I never
 2   met him before, no, it wasn't.
 3   Q.  Had you, in fact, met the man with the dreads before?
 4   A.  Yes, I did.
 5   Q.  When had you met him before?
 6   A.  On weeks ago.
 7   Q.  Had you, in fact, met K more than a week earlier?
 8   A.  Yes, I did.
 9   Q.  Had you met the other man in the back before?
10   A.  No.
11   Q.  Why is it that you gave those answers?
12   A.  I wasn't trying to look like I was hanging out with them.
13   Q.  Was there anything else that you were trying to do while
14   you were in that interview room?
15   A.  I was trying to speed up the process and go back
16   downstairs.
17   Q.  Why was that?
18   A.  I didn't want to make it look like I was talking to
19   detectives.
20   Q.  Did you end up testifying anywhere about the incident?
21   A.  Yes, I did.
22   Q.  What happened with your charges after that?
23   A.  Got dismissed.
24   Q.  Did you ever come -- did there ever come a time that you
25   spoke with the police about the incident in Manhattan?
```

E56ebar3                    Rosario – direct

1   A.  Yes, I did.

2   Q.  When was the first time that that happened?

3   A.  I don't remember the time.

4   Q.  Was that before, after or at the same time that you made

5   those IDs in the photographs?

6   A.  Before.

7           MR. BURKE:  Can we approach, Judge.

8           THE COURT:  Yes.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (At side bar)

 2                 MR. BURKE:  Forgive me, Judge, for interrupting.

 3    Mr. Barbee has got to go to the bathroom.  He's dying.

 4                 THE COURT:  Okay.  So we'll take a ten-minute break.

 5                 MR. MAIMIN:  Your Honor, one moment.  I'm about five

 6    minutes from the end of my examination.  Would he be able to

 7    hold it, or should we take a break?

 8                 MR. BURKE:  I think you should do it now.

 9                 MR. MAIMIN:  I understand.

10                 MR. COHN:  Are you going to ask about a prior

11    consistent statement now, is that your next --

12                 MR. MAIMIN:  Not going to ask about the specific

13    statements, just that he spoke to him.

14                 (In open court)

15                 THE COURT:  Members of the jury, we're going to take a

16    break of a few minutes and we will resume shortly.

17                 You may step down, sir.  Again, remember that you're

18    not allowed to discuss the case amongst yourselves or with

19    anyone else.

20                 (Recess)

21

22

23

24

25
```

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 114 of 181

E56LBAR4

1           (In open court; jury not present)

2           MR. NAWADAY:  Your Honor, should we have the witness

3    back on the stand?

4           MR. COHN:  Not yet.

5           THE COURT:  Mr. Cohn has an application apparently.

6           MR. COHN:  Yes, your Honor.  The government read very

7    large portions of that transcript that we had supplied, which I

8    assume they've agreed was accurate.

9           THE COURT:  One moment, please.

10          MR. COHN:  And in the face of what I regard as very

11   explicit questioning throughout the tape, the witness says that

12   he misunderstood the nature of the question and who they were

13   asking about.  I think that given that the government has read

14   that much in that the entire tape ought to come in.

15          MR. MAIMIN:  This was about as explicit an adoption of

16   I made a prior inconsistent statement as it gets.  Every single

17   question and every single answer was specifically acknowledged

18   by the defendant.

19          MR. COHN:  Yes, your Honor, but the problem is he said

20   he misunderstood something that was critical and in fact he

21   could not have misunderstood and, therefore, the nature of the

22   examination and the questions and his demeanor are all

23   important in determining whether or not he was stretching the

24   truth when he said he misunderstood and tried to give an

25   explanation for what was in the government's view, at least,

E56LBAR4

1    clearly a lie.

2          MR. MAIMIN:  Well, to be clear, A, I didn't say it was

3    clearly a lie.  A lie is intentional.  That said, he did not

4    simply say that he was confused.  He also said and I didn't

5    want to be associated with those guys.  I didn't want them to

6    know I was with those guys because of the stuff that those guys

7    were doing.

8          THE COURT:  Is there something in the transcript,

9    Mr. Cohn, that you can point to specifically that would

10   demonstrate an absence of confusion?

11         MR. COHN:  Well, yes, but I think it's actually been

12   read in.  But it's the question of -- I mean based on the

13   questions and I can't see how he could say there was confusion.

14         But this is what I would do, your Honor.  Mr. Burke is

15   going to go first.  It is now five to two.  And my guess is --

16   five to one.  That's okay.  I'm confused.

17         MR. MAIMIN:  Your Honor, I'd like that to be read back

18   several times.

19         MR. COHN:  All right.  So we'll have to look at the

20   tape and see.  I believe that I'm entitled to the whole tape

21   based on the extensive nature of what the government has read

22   in, not the two lines that they argue were apparent when we

23   made this original application, and that he read in enough of

24   the tape so that the whole tape ought to come in.

25         MR. MAIMIN:  And respectfully, your Honor, and we

E56LBAR4

1    briefed this extensively, the question of what gets in is

2    whether he admits to having made prior inconsistent statements.

3    Again, Mr. Cohn is saying I think that if the jury watches the

4    whole tape, they will generally frown upon his credibility

5    because of his demeanor, which we briefed extensively is not

6    the basis to let in prior statements.

7         MR. COHN:  But he said that the reason for his lie was

8    that he was confused, not that he was lying.  He said I was

9    mistaken.  That's different.  That's not an admission of an

10   inconsistent statement.

11        MR. MAIMIN:  He admitted that he made an inconsistent

12   statement.  The rule does not provide that he has to say what

13   defense counsel wants him to say.  He admitted to the

14   inconsistent statement.  Fred can cross him -- I'm sorry --

15   Mr. Cohn can cross him to kingdom come about whether it was a

16   confusion or a lie.  But the question here is whether he made

17   the inconsistent statement.  The motive is not something that

18   is contemplated by the rules, and Mr. Cohn has not found a

19   single case that says that you get to put in a videotape or a

20   transcript of an entire interview in order to try to

21   demonstrate somebody's motive for providing a prior

22   inconsistent statement.

23        He has said that he made each and every inconsistent

24   statement to which Mr. Cohn had pointed in his letter.  In

25   fact, we found a neighboring inconsistent statement that we

E56LBAR4

1   added in in here.  He has adopted those, admitted them, and

2   admitted them with alacrity, your Honor.

3            THE COURT:  All right.  My ruling stands.  I am not

4   going to hear more on the issue, and you can explore the matter

5   in cross-examination.  Would you have the jurors come in,

6   please.

7            MR. MAIMIN:  Certainly.  Shall we have the witness on

8   the stand first or bring them in at the same time?

9            THE COURT:  At the same time is sufficient.

10            MR. COHN:  Can I tell the government that I don't mind

11   if they call me Fred, but they should live darling out of it.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 118 of 181    145
Case 1:21-cv-005834-AT  Document 2  Filed 02/16/21  Page 118 of 181
E56LBAR4                      Rosario – direct

1            (Jury present)

2            THE COURT:  I remind you, Mr. Rosario, that you're

3    still under oath.

4            THE WITNESS:  Yes.

5            MR. MAIMIN:  May I proceed, your Honor?

6            THE COURT:  You may.

7    BY MR. MAIMIN:

8    Q.  Mr. Rosario, when you were arrested in October of 2006, do

9    you recall if anything was recovered from your car?

10   A.  Yes.

11   Q.  What?

12   A.  A gun.

13   Q.  And do you recall whether either K or the man with the

14   dreads had said anything about that gun before you were

15   actually arrested?

16   A.  I don't recall.

17   Q.  Do you recall whether anybody tried to get rid of that gun

18   before you were arrested?

19   A.  Yes.

20   Q.  Can you please tell the jury about that.

21   A.  As I was driving fast from the 180th, K was the one in the

22   front seat and was just telling me to drive faster so get

23   closer to the curb so he could throw the gun out.

24   Q.  And did you in fact see him manage to throw the gun out?

25   A.  No, I didn't.

E56LBAR4                        Rosario – direct

1    Q.  Now, did there come a time that you spoke with members of

2    the New York City Police Department about the incident in

3    Manhattan?

4    A.  Yes.

5    Q.  In that meeting did you identify the individuals who were

6    in your car during the incident in Manhattan?

7              MR. COHN:  Objection.

8              THE WITNESS:  Yes.

9              THE COURT:  If you'll step up, please.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E56LBAR4                        Rosario - direct

1            (At the side bar)

2            MR. COHN:  What he's calling for is a prior consistent

3      statement.  He has laid no foundation for it and he can't.

4            MR. MAIMIN:  I'm only asking for an identification

5      which is a specific exception of the hearsay rule.

6            MR. COHN:  It's a nonspeaking hearsay.  It's a

7      nonspeaking -- it's a nonspeaking statement.  Did you identify

8      him?  What do you think he says?  Yes, I did.  And I can't --

9      that's a prior consistent statement.

10           MR. MAIMIN:  But the rules specifically allow for a

11     prior identification.  That's all I'm asking.  I'm not going to

12     ask him for consistent statements.  I'm not going to say what

13     did you say to the detectives happened.  I'm not going to say

14     anything about the black Magnum unless it's brought up in cross

15     and it's proper for redirect.  I'm only asking for the

16     identification so I can cement on what date he identified them

17     to the detectives.

18           MR. COHN:  I don't believe there's a distinction.  I'm

19     sorry.

20           THE COURT:  You're saying that the federal rules

21     permit the identification?

22           MR. MAIMIN:  That's right.  There's a specific

23     carve-out in 801 I want to say (d).

24           MR. NAWADAY:  (d)(1)(C).

25           MR. MAIMIN:  He's good.  (d)(1)(C).

E56LBAR4                    Rosario - direct

1                MR. COHN:  He's got to do something in this trial.

2                MR. MAIMIN:  A statement is not hearsay if it is one

3     of identification of a person after perceiving the person.

4                THE COURT:  The objection is overruled.

5                MR. BURKE:  Judge, as long as we're here, there's two

6     of us involved in the case.  As long as Mr. Cohn is making an

7     objection, I think the objection for one should be considered

8     an objection for all so I don't have to burden the record with

9     joining in all the time.

10               THE COURT:  Oh, I don't know what the rule is and I

11    would --

12               MR. COHN:  It's done here all the time.

13               MR. BURKE:  Usually it's done here that way, but I'll

14    do it however you want.

15               MR. MAIMIN:  Your Honor, I have no problem with that.

16               THE COURT:  All right then.

17               MR. BURKE:  Unless I opt out.

18               THE COURT:  Okay.

19               (Continued on next page)

20

21

22

23

24

25

E56LBAR4                          Rosario - direct

1              (In open court)

2              THE COURT:  The objection is overruled.  You may read

3      back the question.

4              (Record read)

5              THE WITNESS:  Yes.

6    Q.  And was that using the photo arrays that we looked at

7    before?

8    A.  Yes.

9    Q.  And just looking at those photo arrays, what was the date

10   on which you made those identifications?

11   A.  I don't recall.

12   Q.  Do you have -- would looking at the photo arrays refresh

13   your recollection?

14   A.  Yes.  April 18, 2007.

15   Q.  Thank you.

16             MR. MAIMIN:  Nothing further, your Honor.

17             THE COURT:  Cross-examination.  Is it by Mr. Burke?

18   CROSS-EXAMINATION

19   BY MR. BURKE:

20   Q.  Now sometimes, sometimes when you speak to law enforcement

21   authorities, you don't always tell them the truth, right?

22   A.  No.

23   Q.  Sometimes when you're talking to the cops or detective or

24   even the DA, they ask you a question, you roll around your

25   head, and you pick out the answer that's good for you, right?

E56LBAR4                          Rosario – cross

1   A.  No.

2   Q.  Well, sometimes when they question you, you pick out an

3   answer that's going to make you look good?

4   A.  No.

5   Q.  Sometimes you don't tell them the truth, right?

6   A.  No.

7   Q.  You always tell the truth?

8   A.  At the time I didn't tell the truth.

9   Q.  Oh.  So at one time you weren't telling the truth, right?

10  A.  At the time they asked me if I knew –- if I met the dreads

11  before, yeah.

12  Q.  So sometimes you lie to the police, right?

13  A.  No.

14  Q.  Sometimes you lie about who you are, right?

15  A.  Yeah.

16  Q.  About who you are?

17  A.  Yeah, that happened.

18  Q.  And it's happened more than once, right?

19  A.  Yes.

20  Q.  You think it over when I ask you these questions?

21  A.  It was eight years ago.

22  Q.  And sometimes you can look a detective in the eyes, right,

23  NYPD detective, and you can lie to him, right?

24  A.  No.

25  Q.  You would never lie to a detective?

Case 1:21-cv-00583-AT Document 2 Filed 06/30/21 Page 128 of 181

E56LBAR4                           Rosario – cross

1    A.  I lied, yeah, I lied.

2    Q.  You did.  So you can?

3    A.  Yes.

4    Q.  You're able to lie to detectives, right?

5    A.  Yes, yes.

6    Q.  It's pretty gutsy, right?

7           Now, when Mr. Maimin was talking to you, he asked you

8    did you buy some fake ID one time for money.  Do you recall

9    that on direct?

10   A.  Yes.

11   Q.  You said no.  Right?

12   A.  Yes.

13   Q.  Are you sure about that?

14   A.  Yes.

15   Q.  Didn't you buy a fake name for a hundred bucks from

16   somebody who worked in the DMV, the Department of Motor Vehicle

17   Bureau?

18   A.  I didn't buy a fake ID.  The information, yes.

19   Q.  Say it again?

20   A.  No, I didn't buy the fake ID.  The person I worked for.

21   Q.  Did you pay somebody $100 for a name?

22   A.  No, I didn't pay it.

23   Q.  Did he give you a fake name?

24   A.  My name.

25   Q.  Now, do you remember meeting with the government in January

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 125 of 181

E56LBAR4                          Rosario - cross

1   of 2014?  I mean this year, this winter.

2   A.  Yes.

3   Q.  And do you remember telling them the guy from the DMV gave

4   you a false name one time for $100?

5   A.  I don't recall that.

6           MR. BURKE:  May I approach the witness with a

7   document, judge?

8           THE COURT:  Yes.

9           MR. BURKE:  It's 3503-J page 3.

10  Q.  If you can, Mr. Rosario, just take a look at the document.

11  See if it refreshes your recollection.  Just take a look at it.

12  See the part that's underlined in red there?

13  A.  No, it doesn't.

14  Q.  Doesn't bring back anything about you giving someone $100

15  for a false name?

16  A.  No, it doesn't.

17  Q.  But you have used false names in the past, right?

18          MR. COHN:  Your Honor, may I ask the government a

19  question privately?

20          THE COURT:  No.

21          MR. COHN:  Okay.

22  Q.  You have used false names in the past, right?

23  A.  Yes, I did.

24  Q.  What false name have you used?

25  A.  My name.

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 126 of 181

E56LBAR4                         Rosario - cross

1    Q.  Well, isn't your name a real name?

2    A.  It's a real name but I impersonated the name as an officer.

3    Q.  How about when -- let's leave the officer thing aside for

4    right now, right -- how about when you're stopped by the cops,

5    don't you give them a fake name?

6    A.  Yes.

7    Q.  Okay.

8    A.  I remember now, tickets.

9    Q.  What fake name did you give the cops when you got stopped

10   by them?

11   A.  Jose Rosario.

12   Q.  And did you give them a fake date of birth?

13   A.  Yes.

14   Q.  Did you have a fake ID?

15   A.  No, I didn't.

16   Q.  So when you get stopped sometimes, right, you looked at

17   cops and say, hey, it's me, Jose Rivera, right?

18   A.  Jose Rosario, yes.

19   Q.  When did you tell them you're born?

20   A.  The date of birth.

21   Q.  You just pick it out of a hat, what do you pick out?

22   A.  I don't know because it will be somebody that I know.

23   Q.  So you use a friend of yours?

24   A.  Yes.

25   Q.  So you make believe you're a friend of yours?

E56LBAR4                    Rosario - cross

1   A.  Yes.

2   Q.  Jose Rivera, is he a good friend?

3   A.  Yes.

4   Q.  So when you got stopped by cops, you tell them you're Jose

5   Rivera?

6   A.  Rosario.

7   Q.  Jose Rosario?

8   A.  Yes.

9   Q.  Instead of Joseph Rosario?

10  A.  Yes.

11  Q.  Is he your brother or cousin?

12  A.  No, he's not.

13  Q.  Did you think your friend might get in trouble?

14  A.  No.

15  Q.  Is there a reason why you're using a fake name, why don't

16  you give your real name?

17  A.  Because at times my license was suspended for about two

18  years.

19  Q.  Now, besides Jose Rivera --

20          THE COURT:  Rosario.

21  Q.  -- Rosario, right, you've used some other fake names,

22  right?

23  A.  Yes.

24  Q.  What other fake names do you think you used?

25  A.  Carlos Dominguez.

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 128 of 181     155
Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 132 of 181
E56LBAR4                    Rosario - cross

1   Q.  Carlos Dominguez?

2   A.  Mm-hmm.

3   Q.  How many times do you think you used that one?

4   A.  I don't remember how many times.

5   Q.  Again, we're not asking you for an exact number.  A

6   ballpark figure, five times, ten times, any idea?

7   A.  About ten times.

8   Q.  So you get pulled over and just what was that last one,

9   Carlos Dominguez?

10  A.  Yes.

11  Q.  And when you say you're Carlos Dominguez, is he a pal of

12  yours too?

13  A.  Yes, he is.

14  Q.  Do you gave his name and date of birth?

15  A.  Yes.

16  Q.  Any other fake names you use?

17  A.  That's it.

18  Q.  How about this one, how about Luis Gonzalez, how about that

19  name, is that ringing a bell?

20  A.  Yeah, I think I used that a long time ago once.

21  Q.  It's coming back to you a little bit, right?

22  A.  Yeah.

23  Q.  I want you to think back.  Let's go back to last year,

24  March 28 of 2013.  Do you remember getting pulled over by the

25  cops, right, they pull you over for something, I don't know.

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 129 of 181    156
Case 1:21-cv-00683-AT Document 2 Filed 03/10/14 Page 123 of 181
E56LBAR4                         Rosario - cross

1           Do you remember what they pulled you over for on that

2    day?

3    A.  Tinted glass on my windows, yeah.

4    Q.  And you tell them, look, my name is Luis Gonzalez, I was

5    born in 1992; do you remember telling that to them?

6    A.  I remember using the name.  But I don't remember telling

7    them exactly like that, but I used that name.

8    Q.  I'm sorry?

9    A.  I used the name, yes.

10   Q.  Okay.  And do you remember what date of birth you used, do

11   you remember saying, hey, I'm Luis Gonzalez, I was born in July

12   of 1992; do you remember that?

13   A.  Yes.

14   Q.  And you remember telling them 782 Pelham Parkway?

15   A.  Yes.

16   Q.  And that was just picked up out of your head or are you

17   giving your friend's name?

18   A.  I didn't make it up.  That's my friend's name.

19   Q.  Did you have fake ID or just talking to them?

20   A.  No fake ID.  Just talking.

21   Q.  But then they found your real ID under the seat, right?

22   A.  Yes.

23   Q.  So you had to give it up, right?

24   A.  Yes.

25   Q.  So you don't really have a problem with lying to the cops

E56LBAR4                          Rosario - cross

1   or authority until you get caught, right?

2              THE COURT:  Answer.

3   A.  Yes.

4   Q.  Sometimes when you lie, you can get away with it, right,

5   nobody knows?

6   A.  Yes.

7   Q.  Sometimes you've been successful with this fake name thing,

8   right?

9   A.  Yes.

10  Q.  Sometimes you've been successful lying to the authorities,

11  right?

12  A.  Yes.

13  Q.  It can work out good for you sometimes, right?

14  A.  Yes.

15  Q.  Now, when you're lying to the authorities, you don't -- did

16  you ever play poker?

17  A.  No.

18  Q.  No?

19  A.  No.

20  Q.  Well, do you know what a tell is, so you can tell when

21  someone is doing something, when someone is lying?  We can't

22  tell when you're lying, can we?

23  A.  No.

24  Q.  You don't twitch or anything, right?

25  A.  No.

E56LBAR4                          Rosario - cross

1    Q.  You look just the same when you're telling truth and when

2    you're telling a lie, right?

3    A.  I don't know.

4    Q.  Now, you have two open cases in Westchester you pled guilty

5    to?

6    A.  Yes.

7    Q.  And one of them is a credit card fraud of some sort?

8    A.  Yes.

9    Q.  And what, you got a bunch of credit cards and you go

10   shopping with them?

11   A.  Yes.

12   Q.  And did you have a girl who was using your credit card too?

13   A.  No.

14   Q.  You drive for an escort service for a while?

15   A.  After the cab service, yeah.

16   Q.  This was up in Westchester?

17   A.  No.

18   Q.  Manhattan?

19   A.  The Bronx.

20   Q.  And this girl was an escort, so to speak?

21   A.  Yes.

22   Q.  And were you paying for her room?

23   A.  No.

24   Q.  Did she use your name it pay for the room?

25   A.  Yes.

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 132 of 181

E56LBAR4                         Rosario - cross

```
 1   Q.  She was paying you to drive her around?
 2   A.  Yes.
 3   Q.  So you were making a little money with escorts, right?
 4   A.  Was.
 5   Q.  Not anymore, right?
 6   A.  No.
 7   Q.  And when you're going to mall, you went to the mall --
 8   withdrawn, your Honor.
 9           You have the fake credit cards.  You wouldn't go
10   shopping in New York.  Would you go to Jersey?
11   A.  Yes.
12   Q.  And you made what, 15 grand there?
13   A.  Estimated.  Estimated price, yeah, roughly.
14   Q.  You would get a hundred bucks for every computer or
15   something?
16   A.  Yeah.
17   Q.  So it's like you went there like ten times?
18   A.  Like once a day, once a day.
19   Q.  Once a day?
20   A.  Yeah.
21   Q.  Now, when did all this stop, when did you stop doing all
22   this stuff?
23   A.  When I got arrested.
24   Q.  Now, but you've been arrested a bunch of times, right?
25   A.  Yes.
```

E56LBAR4                          Rosario – cross

| | |
|---|---|
| 1 | Q.  And you're not a police officer, right? |
| 2 | A.  No. |
| 3 | Q.  You're not in the police auxiliary, right? |
| 4 | A.  No. |
| 5 | Q.  Do you watch a lot of police shows? |
| 6 | A.  No. |
| 7 | Q.  Let's go back to that.  I think you mentioned this, in |
| 8 | 2009, you're driving a car, it's an old cop car, right? |
| 9 | A.  Yes. |
| 10 | Q.  What is it a Chevy Impala, black? |
| 11 | A.  Yeah, Chevy Impala, black, yeah. |
| 12 | Q.  And you have a police radio in that car? |
| 13 | A.  Yes. |
| 14 | Q.  And you have lights that go on and off, right, like a |
| 15 | siren, like a cop car? |
| 16 | A.  Yeah. |
| 17 | Q.  And you have a siren? |
| 18 | A.  Yes. |
| 19 | Q.  So it's August 31, 2009, you're buy the Cross Bronx and the |
| 20 | Major Deegan, right, it's 2 o'clock in the morning, and you |
| 21 | decide to try your car out, you pull somebody over? |
| 22 | A.  Yeah. |
| 23 | Q.  And you tell them -- did you have a loud speaker in the |
| 24 | car, speaker system? |
| 25 | A.  Yeah, I had a loud speaker in the car. |

E56LBAR4                              Rosario - cross

1    Q.  Like the cops can speak to you, like get over here?

2    A.  Yeah.

3    Q.  What did you say, I'm Detective Rivera, pull over?

4    A.  I didn't use it.  I rolled my window down.

5    Q.  So you were cool with that.  You didn't use the PA system,

6    you just spoke to them?

7    A.  Yeah.

8    Q.  You didn't use the loud speaker?

9    A.  No.

10   Q.  And you used your lights though?

11   A.  The sirens light.  Not the light, the sirens thing.

12   Q.  Just the sirens?

13   A.  Yeah.

14   Q.  You didn't want to be -- you didn't want to be crazy about

15   this.  You just figured you'd put your siren on?

16   A.  It was a short thing.  I didn't think about putting the

17   lights on.

18   Q.  So you pull the guy over.  It's a guy, right?

19   A.  Yeah.

20   Q.  And you tell him, hey, I'm Detective Rivera from the 43

21   Precinct; is that what you said to him?

22   A.  Rosario.

23   Q.  Forgive me.  You said, hey, I'm Detective Rosario, right?

24   A.  Yes.

25   Q.  Now, were you wearing a police outfit or anything?

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 135 of 181

E56LBAR4                    Rosario - cross

```
 1   A.  No.

 2   Q.  Were you wearing regular clothes?

 3   A.  Yes.

 4   Q.  And were you stoned at the time?

 5   A.  Sorry, excuse me?

 6   Q.  Forgive me.  Were you under the influence of any

 7   intoxicants when you did this?

 8   A.  No, I wasn't.

 9   Q.  So you just thought this was a good idea?

10   A.  Sorry, I didn't hear you.

11   Q.  You thought this was a good idea, you were just going to

12   test out your police equipment?

13   A.  No.

14   Q.  What made you pull this person over?

15   A.  I was with a friend and the friend he -- the guy cut my

16   friend off and my friend pretty much told me go mess with him

17   and that's what I did.

18   Q.  So your friend was in the car with you?

19   A.  No, he was driving his own car.

20   Q.  Did he talk to you on the radio or something?

21   A.  He was on the phone.

22   Q.  So if I have it right, your friend is on the phone and he

23   calls you up and says, hey, Mr. Rosario, I got cut off.  Let's

24   do this guy, let's do something, right?

25   A.  Yes.
```

E56LBAR4                          Rosario – cross

1   Q.  Let's pull him over, right?

2   A.  Yes.

3   Q.  Now, this wasn't the first time you did this, right?

4   A.  It was the first time I did that.

5   Q.  You wouldn't fib about that, would you?

6   A.  Excuse me?

7   Q.  This is the first and only time you did this?

8   A.  Pull him over, yes.

9   Q.  So you had bad luck, you got nabbed the first time you did

10  this?

11  A.  Yes.

12  Q.  Did you make the guy get out of the car?

13  A.  No.

14  Q.  Because it turned out he was a real cop, right?

15  A.  Yes.

16  Q.  Now, he's a real cop.  You end up getting busted, right?

17  A.  Yes.

18  Q.  Other cops come; is that right?

19  A.  Yes, yes.

20  Q.  And they ask you about this incident, right?

21  A.  Yes.

22  Q.  They say, hey, what's happening, what are you doing here,

23  right?

24  A.  Yes.

25  Q.  And you tell them, look, I thought the guy was drunk.  I

Case 1:21-cv-01334-AT   Document 2   Filed 02/16/21   Page 137 of 181        164
Case 1:21-cv-00684-AT   Document 2   Filed 06/16/14   Page 137 of 181
E56LBAR4                    Rosario - cross

1   was just trying to make sure he was okay.  Isn't that what you
2   told the cops?
3   A.  I don't recall.
4   Q.  I'm just going to ask you to take a look at this.  If you
5   could just take a look at this, Mr. Rosario.  Just take a look
6   at that.  See if it refreshes in your memory what you said to
7   the cops when he came to talk to you.
8   A.  I really don't recall this because I didn't write this.
9   Q.  So you don't remember telling the cops, hey, I thought this
10  guy was drunk so I figured I better check him out?
11  A.  I don't remember that.
12  Q.  What did you tell the cops when they asked you why did you
13  pull him over, what did you tell them?
14  A.  I told him the reason I pulled him over is because he cut
15  off my friend.
16  Q.  Was your friend there?
17  A.  My friend had drove by.
18  Q.  Your friend was gone, right?
19  A.  Yeah, he was gone.
20  Q.  Did you tell him your friend's name?
21  A.  No.
22  Q.  I mean isn't it a fact that -- I want you to think back --
23  you told him, look, I pulled the guy over because I thought he
24  was drunk, you made up a story and gave it to them?
25  A.  I don't remember that.  I really don't.

Case 1:21-cv-00633-AT  Document 2  Filed 03/30/21  Page 142 of 181

E56LBAR4                          Rosario - cross

1    Q.  You don't really remember what happened?

2    A.  No.  It was a late night.  I don't really remember.

3    Q.  It's a late night and you're impersonating a cop for the

4    first time and you just can't really remember what you said to

5    them sometimes, right?

6    A.  I don't remember.

7    Q.  Now, you have two cases in Westchester you pled guilty to,

8    right?

9    A.  Yes.

10   Q.  One is for credit cards, right?

11   A.  Yes.

12   Q.  And one is for -- what's the other one for?

13   A.  AUO in the first degree suspended license.

14   Q.  Like having your license suspended like 200 times or

15   something, there's some specific number, it's something like

16   that?

17   A.  Suspended license, yes.

18   Q.  And you haven't been sentenced on those cases, right?

19   A.  No.

20   Q.  And are you negotiating a plea in those cases?

21   A.  Promised sentence was one to three state prison.

22   Q.  Now, is there a chance you can do better than that?

23   A.  I don't get it.  Better than what?

24   Q.  Well, you're testifying here today, right?

25   A.  Yes.

E56LBAR4                          Rosario - cross

1    Q.  And you haven't been sentenced on these cases yet, right?

2    A.  Yes.

3    Q.  And when did you take the plea in those cases?

4    A.  A few months back I took a plea.  I don't remember exact

5    time, but it was this year.

6    Q.  And postponing the sentence?

7    A.  No.  I took the plea.  I had to do probation report, and I

8    get sentenced at the end of June.

9    Q.  You're hoping not to go to jail somehow, right?

10   A.  No.

11   Q.  You want to go to jail?

12   A.  I don't want to go to jail.

13   Q.  And you were on probation before, right?

14   A.  Yeah.

15   Q.  And that was from this whole pulling the cops over thing,

16   right?

17   A.  Yes.

18   Q.  And you got probation, and how did that go on probation?

19   A.  I maxed out three years probation.

20   Q.  Now, you drove -- I'm talking about now October of 2006.

21   You drove to 158th Street in Manhattan, right?

22   A.  I drove there.  I don't remember the date, but yeah.  I

23   drove to.

24   Q.  And then you drove away from that scene, right?

25   A.  Yes.

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 140 of 181    167
Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 140 of 181
E56LBAR4                          Rosario - cross

1  Q.  And you got some weed from that?

2  A.  At the end of the drop off, yeah, I got a little bit of

3  weed.

4  Q.  And you got a little bit of money too, right?

5  A.  Yeah, I don't remember how much, a little bit.  He had owed

6  me though, yeah.

7  Q.  K had your money, right?

8  A.  Yeah.

9  Q.  So you drove to this place where you heard a gunshot,

10  right?

11  A.  Yeah.

12  Q.  You drove away from it, right?

13  A.  Yeah.

14  Q.  And you got some money for that and you got some weed for

15  that?

16  A.  Yeah.

17  Q.  And as you sit here today, you're not charged with a

18  federal robbery conspiracy, are you?

19  A.  No.

20  Q.  You're not charged with a federal robbery, are you?

21  A.  No.

22  Q.  Now, when you drove on that day, you didn't know what was

23  going on, did you?

24  A.  No, I didn't.

25  Q.  You thought maybe they're going to buy some weed, right?

E56LBAR4                         Rosario - cross

1    A.   Yes.

2    Q.   You didn't know what was going on, correct?

3    A.   Correct.

4    Q.   Now, Oneil Douglas, Smash, you know him, right?

5    A.   Smash, yeah.

6    Q.   And he had had a black Magnum, right?

7    A.   It was a black Magnum, yes.

8    Q.   You seen him driving it?

9    A.   No, I didn't see him drive it.

10   Q.   Now, when you first started driving as a taxicab driver,

11   sometimes you'd have somebody with you in the car and help you

12   navigate, right, so you didn't get lost?

13   A.   The first week I had somebody, yeah, that used to help me

14   get around the area.

15   Q.   I want you to think back to this day on 158th Street.  Did

16   you have somebody else helping you drive that day?

17   A.   No.

18   Q.   A friend of yours in the front of the car?

19   A.   Nobody was with me.

20   Q.   Are you sure?

21   A.   I'm positive.

22   Q.   Now, I think you mentioned that after this incident, right,

23   when you hear the gunshot, right, I think you said Oneil got

24   out of your car; is that right?

25   A.   Can you refer to nicknames?

Case 1:21-cv-01334-AT   Document 2   Filed 02/16/21   Page 142 of 181

E56LBAR4                    Rosario – cross

1    Q.  Smash.

2    A.  All right.

3    Q.  Is that correct?

4    A.  Correct, all right.  Can you now repeat the question?

5    Q.  After this incident, when you hear the gunshot, right?

6    A.  Yes.

7    Q.  Smash gets out of your car, right, correct, you drive like

8    a block or two and you let him off?

9    A.  Talking about Manhattan?

10   Q.  Manhattan.

11   A.  Okay.

12   Q.  D'Angelo, the dead guy we're talking about that.  All

13   right?

14   A.  Yeah.

15   Q.  All right.  You're leaving there and you stop on Amsterdam

16   Avenue, right?

17   A.  Yes.

18   Q.  And Amsterdam Avenue on 158th is what, like 400 feet away

19   from where you were parked right down the block?

20   A.  Yes.

21   Q.  Where is St. Nicholas?

22   A.  St. Nichols?

23   Q.  158th and St. Nicholas, do you know where that is?

24   A.  Nicholas?

25   Q.  Yeah, okay.

E56LBAR4                          Rosario - cross

```
 1    A.  Nicholas, yes.

 2    Q.  Where is that?

 3    A.  St. Nicholas is after Amsterdam.

 4    Q.  Okay.  And after you let Smash out of your car in

 5    Manhattan, I think it was your testimony when you testified on

 6    direct that you saw him later on 169th Street, right?

 7    A.  Yes.

 8    Q.  Now, do you remember telling the NYPD detectives on

 9    April 18, 2007, that after Oneil, Smash, gets out of your car

10    at 158th and St. Nicholas Avenue, you didn't see him after

11    that; do you remember telling them that?

12    A.  No.

13    Q.  Approaching with 3503-B, page 2.  I want you to take a look

14    at that.

15    A.  Yeah.

16    Q.  All right.  I want you to think back.  When you talked to

17    the police in 2007 on this day, you told them you never saw

18    Smash again, right, you never told them you saw Smash at

19    169th Street?

20    A.  No.  But what I said was I think he jumped out of the car

21    and he got in another car, he wasn't in my car no longer.  We

22    all went up to 169th Street and Boston Road.  That's where

23    everybody does the split.

24    Q.  Isn't it true in the past -- excuse me.

25            MR. BURKE:  May I approach the witness?
```

E56LBAR4                        Rosario - cross

1          THE COURT:  You may.

2     Q.  If you could take a look at the third page of the document.

3          THE COURT:  Is there a question before the witness?

4     Q.  Sure.  When you talked to the police in 2007, you didn't

5     tell them that you saw Smash again after you left the shooting,

6     did you?

7     A.  So I'm reading this or you want me to answer that?

8     Q.  You signed on page 3, did you sign that statement?

9          THE COURT:  Wait a minute.  There's now a second

10    question before him.

11         MR. BURKE:  I'll withdraw the first one.

12         THE COURT:  Okay.

13    Q.  When you met with the police in April of 2007, did you sign

14    the statement?

15    A.  I signed this statement.

16    Q.  Okay.  And in that statement did you tell them --

17         THE COURT:  Are you seeking to have the statement

18    admitted?

19         MR. BURKE:  No, I am not.

20         THE COURT:  All right.  So don't ask him to read from

21    it.

22    Q.  So I want you to think back again.  When you first spoke to

23    the police in April 2007, you didn't tell them you went to

24    169th Street after this job, did you?

25    A.  I don't recall, but I told them.

Case 1:21-cv-00534-AT Document 2 Filed 02/16/21 Page 145 of 181

E56LBAR4                          Rosario - cross

1  Q.  You didn't tell them that you got pot, did you?

2  A.  Yes, I did.

3  Q.  In April of 2007, you didn't tell them you got any pot, did

4  you?

5  A.  I said I had a little bit, they gave me a little bit of

6  weed, a little bit of cash, and he had owed me the rest.

7  Q.  You didn't tell them until years later though, right?

8  A.  I did tell them that.

9          MR. BURKE:  One moment, Judge.

10  Q.  When you testified in the grand jury, did you tell them you

11  got weed when you testified in the grand jury?

12  A.  I don't recall, but I said it and so the paper, the

13  statement.

14  Q.  You don't remember what you said, right, about the weed?

15  A.  I always said that I got weed off of this and a little bit

16  of money and they had owed me the rest of the money.  That's

17  when I drove them back uptown, White Plains.

18          MR. BURKE:  No further questions, Judge.

19          MR. COHN:  May I, your Honor?

20          THE COURT:  Yes.  Cross-examination by Mr. Cohn.

21  CROSS-EXAMINATION

22  BY MR. COHN:

23  Q.  You just talked to Mr. Burke about getting a little money

24  and a little weed after the shooting incident from K; is that

25  right?

1    A.  Yes.

2    Q.  Correct me if I'm wrong, but on direct didn't you say that

3    you didn't get any money at all and you just got weed?

4    A.  I got weed and a little bit of money.

5    Q.  Pardon?

6    A.  I got weed and a little bit of money.

7    Q.  The question, sir, is on direct testimony was your

8    testimony that you didn't get any money, you got only got some

9    weed and that you gave it to a friend, do you recall?  Do you

10   recall your testimony of half an hour ago?

11               Apparently not.  I'll withdraw --

12               MR. MAIMIN:  Objection, your Honor.

13               THE COURT:  So you're not to answer for the witness.

14   Only ask questions.

15               And you did not answer.  So answer the question.

16   Q.  Now --

17               THE COURT:  Counsel, I've directed the witness to

18   answer.

19               MR. COHN:  Fine.

20   A.  Okay.  I do not recall the whole thing.  But I said it

21   before, I had a little bit of weed, I received a little bit of

22   weed that I gave to my friend, and I also received a little bit

23   of cash and there was a balance what they had owed me, which

24   was never paid.

25   Q.  You said, did you not, that you gave the weed to a friend;

E56LBAR4                    Rosario - cross

1   is that right?

2   A.  Yes.

3   Q.  Did you smoke weed?

4   A.  No, I don't.

5   Q.  You don't smoke at all?

6   A.  No.

7   Q.  People are in your cab all the time smoking weed and you

8   don't do anything?

9   A.  I don't do it.

10  Q.  Do you remember that you testified that the -- you knew

11  that the bag that they came out of the house building with had

12  weed in it because of the smell from the bag?

13  A.  Yes.

14  Q.  And you testified, did you not, that they had been smoking

15  weed before they got out of the car, right?

16  A.  Yes.

17  Q.  And didn't the place already reek from marijuana smoke

18  before they got out of the car?

19  A.  Yes.

20  Q.  And so you could distinguish the smell from the new

21  marijuana from the smoked marijuana, yes?

22  A.  Yes.

23  Q.  Now, this marijuana or weed, as you call it, which you

24  don't smoke, you gave to a friend.

25          Let me ask a question:  How long was were you engaged

E56LBAR4                          Rosario - cross

1   with K and dreads that night?

2   A.  Hours.

3   Q.  Hours.  At $35 an hour, which was your rate; is that right?

4   A.  Yes.

5   Q.  And would you estimate how many hours it was?

6   A.  Approximately four hours.

7   Q.  Four hours.  So if you got your $35 an hour, that would

8   have been $140; is that right?

9   A.  Yes.

10  Q.  And during that period you were driving what kind of car?

11  A.  Dodge Magnum.

12  Q.  Is that a gas guzzler?

13  A.  No, it wasn't.  Six cylinder.

14  Q.  Six cylinder.  But you used gas, right?

15  A.  Yes.

16  Q.  And you, well, you got a little bit of money.  How much

17  money did you get, enough to pay for your 140 bucks?

18  A.  No, not enough for that.

19  Q.  How much, $20, $10?

20  A.  I don't recall how much.

21  Q.  Isn't it a fact, sir, that you took the weed which you

22  don't smoke and you sold it to make up for the $140 you didn't

23  get?

24  A.  I didn't do that.

25  Q.  Pardon?

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 149 of 181
Case 1:21-cv-06634-AT  Document 2  Filed 06/10/21  Page 153 of 181    176
E56LBAR4                        Rosario - cross

1   A.  I did not.

2   Q.  You did not.  You deny that?

3   A.  Yeah, I deny that.

4   Q.  That would be unlawful, right, selling grass is against the

5   law?

6           That was a question, I guess.

7   A.  That was a question?

8   Q.  Yeah.

9   A.  Yeah, it's unlawful.

10  Q.  And therefore you wouldn't do it, right?

11  A.  Gave it to my friend.  I didn't do it.  I didn't sell it.

12  Q.  You know that giving it to a friend is the same under the

13  law as selling it?

14          MR. MAIMIN:  Objection.

15          THE COURT:  Sustained.  He doesn't have a law degree.

16  Q.  Did you give a statement, going back to whether or not you

17  got money, did you give a statement to the either the

18  prosecutor or the detectives on August 24, 2009 -- and that's

19  3503-F, Mr. Maimin -- did you give such a statement?

20  A.  I get to see the statement?

21  Q.  I'm asking you if you gave one.  If you don't remember,

22  I'll show it to you and you'll refresh your recollection.

23  A.  I don't remember.

24  Q.  Fine.

25          MR. COHN:  May I, your Honor?

E56LBAR4                          Rosario - cross

1          THE COURT:  You may.

2     Q.  Showing you what's been marked as 3503-F as in frank and

3     ask you to look at the date on it at the top and ask you if

4     that refreshes your recollection?

5     A.  I really can't understand this handwriting.

6     Q.  Excuse me?

7     A.  I can't understand the handwriting.

8     Q.  I'm asking you to look at the date.  You can't?

9     A.  I don't remember the date.

10    Q.  You don't remember.  It doesn't help.  Okay.

11         Do you recall ever making a statement to a policeman

12    that tall guy came out with money but said he wouldn't give it

13    to me and would give it to you another day; did you ever say

14    that?

15    A.  A tall guy came out with money?

16    Q.  That was the tall guy from the robbery.

17    A.  K?

18    Q.  If he fits the tall guy description, yes.  Did K say that

19    to you?

20    A.  He said that he don't have money, that he'll give it to me,

21    yeah, that he don't have enough money to cover for everything.

22    Q.  So the answer to my previous questions was on the date in

23    question, he didn't give you money, he gave you grass and he

24    promised to give you money on another day; is that fair?

25    A.  No.

E56LBAR4                      Rosario - cross

1    Q.  No, it's not fair.

2              MR. COHN:  Your Honor, now may I ask the government a

3    question privately?  It's about who was --

4              THE COURT:  Counsel, if you need to discuss something

5    with your adversary, do it before or after, not while we have

6    the trial going on.

7              MR. COHN:  Okay.

8    Q.  Let's talk about your pulling this guy over and pretending

9    you're a cop, right.  Why did you buy a police car?

10   A.  Because it was cheap, the price.

11   Q.  How much did you pay for it?

12   A.  2500.

13   Q.  And was it made more attractive because it had the sirens

14   and the lights and whatever else it had?

15   A.  I didn't know about that until I actually bought the car.

16   Q.  When you bought it, did you contemplate, did you think that

17   it would be okay for you to impersonate a police officer?

18   A.  Never crossed my mind.

19   Q.  Pardon?

20   A.  Never crossed my mind.

21   Q.  Never crossed your mind.  Isn't it a fact, sir, that when

22   you pulled this guy over who turned out to be a cop, the reason

23   you pulled him over because you wanted to solicit a bribe?

24   A.  Solicit -- I don't understand.

25   Q.  Didn't you intend to say to him, look, I can give you a

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 152 of 181

E56LBAR4                        Rosario - cross

```
 1   ticket, but if you give me money, I won't?
 2   A.  No, never.
 3   Q.  Never occurred to you?
 4   A.  Never.
 5   Q.  It was just because somebody had cut off your buddy?
 6   A.  Yes.
 7   Q.  Were you armed?
 8   A.  No.
 9   Q.  Have you ever possessed a gun?
10   A.  No.
11   Q.  Let's talk about the statement that you gave on the night
12   that you were arrested with K and the guy with dreads on the
13   16th of October, 2006, okay.
14           Now, first of all, you said you were in a cell with K
15   and the guy with the dreads, right?
16   A.  Yes.
17   Q.  He was shot in the leg, right?
18   A.  Yes.
19   Q.  The cops just threw him in a cell, didn't take him to the
20   hospital, you were with him the whole time?
21   A.  Yes.
22   Q.  You saw him bleeding from a shot in the knee, right?
23   A.  Yes.
24   Q.  Now, you were in the front seat.  He was in the back seat.
25   Is that right?
```

Case 1:21-cv-00583-AT Document 22 Filed 06/10/21 Page 153 of 181

E56LBAR4                      Rosario - cross

1    A.  Yes.

2    Q.  And is it fair to say, sir, that by looking directly back

3    through the rear view mirror, his knee is below the line of

4    sight that you could see, yes?

5    A.  I didn't look through the rear view.  I just turned my

6    head.

7    Q.  You turned around while you were driving and looked back to

8    see if he was bleeding; is that right?

9    A.  Yeah.

10   Q.  Remind me not to ride in your car.

11           MR. MAIMIN:  Objection, your Honor.

12           THE COURT:  Sustained.  Don't testify.

13   Q.  And you said that that night or whenever it was that you

14   made that statement, that statement was to an assistant

15   district attorney, right?

16   A.  Yeah.

17   Q.  And there was a police officer there, right?

18   A.  Yes.

19   Q.  And did you know that it was being put on video?

20   A.  Yeah.

21   Q.  Was there a videographer, somebody who takes the video in

22   the room, or was it just the camera by itself?

23   A.  I don't remember.

24   Q.  Pardon?

25   A.  I do not remember.

E56LBAR4                          Rosario - cross

1    Q.  Okay.  And you said that in saying that you had never met

2    K, met the dread lock guy, that you were confused about who

3    they were talking about; is that right?

4    A.  Can you repeat that question again?

5    Q.  You testified when Mr. Maimin asked you why you had said

6    that you had never seen the guy with dreads before is because

7    you thought that they were talking about the other guy who had

8    run away; is that right?

9    A.  Yeah.  Confused, yeah.

10   Q.  And you were confused.  Were you asked -- and this is on

11   page 10 of the transcript -- the following questions and did

12   you give the following answers:

13           And when did you first notice that he was shot?

14           You:  When.

15           Now, the guy who was shot with the dreads, right?

16   A.  Yeah.

17   Q.  When.  ADA said yeah.  And then you said:  The moment he

18   got in my car, he's laying, not laying down, but tucking down

19   this and that.

20           Right, you were asked that question and you gave that

21   answer, right?

22   A.  Yeah.

23   "Q.  And you'd never seen him before, the person who got shot

24   in the back -- in the back of the -- in the leg.  Had you ever

25   seen him before?

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 155 of 181    182
Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 159 of 181
E56LBAR4                    Rosario - cross

1  "A.  No, never.  No, I don't know him.  Never seen him before."

2          Gave that question and that answer?

3  A.  Yeah.

4  Q.  But you were confused, you were talking about somebody

5  else?

6  A.  I was -- on one occasion I was confused, and the other one

7  I was trying to speed up the process and go back into my cell.

8  Q.  Sir, did you think they were talking about somebody else or

9  that somebody else had been shot in the leg and there was some

10  confusion about who it was?

11  A.  I got confused, yes, I did get confused.

12  Q.  Pardon?

13  A.  I got confused.

14  Q.  So you didn't tell a purposeful lie.  If you understood who

15  it was, you would have told them that you saw him the week

16  before?

17  A.  And another one I just said it so I wouldn't get looked at

18  like I was hanging out with the leader.

19          (Continued on next page)

20

21

22

23

24

25

E56ebar5                          Rosario - cross

1    BY MR. COHN:

2    Q.  Now, the first time you saw him was the night you heard a

3    shot and they came out with the drugs -- that was, for your

4    information, if it will help, on October 6, 2006 -- is that

5    right?  That's the first time you ever saw him?

6             MR. MAIMIN:  October 6th?

7    Q.  In any event, whatever the date was -- the government says

8    to me I misstate the date -- but whatever date that was it

9    was -- the first time you saw him was the date of the shooting,

10   and they ran out with a bag of dope, is that right?

11   A.  We're talking about who again?

12   Q.  Pardon?

13   A.  Who are we speaking about?

14   Q.  It was October 11th.  I'm sorry.

15            October 11th you drove K and Smash and the guy with

16   dreads around, and they went into the building on 158th Street,

17   and there was a shot and they came running out.  And they had

18   stolen some grass, right?

19   A.  Yeah.

20   Q.  And so you knew there had been a robbery and a shooting,

21   right?

22   A.  After I heard the gunshots.

23   Q.  Yeah.

24   A.  I'm assuming, yeah.

25   Q.  Right.  But you drove them wherever it was.  Did you get

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 157 of 181

E56ebar5                      Rosario - cross

1    paid for that job?

2    A.  That's the job I was talking about that I got little bit of

3    weed.

4    Q.  I see.

5    A.  And --

6    Q.  So you took money -- or you took the weed, which was the

7    proceeds of a robbery, right?  I mean, you knew that.

8    A.  I got the weed, yes.

9    Q.  Right?  And, therefore, you were in possession of stolen

10   property, which happened to be grass, which was illegal to own

11   anyway, right?

12   A.  Yes.

13   Q.  And you knew that somebody had been shot, right?

14   A.  No.

15   Q.  You knew that there was a shooting, that somebody fired a

16   shot, right?

17   A.  Heard a shot, yes.

18   Q.  And you know that firing a shot in a building is not a good

19   thing to hear, right?

20   A.  It's not.

21   Q.  And so five days later or six days later you accepted a job

22   from K to go wandering around with guys, and there was a

23   shooting, and you had done that, too, right?

24   A.  When I got -- yes.

25   Q.  Well, I mean, if you knew these were criminals who were --

Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 158 of 181      185
Case 1:21-cv-01334-AT  Document 2  Filed 02/16/21  Page 158 of 181
E56ebar5                          Rosario - cross

1  had been involved in a robbery, why did you do that?

2  A.  At that time I wasn't introduced as -- they didn't tell me

3  they was going to rob somebody.  They just told me --

4  Q.  You knew they had robbed somebody, according to you?

5          MR. MAIMIN:  Objection.  Can you let the witness

6  answer?

7          THE COURT:  Overruled.  Overruled.

8          MR. MAIMIN:  He cut off the witness, your Honor.

9          THE COURT:  So if you -- do you need to finish your

10  answer?

11          THE WITNESS:  Yeah, I'm done.

12  BY MR. COHN:

13  Q.  You knew that they had robbed somebody, if we believe your

14  story, right?

15  A.  Yes.

16  Q.  And here you were driving them around again, right?

17  A.  Yes.

18  Q.  And according to you, you had been driving K around a few

19  times in between the robbery and the night of the 16th, or the

20  day of the 16th, is that right?

21  A.  No, it's not.

22  Q.  When you talked to the District Attorney on the 16th, you

23  told the District Attorney -- the assistant District Attorney

24  that you had driven him around four or five times over those

25  five days, did you not?  Didn't you tell him that?

Case 1:21-cv-00634-AT Document 2 Filed 06/10/14 Page 159 of 181

E56ebar5                    Rosario - cross

```
1    A.  In total, yes, but not after that.

2    Q.  Wait, I'm -- you told them that between the -- you said in

3    the last five days.  This was the 16th you made this statement.

4    You said in the last five days, you had picked up K some number

5    of times, is that right?  That's what you told them?

6    A.  I said I picked them up a few times.  I told them.  That's

7    it.

8    Q.  Was that true or was that false?

9    A.  I picked them up a few times.  That was true.

10   Q.  So, in fact, between the time of the robbery and the time

11   of the shooting, when you were arrested, you had picked up K a

12   few times and driven him wherever he wanted to go, right?

13   A.  Picked him up one time after that.

14   Q.  One time after that.  Now, you said on the 16th you saw K

15   extend his arm and -- out the window, is that right?  And you

16   never saw a gun that night, is that right?

17           THE COURT:  Well, there's two questions now.  If

18   you'll answer --

19           MR. COHN:  Withdraw the second one.

20   Q.  You said you saw K extend his arm outside the window, and

21   you demonstrated that to Mr. Maimin, right?

22   A.  Yes.

23   Q.  And have you said that you never saw a gun that night?

24   A.  That night I didn't see a gun -- yeah, I saw the gun --

25   Q.  Pardon?
```

Case 1:21-cv-01334-AT Document 2 Filed 02/16/21 Page 160 of 181
E56ebar5                         Rosario - cross

1  A.  I seen the glare of the gun, the whole gun.  I didn't see

2  the whole gun.

3  Q.  I see.  Did you see -- when the gun was on the extended arm

4  out the window, did you see a muzzle flash?

5  A.  I seen the muzzle flash and the glare of the metal.

6  Q.  Now, K, you've described K in the past as a tall guy, is

7  that right?

8  A.  Yeah.

9  Q.  How tall do you think he is?

10 A.  Six feet.

11 Q.  Pardon?

12 A.  Six foot.

13 Q.  Just six feet or taller?

14 A.  I wouldn't --

15 Q.  How tall are you?

16 A.  Five eleven.

17 Q.  Is he taller than you are?

18 A.  Yes.

19 Q.  Couple of inches taller, three inches taller?

20 A.  I don't remember that.

21 Q.  Well, if you're looking at him face to face, do you notice

22 his eyes are higher than your eyes?

23 A.  Yeah.  He's taller than me.  Yes.

24 Q.  How much taller?

25 A.  I wouldn't know.

E56ebar5                    Rosario - cross

1    Q.  You don't know.  What about the guy with the dreads?  Do

2    you know if he's taller than you, shorter than you?

3    A.  I don't -- I don't know.

4    Q.  You were in a cell with him for hours.  You have no idea?

5    A.  At that time they were taller than me.  I was the

6    shorter -- well...

7    Q.  How tall are you, five eleven?

8    A.  Five eleven, yeah.

9    Q.  And you say that dreads is taller than you, is that right?

10   A.  At that time he was taller than me, yes.

11   Q.  He's as tall as the tall guy?

12   A.  Taller than him is K.

13   Q.  I'm sorry?

14   A.  K was the tallest one.

15   Q.  So if dreads is taller than you, and you're five eleven,

16   dread must be six feet tall and K is taller than that, right?

17   A.  I don't know.

18   Q.  You don't know.

19           MR. COHN:  Bear with me, your Honor.

20   Q.  The notepads or the computers or whatever it is you bought

21   with fake credit cards, you sold them and you said you made how

22   much money?

23   A.  I didn't sell them.  I just gave them back to the person

24   that was handling everything, and I was getting $100 per piece.

25   Q.  How much did you get ultimately?

E56ebar5                              Rosario - cross

1    A.  About 700 to 1,000 bucks a day, depending -- because I

2    don't work every day, but the days I do work.

3    Q.  Have you been charged with any crime for that?

4    A.  Possession of forged instrument.

5    Q.  No.  Have you been charged for stealing computers

6    essentially by buying them with false credit card?  It's a

7    theft or fraud system.

8            MR. MAIMIN:  Objection, your Honor.

9            THE COURT:  Sustained.

10   Q.  Have you been charged with --

11   A.  No.

12   Q.  You haven't.  And you've told the government about that,

13   right?

14   A.  Yeah.

15   Q.  Because they asked you, they said, you have to tell us

16   everything you've ever done wrong; is that right?

17   A.  Yes.

18   Q.  Have they given you an immunity agreement?

19   A.  I don't know.  What is that?

20   Q.  Have they said that what you tell us about what you did

21   wrong, as long as you tell us the truth, we won't charge you

22   with it?  Have they said that to you?

23   A.  No.

24   Q.  So you're here taking whatever risks you have to take in

25   order to cooperate with the government, free gratis for

1 │ nothing?

2 │         MR. MAIMIN:  Objection, your Honor.

3 │         MR. COHN:  Never mind.  I have nothing further.

4 │         THE COURT:  Is there any redirect?

5 │         MR. MAIMIN:  No redirect, your Honor.

6 │         THE COURT:  Okay, sir.  You may step down.  Thank you.

7 │         (Witness excused)

8 │         THE COURT:  And the government will call your next

9 │ witness.

10 │         MR. NAWADAY:  The government will call Brian Nichols.

11 │  BRIAN NICHOLS,

12 │      called as a witness by the Government,

13 │      having been duly sworn, testified as follows:

14 │ DIRECT EXAMINATION

15 │ BY MR. NAWADAY:

16 │ Q.  Good afternoon.  Where do you work?

17 │ A.  48th precinct in the Bronx.

18 │ Q.  What is your title there?

19 │ A.  Sergeant NYPD.

20 │ Q.  About how long have you been a sergeant with the NYPD?

21 │ A.  Little over 20 years.

22 │ Q.  And before that what was your title?

23 │ A.  Police officer.

24 │ Q.  You said you're assigned to the 48th precinct.  Can you

25 │ please describe the geographic boundaries of that precinct.

E5CEBAR2                         Ryan - redirect

```
 1   out.  Is that right?
 2   A.  No.
 3   Q.  Do you remember that question?
 4   A.  Mm-mm, I remember that question.
 5   Q.  And you know if he's convicted in this case, he'll be in
 6   jail and he can't do anything to you?
 7              MR. MAIMIN:  Objection.
 8              THE COURT:  Overruled.
 9   Q.  You know that, don't you?
10   A.  Yes.
11              MR. COHN:  Thank you.  I have nothing further.
12              THE COURT:  All right, then.  No recross?
13              MR. MAIMIN:  No recross, your Honor.
14              THE COURT:  Thank you, ma'am.  You may step out.
15              (Witness excused)
16              MR. COHN:  Your Honor, at this time I would like to
17   read a stipulation to the jury and then play a video.
18              THE COURT:  You may.
19              MR. COHN:  It is hereby stipulated and agreed by and
20   among the United States of America, by Preet Bharara, United
21   States Attorney for the Southern District of New York,
22   Michael D. Maimin and Kan M. Nawaday, Assistant United States
23   Attorneys of counsel, and defendants, Jomo Williams, by and
24   with the consent of his attorney, Frederick H. Cohn, Esquire,
25   Khalid Barbee, by and with the consent of the attorney John M.
```

E5CEBAR2                        Ryan - redirect

Burke, Esquire, that Williams Defense Exhibit F, as in Frank,

contains three excerpts of a video recorded statement made by

Joseph Rosario on or about October 16, 2006, which excerpts are

time stamped respectively:  One, 13 minutes to 13 minutes and 6

seconds; two, 15 minutes, 48 seconds to 16 minutes, 12 seconds;

and three, 16 minutes, 56 seconds, to 17 minutes and 20

seconds.

          It is further stipulated and agreed that this

stipulation and Williams Defense Exhibit F may be admitted into

evidence at the trial.

          And, your Honor, because of some problems we don't

have the actual disk we're going to introduce; we will just

have the excerpts.  But the government is going to play the

relevant portions from what we deem to be Exhibit F, and for

which we will substitute, and I offer the stipulation as

Defense Exhibit G.

          THE COURT:  So the stipulation is G, and the disk will

be?

          MR. COHN:  The particularized disks will be F, disk

will be F.

          THE COURT:  The disk will be F, which I will deem

admitted, and the stipulation is G.  Both items are admitted.

          (Defendant's Exhibits F and G received in evidence)

          MR. COHN:  And your Honor may recall that the entire

disk has been, in fact, up to now been Court Exhibit 1.

Case 1:21-cv-01334-AT Document 25 Filed 02/16/21 Page 166 of 181   641
Case 1:12-cv-00603-AT Document 25 Filed 03/08/14 Page 45 of 74
E5CEBAR2                    Ryan - redirect

1          THE COURT:  Yes.

2          Members of the jury, you may recall that Jose Rosario,

3    the cab driver, testified that on October 16, 2006, he had a

4    conversation with a Bronx County Assistant District Attorney.

5    That conversation was videotaped, and a portion of the

6    videotape is going to be played now.

7          The statements made by Mr. Rosario in the video are

8    not being offered for the truth of the matter asserted but,

9    rather, for the limited purpose of impeachment.  As I will

10   explain in greater detail tomorrow, that means that you may not

11   conclude that the witness told the truth in this video or in

12   these video statements and acted accordingly.  Rather, you can

13   consider these video statements solely in evaluating the

14   witness' credibility when he testified before you on the stand.

15         MR. COHN:  If the government will have the paralegal

16   play those excerpts, identifying each one as it's played, I

17   would appreciate it.

18         MR. MAIMIN:  This is the excerpt beginning at 13

19   minutes on the dot.

20         (Video played)

21         MR. COHN:  I think, your Honor, the good equipment is

22   in Afghanistan.

23         Your Honor, may we have a brief recess while we try to

24   solve the technical part of this?  I will have nothing after

25   this.  I will rest.

E5CEBAR2                          Ryan - redirect

1          THE COURT:  Members of the jury, we'll take a pause at
2     this time.  Remember that you're not allowed to discuss the
3     case amongst yourselves or with anyone else.  Don't permit
4     anyone to discuss the case in your presence.  I don't think
5     this will take terribly long, so I don't want you to leave the
6     courthouse.  I want you to remain in the courthouse here in the
7     jury room.
8          (Jury excused)
9          MR. NAWADAY:  Your Honor, may we give it a go?
10         MR. KWOK:  Your Honor, if we can have a moment.
11    Mr. Cohn is seeing if our rebuttal case can be done by
12    stipulation.
13         THE COURT:  I'm going to allow the jurors to have a
14    few minutes in order to use the bathroom.
15         MR. NAWADAY:  Thank you.
16         MR. COHN:  Thank you, your Honor.
17         (Recess)
18         MR. MAIMIN:  Your Honor, before we bring in the jury.
19    We have fixed the AV issues but I thought it might be a --
20    we're waiting for defendants, I guess.  Sorry.
21         Sorry about that.  We fixed the AV problems.  Before
22    we bring in the jury, Mr. Cohn has generously agreed to
23    stipulate with regard to our rebuttal case, but there's an
24    issue of how far it can go.  And he and I have agreed that the
25    stipulation will read as per your Honor's ruling on the

E5CEBAR2                    Ryan - redirect

1    question that I'm about to ask.

2         We had written out a stipulation stating that

3    Mr. Williams was incarcerated during the entire month of

4    October in 2002, 2003, 2004, 2005, 2007, 2010, 2011, '12, '13

5    and part of October through October 16th in 2009.  We believe

6    that it's relevant because Ms. Ryan kind of went back and forth

7    and ended up saying she doesn't know what other years she spent

8    with Mr. Williams.  It could have been any of the years that we

9    had mentioned.

10        Mr. Cohn believes that -- and I'll let him speak for

11   this if I don't state it right -- but because at the end she

12   stated the last time she saw him on an anniversary was 2006,

13   that that list should end in 2006.  So we will alter the

14   stipulation or not, as per your ruling, but we were seeking a

15   ruling from your Honor as to the extent of how late we can

16   prove up Mr. Williams' incarceration in October.

17        MR. COHN:  She said the last time -- she was

18   definitive -- the last one they had was 2006.  Anything after

19   that is irrelevant.

20        In addition, some of the time that they're trying to

21   cite he was in jail being detained on this case, so I don't

22   know that we really want to do that.  But I object to anything

23   after 2006.

24        THE COURT:  I'll let you cite his dates of

25   incarceration for 2006.

E5CEBAR2                      Ryan – redirect

1            MR. MAIMIN:  And before?

2            THE COURT:  Yes.

3            MR. MAIMIN:  Thank you.

4            THE COURT:  Wait a minute.  So who is going to be

5   introducing the stipulation?

6            MR. COHN:  He is.  It's going to be on rebuttal.  It

7   will be a very brief rebuttal case.

8            THE COURT:  All right.  So you're going to rest?

9            MR. COHN:  I am resting, yes.

10            THE COURT:  And then, Mr. Burke, I'll ask you if

11   you're resting.

12            MR. BURKE:  Resting.

13            THE COURT:  All right.  So you may bring in the jury.

14            (Continued on next page)

E5CEBAR2                          Ryan - redirect

 1                  (In open court; jury present)

 2                  THE COURT:  Mr. Cohn?

 3                  MR. COHN:  Your Honor, at this time we're going to try

 4       again.

 5                  THE COURT:  Okay.

 6                  (Video played)

 7                  MR. COHN:  That's it.  Next.

 8                  (Video played)

 9                  MR. COHN:  Thank you, your Honor.  And the defense

10       rests.

11                  THE COURT:  And, Mr. Burke, does Mr. Barbee rest?

12                  MR. BURKE:  Barbee rests.

13                  THE COURT:  Does the government have a rebuttal case?

14                  MR. MAIMIN:  Very brief rebuttal.  With your Honor's

15       permission, I will read a stipulation that has been marked for

16       identification as Government Exhibit 503.

17                  It is hereby stipulated and agreed by and among the

18       parties that Williams was incarcerated during the entire month

19       of October in each of the years 2002, 2003, 2004 and 2005.  It

20       is further stipulated and agreed that this stipulation may be

21       admitted into evidence at trial.

22                  And the government offers Government Exhibit 503.

23                  THE COURT:  It is admitted.

24                  (Government's Exhibit 503 received in evidence)

25                  MR. MAIMIN:  And with that, the government rests.

E5ELBAR3

 1   know to have our computers prepared, if necessary, if there is

 2   request for read back, do you just read back or do you also

 3   send the transcript back?

 4            THE COURT:  I do my read backs in the courtroom with

 5   everyone present.  I do not send a transcript back.

 6            MR. COHN:  Your Honor, just one more thing.  Yesterday

 7   I advised you and your deputy, who's not in the room, that my

 8   phone was broken and, therefore, they couldn't call me on my

 9   cell phone.  I fixed it.  So if your deputy wants to call me,

10   she has the number.

11            THE COURT:  Okay.  Good.

12            MR. NAWADAY:  One last thing.  I apologize, your

13   Honor.  Will the courtroom be open for the next ten, 15 minutes

14   so we can bring up the Government Exhibits that will be going

15   back and go through them with defense counsel, as well as the

16   defense counsel exhibits?

17            THE COURT:  Yes.  All right.  Thank you.

18            MR. MAIMIN:  Thank you, your Honor.

19            (Recess pending verdict)

20            (Jury not present; time noted:  3:23 p.m.)

21            THE COURT:  I want to address a note from the jury and

22   a couple of other issues.  First, good afternoon.

23            I have a note from the jury that states:  We need to

24   be in a room where we can discuss our ideas freely.  We are not

25   arguing or yelling.  We can't whisper.  We are uncomfortable

E5ELBAR3b                    Deliberations

1   that we can be heard.

2           This suggests to me that they may feel that people who

3   are in the courtroom can hear them and that that is causing

4   them to feel uncomfortable.

5           MR. MAIMIN:  Your Honor, if I may, just to add

6   something to this.  I've already discussed this with defense

7   counsel.  The CSO who was on duty just before the CSO who just

8   swapped in with him told me that at one point the jury was loud

9   enough that they could be heard in the courtroom in the

10  hallway, so he stuck his head in and told them they might want

11  to keep it down so they wouldn't be heard there, which I

12  suspect is what caused the note.

13          THE COURT:  And what CSO was that?

14          MR. MAIMIN:  There he is.  That gentleman right there.

15          THE COURT:  No. 1, the CSO is to have no contact with

16  the jurors.  The CSO is not to tell them how quiet or how loud

17  they are to be.  The jury is to be able to discuss, to

18  deliberate freely and openly and to be as loud or as quiet as

19  they want without interference.  And so I am directing the CSO

20  to have no further contact of that nature.  You are not to make

21  comments about how loud they are speaking.

22          Is there any other input?

23          MR. COHN:  Your Honor, if they're uncomfortable, for

24  whatever reason they're uncomfortable, we stay away from the

25  door because we don't want to overhear anything.  But I happen

E5ELBAR3b                    Deliberations

1    to know that Judge Duffy is not doing anything and won't for

2    the foreseeable few days and he has a huge jury room on the top

3    floor on 26 and that I'm sure he would lend it to them if you

4    wanted the jurors to deliberate there.  I just came from his

5    chambers so I know that there's nothing going on.

6                THE COURT:  We have a couple of options.  One is to

7    move the jurors, or to clear the courtroom and for me to inform

8    them that the courtroom is cleared so that they know that no

9    one is possibly overhearing them.

10                MR. MAIMIN:  Your Honor, I'm largely indifferent.

11    Moving them up to Judge Duffy's courtroom would be

12    inconvenient, but it may end up making them more comfortable.

13    I really defer to your Honor.  I think at this point the genie

14    is out of the bottle and we have to address the note in some

15    way, but I'm open minded.

16                THE COURT:  So I'm going to ask Ms. Ong to inquire as

17    to the availability of Judge Duffy's deliberation room.

18                The second thing is that a few minutes before

19    5 o'clock I would like everybody to assemble in the courtroom

20    so that I can dismiss them for the day.

21                I am also going to change the status of the alternate

22    jurors.  I'm going to have them on a phone contact status so

23    that I can recall them if necessary, but so that they're not

24    waiting in the courthouse but at home or at their place of

25    business.

E5ELBAR3b              Deliberations

1          MR. MAIMIN:  And, your Honor, just as one question

2     which I think is just so that we understand logistics, if in

3     fact the jury is moved to Judge Duffy's courtroom or to another

4     courtroom, if there are notes or they otherwise need to see

5     this Court or at 5 p.m. today or 9 a.m. tomorrow, are they

6     going to be led through the halls back to this courtroom or

7     will we assemble in the alternative courtroom?

8          MR. COHN:  Well, you're going to have all your

9     material here.

10         THE COURT:  We should assemble here.

11         MR. MAIMIN:  Okay.

12         MR. COHN:  And, your Honor, just as a suggestion

13    because Judge Duffy may inquire how come you're calling him,

14    you can say I was there and I suggested that that might be a

15    reasonable thing to do.

16         THE COURT:  I can also inquire as to the deliberation,

17    other deliberation rooms on this floor.

18         MR. COHN:  There's a trial going on across the

19    street -- across the hall, in A, rather.  And I mean the only

20    reason I suggested Judge Duffy is I know nothing is going to

21    happen up there, you know, for the next few days because I know

22    what Judge Duffy's personal schedule and he's not going to be

23    hearing cases.

24         THE COURT:  All right.  When I do have them moved, do

25    you want me to have them brought into this courtroom to let

E5ELBAR3b                    Deliberations

1    them know that in response to the note that I'm shifting them

2    to another courtroom?

3              MR. COHN:  Yes, and you can tell them, if you would,

4    that none of us are going to be anywhere in the vicinity.

5              THE COURT:  Okay.

6              MR. MAIMIN:  And I think that otherwise that courtroom

7    will be closed from the outer door in so that way they can feel

8    comfortable in their deliberations, even should it echo through

9    the courtroom, that nobody else will be in the courtroom

10   either.

11             THE COURT:  This note was received at 2:57 p.m.  It is

12   not signed by the foreperson.  It is Court Exhibit No. 3.

13             MR. COHN:  Thank you, your Honor.

14             THE COURT:  So I'm just waiting to hear the result of

15   Ms. Ong's inquiry.

16             (Pause)

17             THE COURT:  Judge Duffy's courtroom is not available,

18   unfortunately.  I made the inquiry.

19             However, Judge Cote's jury deliberation room is

20   available and that's 15B as in baby.  Nothing is going on

21   there.  None of the individuals who are in our courtroom or

22   related to this case will go in there, and I'm going to inform

23   the jury of that.

24             I have another note from the jury that came in at

25   3:38 p.m.  I'm making this Court Exhibit No. 4.  It says:  We

E5ELBAR3b                    Deliberations

 1   would like to hear the Jason Elder testimony again, all of it,

 2   if possible.

 3           Do the attorneys know where the Elder testimony is?

 4           MR. MAIMIN:  I believe it was on Friday the 9th.  I

 5   can pull it up right now.  If it makes things easier, one thing

 6   I've done in the past -- and, obviously, it's up to the

 7   Court -- is if your Honor would like, I could run downstairs,

 8   print out the Elder testimony and it will take me five minutes

 9   to go through and have a strike-out through anything that's

10   objected to, testimony where an objection was sustained.

11           THE COURT:  I don't think it's necessary for you to do

12   that.  I think that our reporter is capable of doing that.  But

13   if you would like to review it first, that's fine also.

14           MR. MAIMIN:  Okay.  I think I'll be back in five to

15   ten minutes then with a printout for everybody.

16           MR. BURKE:  It starts on page 534.

17           THE COURT:  Okay.

18           MR. MAIMIN:  I'll be right back, your Honor.

19           (Recess)

20           (Jury not present; time noted:  4:03 p.m.)

21           THE COURT:  I have another note from the jury:  We the

22   jury would like to hear testimony Wednesday of Oneil Douglas

23   from "like taking candy from a baby" to Thursday beginning of

24   cross-examination by Mr. Burke.

25           MR. BURKE:  I'm sorry, Judge?

E5ELBAR3b                        Deliberations

 1              THE COURT:  I will read that again.

 2              We the jury would like to hear testimony Wednesday of

 3     Oneil Douglas from "like taking candy from a baby" to Thursday

 4     beginning of cross-examination by Mr. Burke.

 5              Now, I don't understand what they mean by beginning of

 6     cross-examination, whether they want the testimony before he

 7     began his cross-examination or some or going through some

 8     portion of his cross-examination; and so I'm going to have to

 9     ask them to clarify that.

10              We're still waiting for Mr. Maimin, correct?

11              MR. NAWADAY:  Yes, your Honor.

12              MR. BURKE:  They're referring to I guess Douglas

13     started testifying Wednesday until I started my

14     cross-examination.

15              THE COURT:  No.  They make reference to a specific

16     quote of his, like taking candy from a baby, which I interpret

17     their request to mean starting from when he made that comment

18     to some other point and that's where I need clarification.

19              MR. NAWADAY:  I believe there is a reference to candy

20     on page 337 of the transcript.

21              THE COURT:  I'm going to be in chambers and when

22     Mr. Maimin returns, then we will start with the readback that

23     they have already requested.

24              MR. NAWADAY:  Your Honor, Mr. Maimin seems to be

25     returning to the courtroom.

E5ELBAR3b                    Deliberations

1                (Pause)

2                THE COURT:  During the course of the testimony of

3       Jason Elder, there was a stipulation that was read into the

4       record.  Are you asking that that stipulation be read?

5                MR. MAIMIN:  Your Honor, and Mr. Nawaday checked with

6       defense counsel.  There are two stipulations during the course

7       of the testimony.  Because that's not actually his testimony, I

8       have struck through the stipulations and the offering of the

9       stipulations as well.  I have, however, left in a limiting

10      instruction that your Honor gave about portions of the

11      testimony.

12               And then also just so your Honor can see it if you

13      like because it's almost instantaneous to it and so it's easier

14      for the court reporter for read back, but if your Honor does

15      choose down the road to send things back, I've also printed out

16      a fully redacted version so your Honor can see what it looks

17      like if the strike-outs become fully redacted and you want to

18      send it back to the jury in physical form.

19               THE COURT:  Should they make that request, then I will

20      consider that.

21               MR. MAIMIN:  Okay.

22               THE COURT:  So I'm going to -- defense counsel, you're

23      in agreement with not having the stipulations read in, correct?

24               MR. COHN:  Correct.

25               MR. BURKE:  Correct.

E5ELBAR3b                    Deliberations

1          MR. COHN:  They're fine.  They have them in the jury

2     room.

3          THE COURT:  So I will have the jurors brought in and

4     I'm going to address each note.

5          MR. MAIMIN:  And, your Honor, Mr. Nawaday has just

6     informed me of the new note.  If we want just to make things

7     efficient, I can go down and start redacting the next chunk

8     which we can split out Mr. Burke's part or not depending on how

9     they clarify where they want the end point.

10         THE COURT:  That's fine, but we'll go forward without

11    you.

12         MR. MAIMIN:  That's fine.

13         THE COURT:  We'll be going forward without you.

14         Mr. Cohn.

15         MR. COHN:  It's 4 o'clock.  We think we're going to

16    get to the other one today?

17         MR. BURKE:  No.

18         THE COURT:  We won't get to it.  So that is that.

19         We have the alternates?  We need everyone, absolutely.

20         MR. MAIMIN:  I'm sorry, your Honor.  Are you bringing

21    the alternates in to hear?

22         THE COURT:  Absolutely.

23         MR. MAIMIN:  I don't think that's actually proper

24    because if an alternate is seated, they're supposed to be

25    instructed that all deliberations have to start anew as if

E5ELBAR3b                    Deliberations

1    there were no deliberations yet.

2                THE COURT:  They're not hearing deliberations, they're

3    hearing a readback.

4                MR. MAIMIN:  I understand that, but the readback

5    certainly gives something to the mind of what the deliberations

6    have been thus far.

7                THE COURT:  So under New York State law, which is the

8    law I'm most familiar with, alternates hear all readbacks.

9                And so, defense counsel, did you want to weigh in on

10   this?

11               MR. BURKE:  Judge, when I worked in state court, I

12   mean I let the alternates go as soon as we stopped and they

13   never sit in for readbacks when the jury is impaneled.  So I'm

14   going to request the alternates not be present for any

15   readback.

16               THE COURT:  Mr. Cohn.

17               MR. COHN:  I agree.

18               THE COURT:  All right then.  They will not be present.

19               (Jury present; time noted:  4:13 p.m.)

20               THE COURT:  I have three notes from the jury.  The

21   first states we need to be in a room where we can discuss our

22   ideas freely.  We are not arguing or yelling.  We can't

23   whisper.  We are uncomfortable that we can be heard.

24               First of all, you are entitled to be as loud as you

25   want.  You can laugh out loud, you can argue with each other,

Case 1:21-cv-01334-AT   Document 29   Filed 02/16/21   Page 181 of 181          873
Case 1:1-cv-00803-AT   Document 99   Filed 03/06/14   Page 93 of 96
E5ELBAR3b                    Deliberations

1   you can become intense in your discussions.  It is understood

2   that when a jury is deliberating, there is often heated debate

3   and that is entirely appropriate and you should feel

4   uninhibited in your discussions.

5        And because I have the sense that you feel concerned

6   about that, I'm going to have you transferred to another jury

7   deliberation room on this floor.  It corresponds to a different

8   judge's courtroom.  No one in this room -- not any of the

9   parties, none of the lawyers, and no one in the audience --

10  will be permitted to go into that courtroom.  So you can rest

11  assured you will not be heard by anyone.

12       The next note that I have is we would like to hear the

13  Jason Elder testimony again, all of it, if possible.  In a

14  moment there's going to be a readback by our reporter of that

15  testimony.

16       Then I have a third note.  We the jury would like to

17  hear testimony Wednesday of Oneil Douglas from "like taking

18  candy from a baby" to Thursday, beginning of cross-examination

19  by Mr. Burke.  And this note is signed by the foreperson.

20       So, first of all, going forward, I do want the

21  foreperson to sign all of the notes.  And the first two were

22  not signed.

23       The way that I interpret this third note is that you

24  want the testimony from the point where he mentions this phrase

25  that you've quoted.